United States District Court
Southern District of Texas
**ENTERED**
February 28, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re ENRON CORPORATION | § | |
| SECURITIES, DERIVATIVE & | § | MDL 1446 |
| "ERISA" LITIGATION, | § | |

| | | |
|---|---|---|
| KEVIN LAMPKIN, JANICE SCHUETTE, | § | |
| ROBERT FERRELL, AND STEPHEN | § | |
| MILLER, Individually and on | § | |
| Behalf of All Others Similarly | § | |
| Situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-02-0851 |
| | § | |
| UBS PAINEWEBBER, INC. AND | § | |
| UBS WARBURG, LLC, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

The above referenced putative class action alleges violations of the following securities fraud statutes through Defendants' scheme to optimize revenue in investment banking fees from UBS Securities LLC's corporate client, Enron Corp. ("Enron"), at the expense and defrauding of UBS Financial Service's brokerage retail clients, Lead Plaintiffs Kevin Lampkin, Janice Schuette, Bobby Ferrell, Stephen Miller, Terry Nelson, Diane Swiber, Franklin Gittess, and Joe Brown and similarly situated individuals: §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. §§ 77k, 77l, and 77o, *et seq.*; §§ 10(b) and 20 of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. §§ 78j(b) and 78(t), *et seq.*, and Rule 10b-5, 17 C.F.R. § 240.10b-5;

and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C.§ 78u-4. The 1933 Act claims are brought against UBS Financial Services, Inc. f/k/a UBS Paine Webber, Inc. ("PW") only. #122 ¶¶ 228, 269.

Pending before the Court are (1) a motion to dismiss the Third Amended Complaint,[1] filed by Defendants PW[2] and UBS Securities LLC f/k/a UBS Warburg LLC (Warburg"),[3] (collectively, "UBS Defendants") (Notice of Motion to Dismiss, instrument #125; Memorandum in support, #126); (2) an alternative motion for leave to amend complaint from Lead Plaintiffs Kevin Lampkin, Janice Schuette, Bobby Ferrell, Stephen Miller, Terry Nelson, Diane Swiber, Franklin Gittess, and Joe Brown; (#164);(3) a motion to certify class (#166), filed by Lead Plaintiffs; and (4) an opposed motion for amended scheduling order, for additional briefing, and for a ruling (#223), filed by Plaintiffs.

Plaintiffs in this action have elected to proceed independently of the complaints in the *Newby* and *Tittle* actions in

---

[1] Third Amended Complaint is instrument #122.

[2] PW is a Delaware corporation authorized to do business in Texas and is a wholly owned subsidiary of Switzerland's banking conglomerate UBS AG.  #122 at ¶ 13.

[3] Warburg is a Delaware limited liability company authorized to do business in Texas and also a wholly owned subsidiary of UBS AG.  #122 ¶ 14.
Warburg and PW are collectively referred to as "Defendants." #122 ¶ 15.  Warburg, PW and UBS AG are collectively referred to as "UBS."  *Id.*

MDL 1446.

As housekeeping matters, given the age of this litigation, the lengthy discovery period now closed, and the extensive briefing already filed in this case regarding the claims against the UBS Defendants, the Court denies the motion for amended scheduling order and for additional briefing as unnecessary (#223). In addition because Plaintiffs have already been permitted to file four complaints (#1, 6, 20, and 122), the Court denies their alternative motion for leave to file another (#164). Finally, in light of the issuance of this Opinion and Order, the Court finds that the remaining motion for a ruling (also part of #223) is MOOT.

The Court leaves aside the name-calling, subjective accusations, and denigrating remarks in the various documents it reviews and focuses on the merits of the parties' contentions.

### I.  Standards of Review

**A.  Rule 8(a)**

Federal Rule of Civil Procedure 8(a) states,

A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction, and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may

include relief in the alternative or different
types of relief.

Under the Rule's requirement of notice pleading, "defendants in all
lawsuits must be given notice of specific claims against them."
*Anderson v. U.S. Dept. of Housing and Urban Development*, 554 F.3d
525, 528 (5th Cir. 2008).  While a plaintiff need not plead specific
facts, the complaint must provide "the defendant fair notice of what
the . . . claim is and the grounds upon which it rests." *Bell
Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  If the
complaint lacks facts necessary to put a defendant on notice of what
conduct supports the plaintiff's claims against it, the complaint
is inadequate to meet the notice pleading standard. *Anderson*, 554
at 528.  The complaint must not only name the laws which the
defendant has allegedly violated, but also allege facts about the
conduct that violated those laws.  *Id.*

**B. Rule 12(b)(6)**

When a district court reviews a motion to dismiss pursuant
to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor
of the plaintiff and take all well-pleaded facts as true. *Randall
D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011),
*citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  The
plaintiff's legal conclusions are not entitled to the same
assumption. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)("The tenet
that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions."), *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Hinojosa v. U.S. Bureau of Prisons*, 506 Fed. Appx. 280, 283 (5th Cir. Jan. 7, 2012).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Twombly*, 550 U.S. at 555 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*,556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive

- 5 -

a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974 [550 U.S. at 570]). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b). *Iqbal*, 556 U.S. at 678.

Dismissal under Rule 12(b)(6) is proper not only where the plaintiff fails to plead sufficient facts to support a cognizable legal theory, but also where the plaintiff fails to allege a cognizable legal theory. *Kjellvander v. Citicorp*, 156 F.R.D. 138, 140 (S.D. Tex. 1994), *citing Garrett v. Commonwealth Mortgage Corp.*, 938 F.2d 591, 594 (5th Cir. 1991); *ASARCO LLC v. Americas Min. Corp.*, 832 B.R. 49, 57 (S.D. Tex. 2007). "A complaint lacks an 'arguable basis in law' if it is based on an indisputedly meritless legal theory' or a violation of a legal interest that does not exist." *Ross v. State of Texas*, Civ. A. No. H-10-2008, 2011 WL 5978029, at *8 (S.D. Tex. Nov. 29, 2011).

- 6 -

As noted, on a Rule 12(b)(6) review, although generally the court may not look beyond the pleadings, the court may examine the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010), *citing Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341, 1343 n.6 (5th Cir. 1994). *See also United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003)("the court may consider . . . matters of which judicial notice may be taken"). Taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not transform the motion into one for summary judgment. *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Plaintiffs object to Defendants' attachment of significant amounts of extrinsic evidence to their motion and then arguing fact issues utilizing extrinsic evidence as support, both of which are

inappropriate in a motion to dismiss.[4]  The Court finds this
objection to be unfounded.

"'[D]ocuments that a defendant attaches to its motion to
dismiss are considered part of the pleadings if they are referred
to in the plaintiff's complaint and are central to [its] claim.'"
*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th
Cir. 2000), *quoting Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
987 F.2d 429, 431 (7th Cir. 1993).   "[W]hen a plaintiff does not
attach a pertinent document to the complaint, a 'defendant may
introduce the exhibit as part of his motion attacking the
pleading.'"  *Shepard v. Texas Dept. of Transportation*, 158 F.R.D.
592, 595 (E.D. Tex. 1994); Charles Alan Wright, *et al.*, 5A *Federal
Practice and Procedure:  Civil* § 1327 (3d ed. April 2016 update).
All the documents that Defendants attach to their motion to dismiss
were referenced and relied upon by Plaintiffs in their Third Amended
Complaint, and are central to their claims.  Plaintiffs have not
questioned the authenticity of the documents.  By such attachments
the defendant simply provides additional notice of the basis of the
suit to the plaintiff and aids the Court in determining whether a
claim has been stated.  *Id.* at 499.  The attachments may also
provide the context from which any quotation or reference in the

---

[4] The Court does not address Plaintiffs' arguments about
the pleading standard for scheme liability under Rule 10b-5(a) and
(c) because of the Supreme Court's later rejection of such claims
in *Stoneridge*.

motion is drawn to aid the court in correctly construing that quotation or reference. *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, No. H-04-0087, 2005 WL 3504860, at 11 n.20 (S.D. Tex. Dec. 22, 2005). "Where the allegations in the complaint are contradicted by facts established by documents attached as exhibits to the complaint, the court may properly disregard the allegations." *Martinez v. Reno*, No. 3:97-CV-0813-P, 1997 WL 786250, at *2 (N.D. Tex. Dec. 15, 1997), *citing Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). When conclusory allegations and unwarranted deductions of fact are contradicted by facts disclosed in the appended exhibit, which is treated as part of the complaint, the allegations are not admitted as true. *Carter v. Target Corp.*, 541 Fed. Appx. 413, 417 (5th Cir. Oct. 4, 2013), *citing Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974), *citing Ward v. Hudnell*, 366 F.2d 247 (5th Cir. 1966). *See Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, (7th Cir. 1996)("It is a well settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)(when attached documents contain statements that contradict the allegations in the complaint, the documents control and the court need not accept as true the allegations contained in the complaint.").

**C.  Rule 9(b)**

"Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading," and "requires "only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009).

Rule 9(b) provides,

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person must be averred generally.

"In every case based upon fraud, Rule 9(b) requires the plaintiff to allege as to each individual defendant 'the nature of the fraud, some details, a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants." *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 291 (S.D. Tex. 2001).  In a securities fraud suit, the plaintiff must plead with particularity the circumstances constituting the alleged fraud: Rule 9(b) requires the plaintiff to "'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Southland Securities Corp. v. INspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004), *quoting Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert.*

*denied*, 522 U.S. 966 (1997).   "'In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.'"  *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006), *quoting United States ex rel. Riley v. St. Luke's Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004).

Unlike the alleged fraud, Rule 9(b) allows a plaintiff to plead intent to deceive or defraud generally.  Nevertheless a mere conclusory statement that the defendant had the required intent is insufficient; the plaintiff must set forth specific facts that raise an inference of fraudulent intent, for example, facts that show the defendant's motive.  *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)("Although scienter may be averred generally, case law amply demonstrates that pleading scienter requires more than a simple allegation that a defendant had fraudulent intent.  To plead scienter adequately, a plaintiff must set forth specific facts that support an inference of fraud."); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994).

The particularity requirement of Rule 9(b) also governs a conspiracy to commit fraud.  *Southwest Louisiana Healthcare System v. MBIA Ins. Corp.*, No. 05-1299, 2006 WL 1228903, *5 & n.47 (W.D. La. May 6, 2006); *Hernandez v. Ciba-Geigy Corp. USA*, No. Civ. A. B-

00-82, 2000 WL 33187524, *4 (S.D. Tex. Oct. 17, 2000)("The weight of Fifth Circuit precedent holds that a civil conspiracy to commit a tort that sounds in fraud must be pleaded with particularity."); *In re Ford Motor Co. Vehicle Paint Litigation*, No. MDL 1063, 1994 WL 426548, *34 (E.D. La. July 30, 1996); and *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 961 (5th Cir. 1994).

A dismissal for failure to plead with particularity in accordance with Rule 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

## II.  The Exchange Act and
### the PSLRA's Heightened Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b), states in relevant part,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of any facility of any national securities exchange . . .
>
> (b) To use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in [S]ection 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
>
> Pursuant to the statute, the Securities and Exchange

Commission ("SEC") promulgated Rule 10b-5, 17 C.F.R. § 240.10b-5, which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) to employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Although the statute does not expressly provide for a private cause of action, the Supreme Court has recognized that the statute and its implementing regulation imply a private cause of action for § 10(b) violations. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008), *citing Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n.9 (1971).

To state a claim under § 10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. § 240.10b-5, the plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge*, 552 U.S. at 157, *citing Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). An omission is material for purposes of federal securities law if there is a "substantial likelihood that the disclosure of omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)("adopt[ing] *TSC Industries* standard of materiality for the § 10(b) and Rule 10b-5 context").

Loss causation, i.e., a causal connection between the defendant's material misrepresentation or omission (or other fraudulent conduct) and the economic loss to the plaintiff for which it seeks to recover, can be proven by showing that when the relevant truth about the fraud is disclosed to or leaked into the market place, whether at once or in a series of events, whether by the defendant's announcing changes in its accounting treatments, or whistle blowers, or analysts question financial results, resignations of key officers, or newspapers and journals, etc., it caused the price of the stock to decline and thereby proximately caused the plaintiff's economic injury. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255 (5th Cir. 2009), *citing Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The

Fifth Circuit has held that Rule 8(a)(2) and *Twombly*'s plausibility standard govern the pleading of loss causation.  *Id.* at 256-58.

For many years plaintiffs in securities fraud suits brought claims under § 10(b) and Rule 10b-5 against secondary actors,[5] including investment bankers, lawyers, and accountants, who participated with primary violators in a scheme to defraud investors.  In the last twenty years, the Supreme Court has greatly limited the reach of a private right of action against secondary actors under Rule 10b-5(a) and (c).  Despite the fact that for three decades secondary actors had been found liable under the federal securities laws as aiders and abettors in lower courts, given the 1934 Act's silence as to aiding and abetting, the Supreme Court has concluded, "The section 10(b) implied private right of action does not extend to aiders and abettors."  *Stoneridge*, 552 U.S. at 158; *see also Central Bank of Denver, N.A. v. First Interstate Bank of*

---

[5] Judge Jose A. Cabranes in *Pacific Inv. Management Co., LLC v. Mayer Brown LLP*, 603 F. 3d 144, 148 n.1 (2d Cir. 2010), *cert. denied*, 564 U.S. 1018 (2011), defines "secondary actor" as a term for "lawyers . . . , accountants, or other parties who are not employed by the issuing firm whose securities are the subject of allegations of fraud."  *Id., citing Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 166 (2008)("using the term '[s]econdary actors' to refer to an issuing firm's customers and suppliers"), and *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994)(characterizing "lawyer[s], accountant[s] or bank[s]" as "secondary actors").

*Denver, N.A.*, 511 U.S. 164, 177-78 (1994)(for private parties[6] Section 10(b) "does not itself reach those who aid and abet" a primary wrongdoer's violation of the securities laws because while the statute prohibits the making of a material misstatement or omission or the commission of a manipulative act,[7] the "proscription does not "include giving aid to a person who commits a manipulative or deceptive act"; "We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute." 511 U.S. at 177-78. Instead, to impose liability, a plaintiff must establish that each named defendant committed its own primary violation of the securities laws to be held liable under § 10(b). Moreover the Supreme Court concluded that in some circumstances secondary actors, like lawyers, investment banks, and accountants, "who employ[] a manipulative

---

[6] The PSLRA added Section 20(e), 15 U.S.C. § 78t(e), to the 1934 Act, affirming the right of the SEC to prosecute aiders and abettors in enforcement actions, but not private plaintiffs.

[7] The word "manipulative" is a term of art when used in the context of securities markets and connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Regents of Univ. of Calif. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, (5th Cir. 2007)(*citing Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)), *cert. denied sub nom. Regents of Univ. of Calif. v. Merrill Lynch, Pierce, Fenner & Smith*, 552 U.S. 1170 (2008). The term "'refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'" *Id., quoting Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977).

device or make[] a material misstatement (or omission) on which a purchaser or seller of securities relies," can be liable as primary violators if "*all* the requirements for primary liability under Rule 10b-5 are met." *Id.* at 191. *In accord, Stoneridge*, 552 U.S. at 158 (For a secondary actor to be held liable under § 10(b), that person or entity "must satisfy each of the elements or preconditions for [primary] liability.").[8]

"Where liability is premised on a failure to disclose rather than on a misrepresentation, 'positive proof of reliance[9] is

---

[8]Plaintiffs argue that this Court is bound by its earlier determination in *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 439 F. Supp. 2d 692, 722 (S.D. Tex. 2006) that the applicable level of particularity required is different for omission and scheme cases is that set forth in *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 492 (S.D.N.Y. 2005)("The pleading requirements of the PSLRA regarding misleading statements and omissions do not apply to claims that allege no misrepresentation or omission, but instead are based on employing any device, scheme or artifice to defraud or engaging in any act, practice or course of business that operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security; however those claims sound in fraud and therefore come within" Rule 9(b)).

Not only does this Court have the ability to reconsider its prior rulings, but it observes that some key decisions about pleading requirements have been issued since by the Supreme Court, including *Stoneridge* (rejecting scheme liability), *Janus Capital Group, Inc. v. First Derivative Trader*, 564 U.S. 135 (2011)(clarifying who "makes a statement"), and *Halliburton Co. V. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014)(same), all of which are discussed *infra*. The Court does not address Plaintiffs' scheme liability aiding and abetting claims, which are no longer viable in the wake of *Central Bank* and *Stoneridge.*

[9] "[P]roof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund, Inc. v. Halliburton Co.*,

not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of his decision. . . . This obligation to disclose and the withholding of a material fact establish the requisite element of causation in fact.'" *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 383-84 (5th Cir. 2007)(*quoting Affiliated Ute Citizens of the State of Utah v. U.S.*, 406 U.S. 128, 153-54 (1972)), *cert. denied sub nom. Regents of Univ. of Cal. v. Merrill Lynch, Pierce, Fenner & Smith*, 552 U.S. 1170 (2008).  *See also Basic*, *Inc.*, 485 U.S. at 243 ("[W]here a duty to disclose material information had been breached . . . the necessary nexus between the plaintiffs' injury and the defendants' wrongful conduct had been established.").

When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."  *Central Bank*, 511 U.S. at 174, *quoting Chiarella v. U.S.*, 445 U.S. 222, 235 (1980).  A duty to disclose arises only from "a fiduciary or other similar relation of trust and confidence between [parties]"; it "does not arise from the mere possession of nonpublic market information."  *Chiarella*, 445 U.S. at 228, 235.  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

---

563 U.S. 804, 810 (2011), *quoting Basic, Inc.*, 485 U.S. 243.

The omission of a material fact by a defendant with a duty to disclose establishes a rebuttable presumption of reliance upon the omission by investors to whom the duty was owed. *Affiliated Ute Citizens of the State of Utah v. U.S.*, 406 U.S. 126, 153-54 (1972). "To invoke the *Affiliated Ute* presumption of reliance on an omission, a plaintiff must (1) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure." *Regent of Univ. of Cal.*, 482 F.3d at 384. "This presumption is a judicial creature. It responds to the reality that a person cannot rely upon what he is not told." *Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988). "[A]dministrative and judicial interpretations have established that silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b)" when there is "a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Chiarella*, 445 U.S. at 230.

"Whether a fiduciary duty exists is a question of law for the court's determination." *Stevenson v. Rochdale Investment Management, Inc.*, No. Civ. A. 3:97CV1544L, 2000 WL 1278479, at *3 (N.D. Tex. Sept. 7, 2000), *citing Fuqua v. Taylor*, 683 S.W. 2d 735, 737 (Tex. App.--Dallas 1984, writ ref'd n.r.e.). Nevertheless the factfinder determines whether the facts give rise to a fiduciary duty. *Id.*

In *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex.

- 19 -

565, 160 S.W. 2d 509, 512-13 (Tex. 1942), the Texas Supreme Court

wrote,

> The term "fiduciary" is derived from the civil
> law.  It is impossible to give a definition of
> the term that is comprehensive enough to cover
> all cases.  Generally speaking, it applies to
> any person who occupies a position of peculiar
> confidence  toward  another.    It  refers  to
> integrity and fidelity.  It contemplates fair
> dealing  and  good  faith,  rather  than  legal
> obligation,  as  the  basis  of  the  transaction.
> The  term  includes  those  informal  relations
> which  exist  whenever  one  party  trusts  and
> relies  upon  another,  as  well  as  technical
> fiduciary relations.

*See also Fisher v. Roper*, 727 S.W. 2d 78, 81 (Tex. App.--San Antonio

1987, writ ref'd n.r.e.):

> A  fiduciary  relationship  exists  when  the
> parties  are  under  a  duty  to  act  for  or  give
> advice for the benefit of another upon matters
> within  the  scope  of  the  relation.    It  exists
> where  a  special  confidence  is  reposed  in
> another who in equity and good conscience is
> bound  to  act  in  good  faith  and  with  due  regard
> for    the    interest    of    the    one    reposing
> confidence. A fiduciary relationship generally
> arises  over  a  long  period  of  time  when  parties
> have  worked  together  toward  a  mutual  goal.    To
> establish    a    fiduciary    relationship,    the
> evidence  must  show  that  the  dealings  between
> the parties have continued for such a period of
> time that one party is justified in relying on
> the  other  to  act  in  his  best  interest.    To
> transform  a  mere  contract  into  a  fiduciary
> relationship,  the  evidence  must  show  that  the
> dealings between the parties have continued for
> such  a  period  of  time  that  one  party  is
> justified in relying on the other to act in his
> best interest. [citations omitted].

> For  example,  because  of  the  relationship  of  trust  and

confidence between the shareholders of a corporation and "those insiders who have obtained confidential information by reason of their position with that corporation," courts have imposed a duty to disclose on a corporate insider when the corporate insider trades on the confidential information ("intended to be available only for a corporate purpose and not for the personal benefit of anyone") and makes secret profits. *Chiarella*, 445 U.S. at 227-28. "Trading on such [material, nonpublic] information qualifies as a 'deceptive device' under § 10(b) . . . because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'" *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997)*, citing Chiarella*, 445 U.S. at 228. "That relationship . . . gives rise to a duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed shareholders.'" *O'Hagan*, 521 U.S. at 652, *quoting Chiarella*, 445 U.S. at 228-29. A corporate insider with material information is required to disclose it to the investing public or, if he cannot because he must protect a corporate confidence, or if he chooses not to disclose, he must abstain from trading in or recommending securities concerned while the inside information remains undisclosed. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968)(*en banc*)("[A]nyone in possession of material

inside information must either disclose it to the investing public, or if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed."), *cert. denied sub nom. Kline v. SEC*, 394 U.S. 976 (1969).

An individual or entity that does not fit within the traditional definition of a corporate insider may become a "temporary insider" if the person "by entering into a special confidential relationship in the conduct of the business of the enterprise is given access to information solely for corporate purposes." *SEC v. Cuban*, 620 F.3d 551, 554 (5th Cir. 2010), *citing Dirks v. SEC*, 463 U.S. 646, 655 n.13 (1983). The duty to disclose or abstain from trading arises from the corporate insider's duty to his shareholders, and it applies not only "to officers, directors and other permanent insiders of a corporation," but also to "attorneys, accountants, consultants and others who temporarily become fiduciaries of the corporation." *O'Hagan*, 521 U.S. at 228-29, *quoting Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983).

Violations of Rule 10b-5(a) and (c), which prohibit "employ[ing] any device, scheme or artifice to defraud" or "engag[ing] in any act, practice or course of business which operates . . . as a fraud or deceit upon any person" in connection with the sale of securities, were designated by some courts as

"scheme liability."   In *Stoneridge* (5-3), the Supreme Court addressed the issue, "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose, but does participate in a scheme to violate § 10(b)."   The high court rejected that scheme liability theory because a plaintiff cannot rely on a defendant's concealed deceptive acts.   552 U.S. at 156, 159-60. Justice Kennedy wrote for the majority,

> Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action.   It ensures that, for liability to arise, the "requisite causal connection between a defendant's misrepresentation and a plaintiff's injury" exists as a predicate for liability. . . . We have found a rebuttable presumption of reliance in two different circumstances.   First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. . . . Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public.   The public information is reflected in the market price of the security.   Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement. . . .
>   Neither presumption applies here. Respondents had no duty to disclose; and their deceptive acts were not communicated to the public.   No member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times.   Petitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability.

*Id.* at 769.

In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 137-38, 142, 167 (2011)(5-4), examining what it means to "'make any untrue statement of material fact' in connection with the purchase or sale of securities" under Rule 10b-5 and "mindful that [the Court] must give 'narrow dimensions'" to the implied right of action under § 10(b) since Congress did not authorize it,[10] the

---

[10] The majority of the Supreme Court began by construing the word "make" in Rule 10b-5 very narrowly:

> One "makes" a statement by stating it. When "make" is paired with a noun expressing the action of a verb, the resulting phrase is "approximately equivalent in sense" to that verb. 6 Oxford English Dictionary 66 (def. 59)(1933)(hereinafter OED) . . . .For instance, "to make a proclamation" is the approximate equivalent of "to proclaim," and "to make a promise" approximates "to promise." See 6 OED 66 (def. 59). The phrase at issue in Rule 10b-5, "to make any . . . statement." is thus the approximate equivalent of "to state."

In the dissent, Justice Breyer, joined by Justices Ginsburg, Sotomayor, and Kagen, opined,

> In my view, . . . the majority has incorrectly interpreted the Rule's word "make." Neither common English nor this Court's earlier cases limit the scope of that word to those with "ultimate authority" over a statement's content. To the contrary, both language and case law indicate that, depending upon the circumstances, a management company, a board of trustees, individual company officers, or others, separately or together, might "make" statements contained in a firm's prospectus--even if a board of directors has ultimate

- 24 -

majority of the United States Supreme Court attempted to further clarify the distinction between a primary violation and aiding and abetting by holding, "For purposes of Rule 10b-5, the maker of a statement is the person with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker."[11]  *See also Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2403 (2014)(Section 10(b) and Rule 10b-5 liability should not be extended "to entirely new categories of defendants who themselves had not made any material public misrepresentation.").  Thus *Janus* restricts liability under a § 10(b) private right of action to a person or entity with ultimate authority over a false statement on which an investor relied to his detriment in purchasing or selling a security.

The PSLRA "installed both substantive and procedural controls" that were "[d]esigned to curb perceived abuses of the §

---

content-related responsibility.

*Id.*, 564 U.S. at 149-50.

[11]  The high court compared the relationship between the aider and abettor and the primary violator to that between a speechwriter and a speaker:  "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.  And it is the speaker who takes credit--or blame--for what is ultimately said."  *Id.* at 143.

10(b) private action--nuisance filings, targeting deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 208, 320 (2007). The PSLRA heightened the particularity requirements for pleading securities fraud in two ways: (1) the plaintiff must "specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading . . .," 15 U.S.C. § 78u-4(B)(1)(B); and (2) for "each act or omission alleged" to be false or misleading, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2). *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2007). As noted, Rule 9(b) requires the plaintiff in a securities fraud suit to "'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Southland*, 365 F.3d at 362, *quoting Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997). *See* 15 U.S.C. § 78u-4. In other words, "'[p]leading fraud with particularity . . . requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" *Williams*, 112 F.3d at 177 (5th Cir. 1997), *quoting Tuchman*, 14 F.3d at 1068. The PSLRA mandates

that "untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'" *Southland*, 365 F.3d at 364.  The PSLRA's use of "the defendant" is reasonably construed to mean "'each defendant' in multiple defendant cases.'" *Id.* at 365.  Where the defendant is a corporation (as Warburg and PW are), the plaintiff must plead specific facts giving rise to a strong inference that a particular defendant's employee acted with scienter as to each alleged omission; "[a] defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows the statement is false, or at least deliberately reckless as to its falsity, at the time he or she makes the statement." *Southland*, 365 F.3d at 366.  "'The knowledge necessary to form the requisite fraudulent intent must be possessed by at least one agent [of the corporation] and cannot be inferred and imputed to a corporation based on disconnected facts known by different agents.'" *Id.* at 367, *quoting Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1311 (S.D. Fla. 2000); also citing *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988)("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual."), *aff'd*, 869 F.2d 175

- 27 -

(2d Cir. 1989).

"'In cases concerning . . . omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.'" *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006), *quoting United States ex. rel. Riley v. St. Luke's Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004).  To meet the requirement of materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" and would have actually been significant "in the deliberations of the reasonable shareholder." *Basic, Inc.*, 485 U.S. at 231-32; *Southland*, 365 F.3d at 362.  *See also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-49 (5th Cir. 2009)("Once the defendants engaged in public discussion . . ., they had a duty to disclose a 'mix of information' that is not misleading.").  Thus the standard for misrepresentation in this context is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor. *L.W. Laird v. Integrated Resources, Inc.*, 897 F.2d 826, 832 (5th Cir. 1990).  The Fifth Circuit has "long held under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.  Although such defendant is under no duty to disclose every fact or assumption

underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Lormand*, 565 F.3d at 249.  "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Id.* at 248 These facts "must be laid out before access to the discovery process is granted." *Williams*, 112 F.3d at 178.

The Fifth Circuit does not permit group pleading of securities fraud suits. *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015), *citing Southland*, 365 F.3d at 365 ("[T]he PSLRA requires the plaintiffs to distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud. . . . [W]e do not construe allegations contained in the [second amended complaint] against 'defendants' as a group as properly imputable to any particular defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").[12] "Corporate officers are *not*

---

[12] The group pleading or group publishing doctrine permits plaintiffs to presume that statements in prospectuses, registration statements, annual reports, press releases, etc. are collectively attributable to persons with direct involvement in the regular business of the company. *Southland*, 365 F.3d at 363 n.9.  In its most expansive form it allows "unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate title.  Under this doctrine, the plaintiff need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the

liable for acts solely because they are officers or where their day-to-day involvement in the corporation is pleaded." *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006). A corporate officer may be liable if plaintiff identifies him and alleges he made materially misleading statements with scienter at a shareholder meeting or he signed documents on which statements were made. *Id.* Group pleading, or the group publishing doctrine, fails to satisfy the heightened pleading standards of the PSLRA. *Southland*, 365 F.3d at 363 n.9.[13]

The Fifth Circuit further requires that scienter or the requisite state of mind, which for the PSLRA is "an intent to deceive, manipulate, or defraud," or "'severe recklessness' in which the 'danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been

---

misstatement or omission where the defendants are 'insiders or affiliates' of the company." *Id*. at 363.

[13] The Third Circuit, which includes Delaware, has also held that "the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA." *Winer Family Trust v. Queen*, 503 F.3d 319, 334 (3d Cir. 2007). *See also City of Roseville Employees' Retirement v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 426 (D. Del. 2009)("[T]o plead scienter against the corporate defendants, plaintiffs must identify facts raising a strong inference that false or misleading statements were made or otherwise promoted by an individual acting on behalf of each company and who knew or was reckless in not knowing that the statements were false or misleading at the time they were made."

aware of it,'"[14] must be pleaded for each act or omission for each defendant in a multiple defendant case sufficiently to create "a strong inference that the defendant acted with the required state of mind." *Id.* at 364-65. *See also Owens v. Jastrow*, 789 F.3d at 536 ("Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."), *quoting Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). To determine whether a statement made by a corporation was made with the requisite intent, it is appropriate to look into the state of mind of the corporate official who made the statement rather than to the collective knowledge of all of the corporation's officers and employees acquired in the course of their employment. *Southland*, 365 F.3d at 366; *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)("[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). "A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement

---

[14] *Quoting Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981)(*en banc*).

has the requisite level of scienter, i.e., knows that the statement is false or is at least deliberately reckless as to its falsity, at the time he or she makes the statement." *Southland,* 365 F.3d at 366.

"In determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). Furthermore, the inference of scienter ultimately must be "'cogent and compelling,' not merely 'reasonable' or "permissible.'" "Congress required plaintiffs to plead with particularity facts that give rise to a 'strong'--*i.e.*, a powerful or cogent--inference." *Id.; Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008), *quoting Tellabs, Inc.*, 551 U.S. at 324. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 323-24. But it must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "[A] tie favors the plaintiff." *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015), *quoting Lormand v. US*

*Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009), *citing Tellabs*, 551 U.S. at 324. "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegations, scrutinized in isolation, meet that standard." *Lormand*, 565 F.3d at 251, *citing Tellabs*, 551 U.S. at 322-23. While allegations of motive and opportunity may serve to strengthen the inference of scienter, such allegations alone are insufficient to satisfy the requirement. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009); *Owens v. Jastrow*, 789 F.3d at 539.

If the plaintiff fails to satisfy the pleading requirements for scienter, "the district court 'shall,' on defendant's motion to dismiss, 'dismiss the complaint.'" *Nathenson*, 267 F.3d at 407, citing § 78u-4(b)(3).

Under the PSLRA, 15 U.S.C. § 78u-4(b)(4), a plaintiff must also allege and ultimately prove "the traditional elements of causation and loss," i.e., "that the defendant's misrepresentations (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005). The plaintiff must plead economic loss and loss causation, i.e., a causal connection between the material misrepresentation or omission and the loss. *Id.* at 341-42. "[A]n inflated purchase price will not itself constitute or proximately cause the relevant loss." *Id.* at 342. To establish proximate

causation, the plaintiff must prove that when the "relevant truth" about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and thereby proximately cause the plaintiff's economic injury. *Lormand*, 565 F.3d at 255 ("[W]e conclude that Rule 8(a)(2) requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the  stock and plaintiff's economic loss."), *citing Dura* at 342, 346.

Both the 1933 and the 1934 statutes have a section imposing liability on persons controlling a primary violator. Section 15, 15 U.S.C. § 77o of the 1933 Act, entitled "Liability of controlling persons, states in relevant part,

> (a) Controlling persons
>
> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling persons had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability

> of the controlled person is alleged to exist.
>
> (b) Prosecution of persons who aid and abet violations
>
> For purposes of any action brought by the Commission under subparagraph (b) or (d) of section 77t of this title, any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this subchapter, or of any rule or regulation issued under this subchapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.[15]

"The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. To state a claim for Section 15 control person liability, a plaintiff must allege that a primary violation under Section 11 or 12 was committed and the defendant directly or indirectly controlled the violator. *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 221 (5th Cir. 2004). The plaintiff can show control by alleging facts showing that the defendant possessed the power to direct or cause the direction of the management and policies of a

---

[15] Plaintiffs assert that Defendants are liable for their employees' conduct under the common law doctrine of respondeat superior, as well as under § 15 of the Securities Act on 1933, 15 U.S.C. § 77(o), and under § 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78(t).

person through ownership of voting securities, by contract, business relationships, interlocking directors, family relations, or the power to influence and control the activities of another, but the plaintiff must allege more than the defendant's position or title. *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004). The Fifth Circuit does not require a plaintiff to allege that the controlling person actually participated in the underlying primary violation to state a claim for control person liability.

Section 20(a) of the 1934 Act, 15 U.S.C. § 78(t)("Liability of controlling persons and persons who aid and abet"), states,

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act of acts constituting the violation or cause of action.

Claims under section 20(a) are not governed by Rule 9(b)'s heightened pleading requirements for fraud claims; plaintiffs need only give the defendant fair notice of the claim and the grounds for the allegations. *In re BP p.l.c. Litig.*, 843 F. Supp. 2d 712, 791 (S.D. Tex. 2012). Plaintiffs can state a claim of controlled persons against corporate officers who did not personally make a misrepresentation or play a significant role in the preparation of

a misrepresentation by pleading facts that such a person nevertheless "had the requisite power to directly or indirectly control or influence corporate policy." *Id.* at 792, *quoting G.A. Thompson & Co.*, 636 F.2d 945, 958 (5th Cir. 1981).

Because § 20(a) is a secondary liability provision, if the Plaintiff fails to state a claim for a primary violation under § 10(b) and/or Rule 10b-5, Plaintiff also fails to state a claim for control person liability under § 20(a). *Id.* at 750.

The control person liability provisions of Section 20(a) of the 1934 Act and Section 15 of the 1933 Act, although worded differently, are interpreted similarly. *Dynegy*, 339 F. Supp. 2d at 828, *citing Abbot v. Equity Group, Inc.*, 2 F.3d 613, 619 n.15 (5th Cir. 1993); *In re Franklin Bank Sec. Litig.*, 782 F. Supp. 2d 364, 380 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 Fed. Appx. (5th Cir. Mar. 14, 2012).

### III.  Securities Act of 1933

The 1933 Act, 15 U.S.C. §§ 77a *et seq.*, governs the content of securities registration statements, which the SEC requires for the trading and dealing of stock.

The Securities Act of 1933 also bars the "offer or sale" of "securities" unless a registration statement has been filed with the SEC or an exception to registration requirements applies. Section 5 of the 1933 Act, 15 U.S.C. § 77e; *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 155-56 (5th Cir. 1972).

Section 11, 15 U.S.C. § 77k, addressing "Civil liabilities on account of false registration statement," provides purchasers of registered securities with strict liability protection for material misstatements or omissions in registration statements with the SEC by specifically enumerated parts.  It provides in relevant part,

> (a)  In case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required be stated therein or necessary to make the statement therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue
>
> > (1)  every person who signed the registration statement;
> >
> > (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
> >
> > (3)  every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions or partner; . . . .
> >
> > (5) every underwriter to such security.

Regarding (5), under Section 2(11), 15 U.S.C. § 77b(11), a statutory underwriter is defined functionally on the basis of its relationship to a particular offering and reaches "any person who has purchased from an issuer with a view to, or offers or sells for

- 38 -

an issuer in connection with, the distribution of any security, or participates or has direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking . . . ." Furthermore 15 U.S.C. § 77k(a)(5) provides that any person who purchases a security, which was subject to a registration statement containing a false statement, may sue "every under writer with respect to such security."

Section 12, 15 U.S.C. § 77l, states in relevant part,

(a) in general--Any person who-

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not  know, and in the exercise of reasonable care could not have known, or such truth or omission,

shall be liable, subject to subsection (b) of this section,  to the person purchasing such security from him, who may sue either at law or in equity any court of competent jurisdiction, to recover the consideration paid for such

> security with interest thereon, less the amount
> of any income received thereon, upon the tender
> of such security, or for damages if he no
> longer owns the security.

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k,
"applies to registered securities and imposes civil liability on the
signatories to the registration statement and on the directors of
the issuer when the registration statement is materially misleading
or defective." *Firefighters Pension & Relief Fund of the City of
New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 892 (E.D. La. 2014),
*citing Rosenzweig v. Azurix Corp.* 332 F.3d 854, 861 (5th Cir. 2003).
To state a claim under Section 11 of the Securities Act of 1933, 15
U.S.C. § 77k, the plaintiffs must allege that they purchased shares
from a registration statement that contained (1) an omission or
misstatement (2) of a material fact required to be stated or
necessary to make other statements made not misleading. *Krim v.
Banc Texas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993)(defining
a "material fact" as "one which a reasonable investor would consider
significant in the decision whether to invest, such that it alters
the 'total mix' of information available about the proposed
investment").

Thus section 11, 15 U.S.C. § 77k(a), permits "any person
acquiring such security" to sue, including after market purchasers

of shares issued in a public offering,[16] while in contrast, under section 12(a)(2), 15 U.S.C. § 77l(a)(2), a seller is only liable "to the person purchasing such security from him." *Rosenzweig*, 332 F.3d at 872-73, *citing inter alia Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000)("[T]he natural reading of 'any person acquiring such security' is simply that the buyer must have purchased a security issued under the registration statement at issue, rather than some other registration statement.").

Regarding alleged omissions, under § 11 an issuer only has to disclose information that is required to make other statements not misleading or information that the securities laws require to be disclosed; simply possessing material nonpublic information does not give rise to a duty to disclose. *Firefighters*, 53 F. Supp. 3d at 892. Moreover the statute's "'expansive' liability provisions create 'virtually absolute liability' for corporate issuers for even innocent misstatements." *Id., quoting Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2205). Plaintiffs are not required to plead scienter, reliance or fraud under the statute. *Id., citing Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004).

Where grounded in negligence, Section 11 only requires notice pleading under Federal Rule of Civil Procedure 8, not the

---

[16] *See Rosenzweig*, 332 F.3d at 872 ("§ 11 applies to aftermarket purchasers." Section 11 only applies to public registered offerings, and not to private offerings. *Id.* at 873.

heightened standards of Federal Rule of Civil Procedure 9(b) or of the PSLRA. *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, (S.D. Tex. 2004), *citing Lone Star Ladies*, 238 F.3d at 369 (averments that defendants made untrue statements of material facts and omitted to state material facts in violation of § 11 are not claims that sound in fraud and cannot be dismissed for failure to satisfy Rule 9(b)'s heightened pleading requirements), *citing In re Electronic Data Systems Corp. "ERISA" Litig.*, 205 F. Supp. 2d 658, 677 (E.D. Tex. 2004). Nor is a plaintiff required to allege and show that the defendant acted with scienter under § 11 of the Securities Act of 1933, 15 U.S.C. § 77k(a), or that he relied in any way on the defendant's misrepresentations or omissions. *Collmer*, 268 F. Supp.2d at 756 (S.D. Tex. 2003). Nevertheless, if the allegations are based in fraud, the heightened standards of Rule 9(b) apply. *Firefighters*, 53 F. Supp. 3d at 892*, citing Lone Star Ladies Inv. Club*, 238 F.3d at 368, *citing Melder*, 27 F.3d at 1100 n.6, and *Rombach*, 355 F.3d at 171.

"The Securities Act of 1933 imposes strict liability on offerors and sellers of unregistered securities" and allows purchasers to recover under Section 12(1) "regardless of whether they can show any degree of fault, negligent or intentional, on the seller's part." *Swenson v. Engelstad*, 626 F.2d 421, 424-25 (5th Cir. 1980). An issuer's liability to a plaintiff who buys a security issued pursuant to a registration statement with a material

misstatement or omission under section 12 (as it is under section 11) of the 1933 Act is "'virtually absolute.'"  *Lone Star Ladies Inv. Club v. Scholtzsky's Inc.*, 238 F.3d 263, 369 (5th Cir. 2001), *quoting Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). In *Pinter v. Dahl*, 486 U.S. 622, 644 (1988), the Supreme Court indicate that in some situations the issuer is immune from liability in a firm commitment underwriting [where the public does not purchase from the issuers but from the underwriters]:  "One important consequence of [the purchaser clause] is that § 12(1) imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers.  Thus a buyer cannot recover against *his seller's seller*." *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 370 (5th Cir. 2001), *quoting Pinter*, 486 U.S. at 644 n.21 (emphasis added by *Lone Star*).  Furthermore § 12(a)(2) applies only to purchases of stock in initial offerings, and not to aftermarket trading. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995). *See also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870-71 (5th Cir. 2003)(holding that purchasers who buy their shares on the secondary market lack standing to bring § 12(a)(2) claims.).

Defendants other than the issuer can avoid liability by pleading and proving an affirmative defense of due diligence.  *Id.*

Section 12 restricts recovery to purchasers who purchase

their shares from a seller who makes use of false or misleading statements.  15 U.S.C. § 77l(a)(2)(seller "shall be liable to the person purchasing such security from him."). "Section 2(3) defines 'sale' or 'sell' to include 'every contract of sale or disposition of a security or interest in a security, for value,' and the terms 'offer to sell,' 'offer for sale,' or 'offer' to include 'every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.'  15 U.S.C. § 77(b)(3).  Under these definitions, the range of persons potentially liable under § 12(1) is not limited to persons who pass title." *Pinter v. Dahl*, 486 U.S. 622, 643 (1988).  While the purchase requirement limits liability to instances in which a sale has occurred, the language of the statute extends statutory seller status and thus liability to some persons who simply urged the buyer to purchase the security.  *Id*. at 644.

When a broker acting as an agent of one of the principles to a securities purchase successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is thus liable as a statutory seller.  *Pinter*, 486 U.S. at 646, *citing inter alia Cady v. Murphy*, 113 F.2d 988, 990 (1st Cir.)(finding a broker acting as an agent to be liable as a statutory seller), *cert. denied*, 311 U.S. 705 (1940).  The Supreme Court went on to limit a solicitor's liability to exclude the solicitor, "merely to assist the buyer," "gratuitously urges another

to make a particular investment": "The language ['buy . . . for value"] and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner," e.g., a broker. *Id.* at 647.

As with § 11, where § 12(a) claims do constitute fraud, the plaintiff must plead the circumstances constituting fraud with Rule 9(b) particularity. *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp.2d 718, 756 (S.D. Tex. 2003)*, citing Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994)("When 1933 Securities Act claims are grounded in fraud rather than negligence . . . Rule 9(b) applies.").

Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a), states, "Any person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security

with interest thereon, less the amount of any income received therein, upon the tender of such security, or for damages if he no longer owns the security." Under section 12(a)(2) the term "seller" refers to "either the person who actually passes title to the buyer, or 'the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' e.g., a broker." *Rosenzweig v. Azurix Corp.*, 332 F.3d 853, 871 (5th Cir. 2003), *citing Pinter v. Dahl*, 486 U.S. 622, 647 (1988). To constitute a "solicitation," at the very least the seller must "directly communicate with the buyer." *Id., citing Litigation v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989)("The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12(a)(2).").

To prevail on a claim under § 12(a)(2), 15 U.S.C. § 77l(a)(2), the plaintiff must allege and prove that the defendant, as a seller of a security "by means of a prospectus or oral communication," misrepresented or failed to state material facts to the plaintiff in connection with the sale and that the plaintiff had no knowledge of untruth or omission. *Collmer*, 268 F. Supp.2d at 756, *citing Junker v. Crory*, 650 F.2d 1349, 1359 (5th Cir. 1981). As with § 11, "a 'material' fact is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the 'total mix' of information available about the

proposed investment." *Krim*, 989 F.2d at 1445.

There is no liability under Section 12(a)(2) if there is no duty to disclose the allegedly false or misleading information. *In re Morgan Stanley Technology Fund Sec. Litig.*, 643 F. Supp. 2d 366, 381-82 (S.D.N.Y. 2009), *citing In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1933)(an actionable claim under the Securities Act or the Exchange Act must plead a material omission that involves information that the defendant has a duty to disclose).

### IV.  Employee Stock Option Plans

To have standing to sue under the 1933 and 1934 Acts, a plaintiff must be either a purchaser or a seller of the securities at issue. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). Therefore for the securities laws to apply to a transaction between the employer and the employee, there must be a "security" and a "sale." To determine whether a stock option plan is covered by the securities laws, the Court first examines whether the employee's interest in the plan is a "security," second, whether it involves an "offer" or "sale" of securities, and third, whether it falls within an exemption from either or both of the Acts.

It is undisputed that a stock option is a security. Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and Section 3(a)(1) of the Exchange Act, 15 U.S.C. § 78c(a)(10), define a "security" almost identically, with the variations being

insignificant here, to include *inter alia* any note, stock, bond, option, and participation in an investment contract. *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 480 & n.4 (9th Cir. 1973), *cert. denied*, 414 U.S. 821 (1973); *Hunssinger v. Rockford Business Credits, Inc.*, 745 F.2d 484, 487 (7th Cir. 1984); *Daily v. Morgan*, 701 F.2d 496. 500 (5th Cir. 1983)("'Stock' is expressly included in the definition [of 'security' in the 1933 and 1934 Acts], and represents to many people, both trained and untrained in business matters, the paradigm of a security."); *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 558 (2d Cir. 1985)(holding that stock offered as an inducement to accept employment qualifies as a purchase or sale of securities under the Securities Exchange Act).

An "investment contract" under the federal securities acts is a contract, transaction or scheme in which a person invests money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. 15 U.S.C. § 77b(1) and § 78c(a)(10). Because the Securities Acts are remedial in nature and were enacted to regulate investments in an effort to protect against abuses in the securities market, the Supreme Court opined that the broad definition of securities "encompasses virtually any instrument that might be sold as an investment" and "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by

those who seek the use of the money of others on the premise of profits." *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

In *Howey*, the Supreme Court established a test to determine whether a financial relationship constituted an "investment contract," i.e., "whether a contract transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts" of others. *Id.* at 298-99. In applying the test, courts should disregard form and focus on the "substance--the economic realities of the transaction--rather than the names that may have been employed by the parties." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848-49 (1975). In *Howey* the Supreme Court determined, regarding the first prong, the investment of money, that the employees covered under the defined benefit[17] pension plan did not make an "investment of

---

[17] Employee benefit plans are divided into two broad categories: defined benefit and defined contribution plans. The SEC explains in Employee Benefit Plans, SEC Release No. 33-6188, 19 S.E.C. Docket 465, 1980 WL 29482, at *6-7,

A defined benefit plan pays fixed or determinable benefits. The benefits ordinarily are described in a formula which specifies the amount payable in monthly or annual installments to participants who retire at a certain age. As long as the plan and the employer(s) contributing to the plan remain solvent, and the plan continues to be operate, vested participants will receive the benefits specified. In the event the investment results of the plan do not meet expectations,

money," unlike other purchasers who had given up "some tangible and

definable consideration" in return for their security"; in a pension

plan "by contrast, the purported investment is a relatively

insignificant part of an employee's total and indivisible

compensation package" and "'[n]o portion of an employee's

compensation other than the potential pension benefits has any of

the characteristics of a security. . . Only in the most abstract

sense may it be said that an employee 'exchanges' some portion of

his labor in return for there possible benefits." *Int'l Brotherhood*

*of Teamsters, Chauffeurs, Warehousemen and Helpers of America v.*

---

the employer(s) usually will be required, on
the basis of actuarial computation, to make
additional contributions to fund the promised
benefits.   Conversely, if plan earnings are
better than anticipated, the employer(s) may
be permitted to make contributions that are
less than the projected amounts.

A defined contribution plan does not pay any
fixed or determinable benefits.   Instead,
benefits will vary, depending on the amount of
plan contributions, the investment success of
the plan, and allocations made of benefits
forfeited by non-vested participants who
terminate employment.   Thus, the amount of
benefits is based, in part, on the earning
generated by the plan.

Observing that the opinion in *Int'l Brotherhood of Teamsters,
Chauffeurs, Warehouseman & Helpers of America v. Daniel*, 439 U.S.
551 (1979)(discussed *infra*). "did not rest on the fact that the
plan was a defined benefit one," the SEC finds that the "defined
benefit or defined contribution nature of a plan is not dispositive
in determining whether a security is present." *Id. at *7.*

*Daniel*, 439 U.S. 551, 560-61 (1979).[18]  Nor was the second prong of the *Howey* test met because the pension plan's funds were mainly employer contributions.  *Id.* at 562 ("[A] far larger portion of its income comes from employer contributions," and not from earnings from its assets).  Because any profit made from the pension plan's investment of those monies was minimal and the covered employees would not gain or lose from the choice of those investments, the high court found that the fund was not a "common enterprise with profits to come solely from the efforts of others," and thus it was not an investment contract.  *Id.* at 558, *quoting Howey*, 328 U.S. at 301.  Finally the Supreme Court found that ERISA, which specifically regulates pension plans, undermined any reason for securities regulations of such pension plans.  *Id.* at 569-70.

After *Howey*, in *Daniel* the Supreme Court applied the *Howey* test to decide whether an employee's interest in an employee pension plan constituted a "security" under the 1934 Act.  It concluded that the answer depended on whether the plan is voluntary or compulsory, individually contributory or noncontributory.[19]  *Daniel*, 439 U.S. at

---

[18] The Supreme Court noted in *Daniel*, 439 U.S. at 559, "An employee who participates in a noncontributory, compulsory pension plan by definition makes no payment into the pension fund.  He only accepts employment, one of the conditions of which is eligibility for a possible benefit on retirement."

[19] In *Daniel* the plan was compulsory because all employees were enrolled in it under a collective bargaining agreement and it was noncontributory because the employer alone paid money into it.

559; Employee Benefit Plans, SEC Release No. 33-6188, 1 Fed. Sec. Rep. (CCH) P 1051 at 2073-6 n, 19-20, 1980 WL 29482 (Feb. 1, 1980). A "compulsory" benefit indicates the employer imposed the benefit as a condition of employment (i.e., all employees were required to participate), while "noncontributory means that "[t]he employees paid nothing to the plan themselves," and the employer made all the contributions.  Observing that every Supreme Court decision finding the existence of a security under the 1933 and 1934 Acts also found an investor who "chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security" or a purchaser who "gave up some tangible and definable consideration for an interest that had substantially the characteristics of a security," the Supreme Court found that in *Daniel*'s plan the "purported investment [was] a relatively insignificant part of an employee's total compensation package." 439 U.S. at 560.  "Only in the most abstract sense may it be said that an employee 'exchanges' some portion of his labor in return for these possible benefits." *Id.* "Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment." *Id.* at 559-60.[20]

---

[20] Inducements to continue employment (in contrast to inducements to accept employment) are not seen as a contribution sufficient to constitute a "security" to meet the test. *In re Cendant Corp. Sec. Litig.*, 81 F. Supp. 2d 550, 556 (D.N.J. 2000("When an employee does not give anything of value for stock other than the continuation of employment not independently

*Daniel* held that an interest in a compulsory, noncontributory pension plan is not an interest in an investment contract, and thus not a "security" under the 1933 and 1934 Acts. *Daniel*, 439 U.S. at 553; *Howey*, 328 U.S. at 298. Thus the 1933 and 1934 Securities Acts do not apply to pension plans to which employees do not contribute and in which employee participation is compulsory because such a plan does not require the employee to "give up specific consideration in return for a separable financial interest with the characteristics of a security." *Daniel,* 439 U.S. at 559, 570.

The SEC subsequently expanded *Daniel* beyond pension plans to all involuntary and noncontributory employee benefit plans. SEC Release No. 33-6188 (Feb. 1, 1980); SEC Release No. 33-6281 (Jan. 15, 1981).

Only an actual direct purchaser or seller of securities has standing to sue under Section 10(b) and Rule 10b-5. *Blue Chip Stamps*, 421 U.S. at 749-55, ratifying *Birnbaum v. Newport Steel Corp.*, 193 F.3d 461, 462-63 (2d Cir. 1952). Section 11(a) of the Securities Act of 1933 "gave a right of action by reason of a false

---

bargains for . . . stock, there is no 'purchase or sale' of securities."). They distinguish cases "in which an employee was found to have purchased or sold stock options in return for labor" as "based on the concept that the options are 'a *quid pro quo* offered to induce plaintiff to enter into the employ of [defendant]." *Id., citing as examples Yoder*, 751 F.2d at 560; *Rudinger v. Insurance Data Processing, Inc.*, 778 F. Supp. 1334 (E.D. Pa. 1991); and *Collins v. Rukin*, 342 F. Supp. 1282 (D. Mass. 1972).

registration statement to 'any person acquiring the security, and § 12 of the Act gave a right to sue the seller of a security who had engaged in proscribed practices with respect to prospectuses and communication to 'the person purchasing such security from him.'" *Blue Chip Stamps*, 421 U.S. at 728.   Section 2(3) of the Securities Act of 1933 states, "The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security for value," while section 3(a)(14) of the Securities Exchange Act of 1934 provides, "The terms 'sales' and 'sell' each include any contract to sell or otherwise dispose of."

Arising in the wake of *Daniel*'s holding that an interest in a compulsory, noncontributory pension plan is not a "security," the SEC's "no-sale doctrine" provides that a grant of securities to employees pursuant to a stock bonus plan is not a "purchase or sale" where these employees "do not individually bargain to contribute cash or other tangible or definable consideration to such plans." SEC Release No. 33-6188, 1980 WL 29482 at *15[21] (Feb. 1, 1980). Such plans are "involuntary [or compulsory], non-contributory plans." *Id.* at *8.   Thus compulsory noncontributory stock option plans where the employees do not individually bargain to contribute cash or other consideration are not "sales" under the definition of the Securities Act of 1933.   *Id.   See also Compass Group PLC, SEC*

---

[21]   Or 1980 SEC LEXIS 2141 at *15.

*No-Action Letter*, 1999 WL 311797 (May 13, 1999)(finding that registration of stock options was not required "when an employee does not give anything of value for stock other than the continuation of employment nor independently bargains for such stock, as a stock bonus program that involves the award of stock to employees at no direct cause."). When an employee does not give anything of value[22] for stock other than the continuation of employment nor independently bargains for . . . stock, as when the employee receives his stock through a company-wide stock option plan "there is no 'purchase or sale' of securities." *Wyatt v. Cendant Corp. (In re Cendant Corp. Sec. Litig.)*, 81 F. Supp. 2d 550, 556 (D.N.J. 2000)(internal quotation omitted); *McLaughlin v. Cendant Corp., (In re Cendant Corp. Sec. Litig.)*, 76 F. Supp. 2d 539, 550 (D.N.J. 1999)("Under the SEC's 'no sale' doctrine, a grant of securities to an employee pursuant to a stock bonus plan is not a 'purchase' or sale' because these employees 'do not individually bargain to contribute cash or other tangible or definable consideration to such plan . . . [and] employees in almost all instances would decide to participate if given the opportunity."), *citing* Securities Release No. 33-6188, 1980 WL 29482, and *Compass*

---

[22] The phrase "for value" in § 2(1) of the Securities Act of 1933 has been construed to include a wide variety of forms of consideration, including property, cash, services, and the surrender of a legal right. SEC Release No. 33-6188, 1980 WL 29482, at *16.

*Group PLC,* SEC No-Action Letter, 1999 WL 311797 (May 13, 1999)(finding that no registration of stock options was required "when an employee does not give anything of value for stock other than the continuation of employment no independently bargains for such stock, such as a stock bonus program that involves the award of stock to employees at no direct cost."); *Daniel*, 439 U.S. at 558-59 (holding that the Exchange Act does not apply to noncontributory, compulsory pension plan; "An employee who participates in a noncontributory compulsory pension plan by definition makes no payment into the pension fund.").

This reasoning has been applied to employee stock option plans. *Cendant*, 76 F. Supp. 2d at 545-46, *citing Bauman v. Bish*, 571 F. Supp. 1054 (N.D.W. Va. 1983)(concluding that an employee stock option plan was "compulsory" where "there [was] no affirmative investment decision" made by the individual employee), and *Childers v. Northwest Airlines, Inc.*, 688 F. Supp. 1357, 1363, 1364 (D. Minn. 1988)("Plaintiffs' participation was an incident of employment and their only choice would have been to forego the receipt of benefits entirely"; "The notion that the exchange of labor will suffice to constitute the type of investment which the Securities Acts were intended to regulate was rejected in *Daniel*"). Only "[w]here an employee . . . acquires the right to [stock] options as part of his or her bargained-for compensation [will courts] infer that the employee made an intentional decision to 'purchase' the options."

*Cendant*, 81 F. Supp. 2d at 557-58,[23] *citing Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 560 (2d Cir. 1985)(noting that the definitional sections of the two Acts, § 2 of the 1933 Act and § 2 of the 1934 Act, begin with the proviso, "When used in this title, *unless the context otherwise requires*[24] [emphasis added by

_____

[23] "To 'purchase or sell' stock options, employee-purchasers must give up a specific consideration in return for a separable financial interest with the characteristics of a security." *Cendant*, 81 F. Supp. 2d at 556. *In accord Fishoff v. Coty, Inc.*, No. 09 Civ. 628 (SAS), 2009 WL 1585769, at *5 & n.74 (S.D.N.Y. June 8, 2009), *citing Fraser v. Fiduciary Trust Co., Intern.*, 417 F. Supp. 310, 318 (S.D.N.Y. 2006).

[24] Addressing this key phrase in the beginning of the definitional sections of the 1933 and 1934 Acts, Matthew T. Bodie explains in *Aligning Incentives With Equity: Employee Stock Options and Rule 10b-5*, 88 Iowa L. Rev. 539, 558-59 (March 2003),

> Courts and commentators have debated over the exact meaning of this exception, particularly whether "context" means "in the context of the statute's text," or "in the context of the facts of the case." In two Rule 10b-5 cases involving employee ownership interests--one involving stock [*Yoder v. Orthomolecular Nutrition Institute, Inc.*], the other stock options [*Collins v. Rukin*, 342 F. Supp. 1282, 1286 (D. Mass. 1972)(defendant corporation offered plaintiff a stock option as an inducement to accept employment, which satisfied the "for value" requirement of the 1933 Act)]--defendants argued that the securities laws should not apply in the "context" of securities that form a part of an employment contract. In both cases, while the courts noted that the securities laws were designed to protect investors, they nevertheless found the securities protections broad enough to encompass employees with interests in their companies. As Judge Friendly wrote in the *Yoder* case, "We see no

this Court], . . . ," and finding that the promise of a stock distribution in exchange for an individually bargained employee contract could be consideration for a "sale" under the Securities Act); *Childers v. Northwest Airlines, Inc.*, 688 F. Supp. 1357, 1363 (D. Minn. 1988)("Plaintiffs' participation was an incident of employment and their only choice would have been to forgo the receipt of benefits entirely.").[25]

Moreover where the plan is noncontributory and involuntary, the stock awarded to employees is not required to be registered because there is no "sale" to the employees since they have not individually bargained to contribute cash or other consideration to the employee stock ownership plan.  1980 SEC Release No. 33-6188.  These courts and the SEC Release grew out of *Daniel*'s finding that these stock option employees that did not directly contribute to the plan failed to meet the "investment of money" or investment contract requirement of *Howey* for a sale/purchase and the SEC's "no-sale" doctrine.

Plaintiffs rely on decision by the Ninth Circuit in

---

reason why 'the context requires' us to hold that an individual who commits herself to employment by a corporation in return for stock or the promise of stock should not be considered an investor."

[25] As noted, under *Howey* and *Daniel*, an employee's participation in a noncontributory, compulsory pension plan also cannot be characterized as an investment contract.  *Daniel*, 439 U.S. at 559.

*Falkowski v. Imation Corp.*, 309 F.3d 1123 (2002), *amended*, 320 F.3d 905 (9ᵗʰ Cir. 2003), that is contrary to the *Cedant* cases and to the 1980 SEC Release. The panel in *Falkowski*, interpreting SLUSA and its preemption of class actions that involved charges of fraud "in connection with the purchase and sale of a covered security," grounded in California state law, dealt with a class action comprised of employees and contractors of Cemax who had received stock options through a company plan from their original employer, Cemax-Icon ("Cemax"), which was subsequently acquired by Imation and their options were converted to Imation stock options. *Id.* at 1126-27. A year later Imation sold Cemax to Eastman Kodak Company, and in connection with that sale, according to the plaintiffs in their class action, induced the employees to remain with Cemax-Imation merged company by misrepresenting the value of their stock and options and exaggerating the length of time they would have to exercise their options. *Id.* at 1127. Instead of basing their decision on the concept of an "investment contract" to which the employees had failed to contribute anything in *Daniel*, the Ninth Circuit panel observed that SLUSA's language was very like that of § 10(b), which bars securities fraud "in connection with the purchase or sale of any security." *Id.* at 1129. Moreover, emphasizing that the Supreme Court in *SEC v. Zandford*, 535 U.S. 813 (2002), found that § 10b "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes" and

"be viewed as part of the remedial package of federal securities laws," the Ninth Circuit panel focused on the fact that "the 1933 and 1934 Acts define the purchase or sale of a security to include any contract to buy or sell a security."  15 U.S.C. §§ 77b(a)(3). 78c(a)(13)-(14)."  *Id.* at 1129.  They further reasoned that "if a person contracts to sell a security, that contract is a 'sale' even if the sale is never consummated." *Id.*  The panel determined, "The grant of an employee stock option on a covered security is therefore a 'sale' of the covered security.  The option is a contractual duty to sell a security at a later date for a sum of money, should the employee choose to buy it.  Whether or not the employee ever exercises the option, it is a 'sale' under Congress's definition." *Id.* at 1129-30.  They concluded, "Whether or not an option grant is a sale in the lay sense, it is a sale under the securities laws because it is a contract to sell a security when the option is exercised.  We reject the contrary holding of" the *Cedant* cases. *Id.* at 1130.

    This Court observes that *Falkowski* relied on a statement in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750-51 (1975):  "A contract to purchase or sell securities is expressly defined by section 3(a) of the 1934 Act, 15 U.S.C. section 78c(a), as a purchase or sale of securities for the purposes of the Act. . . . [T]he holders of  . . . options and other contractual rights or duties to purchase or sell securities have been recognized as

'purchasers' or 'sellers' of securities for purposes of Rule 10b-5, not because of a judicial conclusion that they were similarly situated to 'purchasers' or 'sellers,' but because the definitional provisions of the 1934 Act themselves grant them such a status." In deciding to follow the *Cedant* cases and rejecting *Falkowski*, this Court would emphasize that *Blue Chip Stamps* was issued before *Daniel* (1979) and before the SEC 1980 Release. Moreover in the 1980 Release, the SEC changed its prior position to accord with *Daniel*'s and its progeny's reasoning. Additional reasons for not following *Falkowski* are highlighted in *McKissick v. Gemstar-TV Guide, Intern., Inc.*, 415 F. Supp. 2d 1240, 1244-45 (N.D. Okla. 2005).[26]

> Congress, in enacting the Securities and
> Exchange Act, provided definitions to help in
> the interpretation and application of the

---

[26] In *Mckissick*, as a result of the merger of TV Guide, Inc. and Gemstar International Group Limited, in which TV Guide became a wholly-owned subsidiary of Gemstar, each TV Guide shareholder received a fractional share of Gemstar stock in exchange for his TV Guide stock and each person who held stock options for purchase of TV Guide stock were granted stock options in Gemstar in the same fractional share given current shareholders. The plaintiff, who was President and Chief Operating Officer of TV Guide and had been awarded a number of stock options remained in that position with the subsidiary after the merger in 2000, but then left in 2003. She alleged that she had planned to exercise her stock options with TV Guide before the merger, but was fraudulently induced to hold them because of misrepresentations that mere made to her during the merger on which she relied, so her stock options were converted into Gemstar stock options. Soon after the value of Gemstar stock and her stock options significantly decreased, causing her a major loss. She sued. The plaintiff did not allege that she purchased or sold any stock at the time of the merger, but only that she had a contractual right to do so.

statutes. *See* 15 U.S.C. 78c. But, as the Supreme Court has stated, "The relevant definitional section of the 1934 Act are for the most part unhelpful; they only declare generally that the terms "purchase" and "sale" shall include contracts to purchase or sell. *SEC v. Natl. Sec., Inc.*, 393 U.S. 453, 466 . . . (1969). Thus, the Court must look to other courts to discern boundaries for standing under a Rule 10b-5 cause of action to determine if the holding of stock options by the Plaintiff constitutes a contract to purchase or sell stocks. . . .

[T]he Supreme Court's language in the *Blue Chip Stamps* decision was nothing more than dicta that alone cannot serve as the basis for standing under 10(b) or Rule 10b-5. . . . To allow the Plaintiff, who simply held her stock options, to qualify as a purchaser or seller of stock under Rule 10b-5 under these facts would destroy the Supreme Court's reasoning for adopting the *Birnbaum* Rule.[27] As the Court stated, "In the absence of the Birnbaum doctrine, bystanders to the securities marketing process could await developments on the sidelines without risk." *Blue Chip Stamps*, 421 U.S. at 747. . . .Here, the Plaintiff is exactly the person described by the Court, a "bystander to the securities market[]." *Id.* Moreover, as the Fifth Circuit has noted, "It is well established that the mere retention of securities in reliance on material misrepresentations or omissions does not form the basis for a section 10(b) or Rule 10b-5 claim." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1443 n. 7 (5ᵗʰ Cir. 1993)(citing *Blue Chip Stamps*, 421 U.S. 723 . . . .

## V. Disregarding the Corporate Form

Plaintiffs contend that the three Defendant UBS entities

---

[27] *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952)(finding that a purchase or sale was required for a Rule 10b-5 cause of action).

(PW, Warburg, and nonparty UBS AG) form a single enterprise which is liable to Plaintiffs for some or all of their alleged violations of the Securities Exchange Act. When an entity's corporate form is at issue, courts standardly hold that the law of the state of incorporation of that entity applies to determine whether its corporate form should be disregarded, i.e., whether one can pierce the corporate veil. *Ace American Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 195 (S.D. Tex. 2008)(and cases cited therein). PW and Warburg were incorporated in Delaware; thus the Court applies Delaware's law to determine if their corporate forms should be disregarded and UBS should be treated as a single enterprise Defendant.[28]

As stated in the complaint, PW and Warburg are subsidiaries of UBS AG. Contrary to Plaintiffs' insistence that in a Rule 12(b)(6) review the Court must accept their conclusory claim that "UBS" is a single entity and not three separate corporations as suggested by their names and corporate histories, under Delaware law a corporate entity "may be disregarded 'only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or equitable considerations among members of the corporation require it, are involved." *In re Phillips*

---

[28] As noted, the Third Circuit, which includes Delaware, has rejected group pleading as failing to satisfy the PSLRA's particularity in pleading requirement. *Winer*, 503 F.3d at 335.

*Petroleum Sec. Litig.*, 738 F. Supp. 824, 838 (D. Del. 1990). A conclusory statement that three entities are one is not sufficient without specific facts supporting such an allegation.  The separate corporate forms will not be disregarded "merely upon a showing of common management or whole ownership."  *Id.*  "A subsidiary corporation may be deemed the alter ego of its corporate parent[29] where there is a lack of attention to corporate formalities, such as where the assets of two entities are commingled and their operations intertwined" or "where a corporate parent exercises complete domination over its subsidiary." *Mobil Oil Corp v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989).  To pierce the corporate veil under an alter ego theory, Delaware law requires a showing of fraud or similar injustice.  *Ace American,* 255 F.R.D. at 196 (and cases cited therein).  While the "general principle of corporate law 'deeply ingrained in our economic and legal systems" is that "a parent corporation . . . is not liable for the acts of its subsidiaries," in exceptional circumstances plaintiffs may allege and ultimately prove that an alter ego relationship exists, in which a corporate parent exercises total domination and control

---

[29] Delaware courts use varying terminology when addressing the issue of liability in a parent-subsidiary relationship, "[y]et regardless of the precise nomenclature employed, the contours of the theory are the same." *Mobile Oil*, 718 F. Supp. at 266.  "Alter ego" is often used interchangeably with "disregarding the corporate entity," "piercing the corporate veil," "instrumentality," and "agent."  *Id.*

over its subsidiary, that the corporation and its subsidiary "operated as a single economic entity" so that "the corporation is little more than a legal fiction,'" and the parent company has fraudulent intent *Blair v. Infineon Technologies AG*, 720 F. Supp. 462, 469 (D. Del. 2010), *quoting United States v. Bestfoods*, 524 U.S. 51, 61 (1998), and *citing Bd. of Tr. of Teamsters Local 863 Pensions Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002); *Pearson v. Component Tech. Corp*, 247 F.3d 471, 485 (3d Cir. 2001); and *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989)("A subsidiary corporation may be deemed the alter ego of its corporate parent where there is a lack of attention to corporate formalities, such as where the assets of two entities are commingled and their operations intertwined.  An alter ego relationship might also lie where a corporate parent exercises complete domination and control over its subsidiary.").  As a tool of equity, under Delaware law "[t]he corporate fiction may be disregarded to prevent fraud," and a wholly-owned subsidiary may sometimes be treated as an instrumentality of the parent.  *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 38 Del. Ch. 490, 493 (Del. Ch. 1959).

The Third Circuit applies a "single entity test" that considers seven factors in deciding generally whether two or more corporations operated as a single economic entity:  (1) a corporation is grossly undercapitalized for the purposes of the corporate undertaking; (2) a failure to observe corporate

formalities; (3) the non-payment of dividends; (4) the insolvency of the debtor corporation at the time; (5) the siphoning of the corporation's funds by the dominant stockholder; (6) the nonfunctioning of other officers or directors; (7) the absence of corporate records; and (8) the fact that the corporation is merely a facade for the operations of the dominant stockholder(s). *Blair*, 720 F. Supp. 2d at 470-71, *citing United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981)(approving the federal alter ego factors used by the Fourth Circuit in *DeWitt Truck Brokers, Inc. v. W. Ray Fleming Fruit Co.*, 540 F.2d 681, 686-87 (4th Cir. 1976) to determine whether it was appropriate to pierce the corporate veil).  "While no single factor justifies a decision to disregard the corporate entity," some combination of these factors is necessary and "an overall element of injustice or unfairness must always be present as well." *U.S. v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988), *aff'd sub nom. Golden Acres, Inc. v. Sutton Place Corp.*, 879 F.2d 857 (3d Cir. 1989)(piercing the corporate veil where a subsidiary was undercapitalized, corporate formalities were not observed, the subsidiary was insolvent, the subsidiary did not pay dividends, and defendants were siphoning funds from the subsidiary, using it as "an incorporated pocketbook").  Some of these seven factors may be sufficient to show the requisite unfairness. *Pisani*, 646 F.2d at 88.  The test does not require evidence of actual fraud as a prerequisite for piercing the corporate veil. *Trustees of Nat.*

*Elevator Industry Pension, Health Benefit and Educational Funds v. Lutyk*, 332 F.3d 88, 194 (3d Cir. 2003).

In a narrowed application of the alter ego theory, under Delaware law a court may "pierce the corporate veil of a company where . . . it in fact is a mere instrumentality or alter ego of its owner" and the two operate as a "single entity." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995). To prevail on an alter ego claim, "a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness is present." *Id.* For the first element, the plaintiff must allege "exclusive domination and control . . . to the point that [the subsidiary] no longer has legal or independent significance of its own." *Id., citing Wallace ex rel. Cencom Cable Income Partners II, LP v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999). That element incorporates the list of typical  factors in the general corporate veil-piercing analysis: "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder. *In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr. D. Del. 2003), *citing Harco National Ins. Co. v. Green*

*Farms, Inc.*, CIV. A. No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989), *quoting Golden Acres*, 702 F. Supp. at 1104.  To satisfy the second element the plaintiff must show fraud or injustice inherent "in the defendant's use of the corporate form";  however "[t]he underlying cause of action, at least by itself, does not supply the necessary fraud or injustice," but is distinct from the tort alleged in the suit.  *Id., citing In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003); *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990).  "'To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping.'"  *Id., citing Mobil Oil*, 718 F. Supp. at 268.  To pierce the corporate veil, the corporate structure must cause the fraud, and the fraud or injustice must be found in the defendants' use of the corporate form; the corporation must be a fraud or a sham existing only for the purpose of serving as a vehicle for fraud.  *Foxmeyer*, 290 B.R. at 236 (cases not cited).[30]

---

[30] In *Skouras v. Admiralty Enterprises, Inc.*, 386 A.2d 674, 681 (Del. Ch. 1978), *citing Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684 (Del. Supr. 1959), and *State ex rel. Rogers v. Sherman Oil Co.*, 117 A. 122 (Del. Supr. 1922), the Delaware Court of Chancery emphasized that mere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity under Delaware law:  [a]bsent a showing of a fraud or that a subsidiary is in fact the mere alter ego of the parent, a common central management alone is not a proper basis for disregarding separate corporate existence." *In accord, eCommerce Industries, Inc. v. MWA Intelligence, Inc.*, C.A. No. 7471-VCP, 2013 WL 5621678, at *27 (Del. Ch. Oct. 4, 2013). In *Skouras*, the court found that the parent corporation's "subsidiary corporations were so organized and

Plaintiffs have failed to allege any of these kinds of facts to warrant disregarding the corporate forms of PW and Warburg.

### V.  Stock Broker Standards

At issue in this case is whether PW, in its brokerage relationship with the investor participants in the Enron Stock Option program, had a fiduciary duty to disclose material information about Enron's fraudulent activities and financial decline to its investor retail clients purchasing or holding Enron securities or debt.

Firms in the securities market operate in three main capacities: broker, broker-dealer, and investment advisor.  Thomas

---

controlled and their affairs are so conducted as to make them adjuncts or instrumentalities of the defendant company," and it listed factors that might be considered in determining whether a parent corporation is liable for the wrongdoing of a subsidiary because they operated as a single economic unit, including whether

> all of the subsidiary corporations were engaged in the same general business as the parent; the parent owned all of the shares . . . of the subsidiaries; all the members of the boards of directors of . . . the subsidiary corporations were also directors of defendant, and a majority of members of the boards of the remaining . . . subsidiaries were directors of defendant. Furthermore, the books of the subsidiaries were not in defendant's possession, custody, or control. Upon determining that the separate subsidiary corporations had been formed for fraudulent purposes, this court granted plaintiffs' demand for inspection of the books of defendant's subsidiaries. . . .

*Id.* at 681.

- 69 -

Lee Hazen, "Are Existing Stock Broker Standards Sufficient?," 2010 Colum. Bus. L. Rev. 710, 730 (2010).

A "broker" is defined in *Black's Law Dictionary* (6th ed. West 1990) as, "An agent employed to make bargains and contracts for compensation. A dealer in securities issued by others. . . . An agent of a buyer or seller who buys or sells stocks, bonds, commodities, or services, usually on a commission basis." *See also Rauscher Pierce Refsnes, Inc. v. Great Southwest Sav., F.A.*, 923 S.W. 2d 112, 115 (Tex. App.--Houston [14[th] Dist.] 1996)("The relationship between a broker and its customer is that of principal and agent."). Under the Exchange Act, 15 U.S.C. § 78c(a)(4)(A), a broker is "any person engaged in the business of effecting transactions in securities for the account of others."

A "broker-dealer" is defined as a "securities brokerage firm, usually registered with the S.E.C. and with the state in which it does business, engaging in the business of buying and selling securities to or for customers." *Black's Law Dictionary* (6th ed. West 1990).[31] There is no explicit fiduciary standard applicable to

---

[31] Under the Exchange Act a "dealer" is a person who engages in "the business of buying and selling securities . . . for such person's own account," and not as part of a regular business. 15 U.S.C. § 78c(a)(5)(A). The term broker-dealer includes persons who act as brokers, dealers, or both brokers and dealers. Tuch, *Self-Regulation*, 83 Geo. Wash. L. Rev. at 117. In the context of securities offerings, an investment banker plays two roles: it counsels the corporate issuer and, if it underwrites the offering on a firm-commitment basis, commits to acquiring the issuer's securities, and it sells those securities to investors. *Id.* at

broker-dealers under the Exchange Act,[32] but when they do more than act as order takers for their clients' transactions, they must meet other standards, including of suitability in making investment recommendations to their clients, and they must satisfy the rules of the self-regulatory organizations ("SROs"), including national securities exchanges and the Financial Industry Regulatory Authority ("FINRA," the self-regulatory body for broker-dealers) that oversee them.   Thomas Lee Hazen, "Fiduciary Obligations of Securities Brokers," 5 Law Sec. Reg. § 14:133 (March 2016 update).

Thus while a broker owes his investor-client a fiduciary duty, that duty varies in scope with the nature of their relationship, and determining that nature requires a fact-based analysis. *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 520 (5th Cir. 1987), *cert. denied*, 487 U.S. 1205 (1988).   The nature of the account, whether nondiscretionary or discretionary, is one factor to be considered, as are the degree of trust placed in the broker and the intelligence and qualities of the customer.

---

114-15.   Investment banks are correctly designated as broker-dealers, as evidenced by FINRA rules and the SEC's *Guide to Broker-Dealer Registration*.   *Id.* at 118.   In particular they qualify as brokers where they advise on security offerings, are involved in the sale or exchange of securities and receive fees for that service, negotiate between the issuer and the investor, and counsel on structuring transactions.   *Id*. at 118-20.

[32] Section 913(g) of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. at 1827-28, gives the SEC rulemaking authority to impose a fiduciary duty on broker-dealers, but it has not done so.

*Id.* A broker's duty is usually restricted to executing the investor's order when "the investor controls a nondiscretionary account and retains the ability to make investment decisions."[33] *Romano*, 834 F.2d at 530; *Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir. 1998).

When investors "lack the time, capacity, or know-how to supervise investment decisions" and "delegate authority to a broker who will make decisions in their best interests without prior approval" in a discretionary account, however, there well may be a duty to disclose. *Town North Bank, N.A. v. Shay Financial Services, Inc.*, Civ. A. No. 3:11-CV-3125-L, 2014 WL 4851558, at *17 (N.D. Tex. Sept. 30, 2014), *citing Martinez Tapia*, 149 F.3d at 412,[34] and *SEC v. Zandford*, 535 U.S. 813, 823 (2002). Under Texas law,

> In a non-discretionary account, the agency relationship begins when the customer places the order and ends when the broker executes it because the broker's duties in this type of

---

[33]   On the other hand, where the broker's duty simply consists of bringing parties together so they can negotiate a sale by themselves, he is merely a middleman and not necessarily an "agent" of any. *Rauscher*, 923 S.W. 2d at 115. The question whether an agency relationship exists is usually a question of fact. *Coleman v. Klockner & Co.*, 180 S.W. 3d 577, 587 (Tex. App.--Houston [14th Dist.] 2005)

[34] *Citing Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817, 825 (11th Cir. 1996)("fiduciary duty in the context of brokerage relationship is only an added degree of responsibility to carry out pre-existing, agreed-upon tasks properly"); *Limbaugh v. Merrill Lynch Pierce, Fenner & Smith*, 732 F.2d 859, 862 (11th Cir. 1984)("duty owed by the broker was simply to execute the order").

account, unlike those of an investment advisor or those of a manager of a discretionary account, are "only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security . . . ." As a general proposition, a broker's duty in relation to a nondiscretionary account is complete, and his authority ceases, when the sale or purchase is made and the receipts therefrom accounted for. Thus, each new order is a new request that the proposed agent consents to act for the principal. There is no on-going agency relationship as there would be with a financial advisor or manager of a discretionary account.

*Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 493-94 (Tex. App.--Houston [14th Dist.] 1994, writ denied)(citations omitted).

In a discretionary investment account, in contrast to a nondiscretionary account, a broker is a "fiduciary of his customer in a broad sense" and is required to

(1) manage the *account* in a manner directly comporting with the needs and objectives of the customer as stated in the authorization papers or as apparent from the customer's investment and trading history; (2) keep informed regarding the changes in the *market* which affect his customer's interest and act responsively to protect these interests; (3) keep his customer informed as to each completed *transaction*; and (4) explain forthrightly the practical impact and potential risks of the *course of dealing* in which the broker is engaged.

*Anton v. Merrill Lynch*, 36 S.W. 3d 251, 257-58 (Tex. App.--Austin 2001, rev. denied)(citations omitted, emphases added in *Anton*), *quoting Leib v. Merrill Lynch, Fenner & Smith, Inc.*, 461 F. Supp.

951, 953 (E.D. Mich. 1978), *aff'd*, 647 F.2d 165 (6th Cir. 1981).[35]

Although there is no statutorily mandated heightened pleading of fiduciary duty for brokers, Thomas Lee Hazen, a noted scholar in the field, points out that "there is plenty of authority under the existing law that recognizes heightened obligations of securities broker-dealers, at least when they are acting in a capacity beyond that of mere order taker. . . . The law, regulations, and regulatory interpretations to date make clear that broker-dealers have fiduciary or fiduciary-like obligations when they provide services beyond executing customer orders."  Hazen, "Are Existing Stock Broker Standards Sufficient?," 2010 Colum. Bus. L. Rev. 710, 713-14 (2010).   These legal sources include the Investment Advisers Act of 1940, regarding which the Supreme Court has held that, even though the word "fiduciary" does not appear in the statute, investment advisers are fiduciaries to their clients and must meet the fiduciary duties of care and loyalty, i.e., they must "must fully disclose material facts about prospective investments . . . [and] all conflicts of interests when giving

---

[35] Also cited by other courts in the Fifth Circuit, e.g., *In re Rea*, 245 B.R. 77, 88, 89-90 (N.D. Tex. 2000); *Puckett v. Rufenacht, Bromagen & Hertz*, Civ. App. No. H-88-0035(W), 1989 WL 265340, at *5 (S.D. Miss. May 31, 1989), *aff'd in part by* 903 F.2d 1014 (5th Cir. 1990), *amended by* 919 F.2d 992 (1990), *certified question* (*"What duty of care under Mississippi law does a commodities broker owe to commodities customers in a nondiscretionary account?"*), *answered by* 587 So. 2d 273 (Miss. 1991).

advice." *Id.* at 716, *citing SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 191-92 (1963).   A fundamental purpose common to a number of statutes enacted in the 1930's, including the Investment Advisers Act and the 1934 Act, "was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau*, 375 U.S. at 186.

The Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(11), however, defines "investment adviser" in relevant part as follows:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities, but does not include . . . (C) any broker or dealer whose performances of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor . . . .

The Court concludes from the allegations in the complaint and the lack of mention of any special compensation for PW's advice to its retail clients that PW does not qualify as an investment advisor under subsection (C). *See, e.g., Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1039 (4th Cir. 1997)("In this case, it is clear that, to the extent that Epley and Alex. Brown provided

'investment advisory services,' such services were "'solely incidental to the conduct of business as a broker dealer'" and "the Bank was not an 'advisory client' of the defendants."). The complaint states that PW did not charge Enron any fee to administer the Employee Stock Option program, and charged the employees merely six cents per share to exercise their options, apparently an administrative charge for effecting the transaction. #122 ¶ 67.

Furthermore the Supreme Court has held that private rights of action under the Investment Advisers Act of 1940 are restricted to suits for equitable relief for rescission of investment adviser contracts and restitution under section 215; damages are not available. *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979). "'[T]he rescinding party may have restitution of the consideration given under the contract, less any value conferred by the other party.'" *Douglass v. Beakley*, 900 F. Supp. 2d 736, 745 (N.D. Tex. 2012), *citing Transamerica Mortg. Advisors,* 444 U.S. at 18-24. The SEC may enforce the Act by obtaining an injunction mandating that a registered investment adviser disclose to his clients any of the adviser's violations of his duties under the Act. *Capital Gains*, 375 U.S. at 181.[36]

---

[36] As the Fifth Circuit observed in *Laird v. Integrated Resources, Inc.*, 897 F.2d 826, 833-37 (5th Cir. 1990), "Other circuits understand the investment adviser's fiduciary status to require disclosure of any conflicts of interest for the purpose of assessing liability under rule 10(b)-5." *Id.*, *citing and discussing SEC v. Blavin*, 760 F.3d 706, 711-12 (6th Cir. 1985)("As

Relevant to the determination whether broker-dealers have fiduciary or fiduciary-like obligations when they provide services beyond executing customer orders are SEC rules, particularly those addressing "(a) conflicts between the firm's obligations to its customers and its own financial interests, and (b) trading in or recommending securities in the absence of adequate information about the issuer," made pursuant to the general anti-fraud provisions of sections 10(b), 15 U.S.C. § 78j(b), and 15(c), 15 U.S.C. §78o(c), of the 1934 Act, section 17(a) of the Securities Act of 1933, 15

---

a fiduciary, the standard of care to which an investment adviser must adhere imposes 'an affirmative duty of 'utmost good faith, and full and fair disclosure to all material facts,' as well as an affirmative obligation to 'employ reasonable care to avoid misleading' his clients.")(citing *Capital Gains*), and *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1267-68 (9th Cir. 1979)(addressing section 206(1) and (2)("It shall be unlawful for any investment adviser, by use of the mails and any means or instrumentality of interstate commerce, directly or indirectly (1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . ."), which tracks the language in Rule 10b-5, of the Investment Advisers Act, as amended 15 U.S.C. § 80b-6(1,2), as analogous to § 10(b) and Rule 10b-5 of the Securities Exchange Act)("The plaintiffs here do not argue that Campbell was an investment adviser as defined in the statute; thus *Capital Gains* is not controlling. But the failure to bring the case within the Investment Advisers Act does not mean that the claim under Section 10(b) and Rule 10b-5 should fail. We hold that as applied to the facts we must assume in this case, the Investment Advisers Act was not meant to limit the Securities Exchange Act or Rule 10b-5. Instead, we believe these provisions complement each other and provide different means to curb slightly different types of 'fraud or deceit.' . . . A number of cases since *Capital Gains suggest that Rule 10b-5 requires the disclosure of conflicts of interests in situations similar to the facts of this case.*").

U.S.C. § 77q(a),[37] and section 206 of the Investment Advisers Act, described *supra*.  Hazen, "Are Existing Stock Broker Standards Sufficient?," 2010 Colum. Bus. L. Rev. at 722.

In the late 1930's, Congress amended the Exchange Act to authorize self-regulatory organizations for broker dealers.  *See, e.g.,* Andrew F. Tuch, *The Self-Regulation of Investment Bankers*, 83 Geo. Wash. L. Rev. 101, 112 & n.50 (December 2014), *citing* Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 8881 (codified as amended at 15 U.S.C. §§ 78a-78pp (2012)).  Hazen

---

[37] Section 77q(a), addressing "Use of interstate commerce for purpose of fraud or deceit, states,

> It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 78c(a)(78) of this title) or by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> > (1) to employ any device, scheme, or artifice to defraud, or
> >
> > (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> >
> > (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

particularly highlights the SEC and FINRA [formed in 2007 to replace the National Association of Securities Dealers ("NASD")] regulations[38] as sources of fiduciary-like duties. *Id.* at 733-55. Sections 6(b)(5) and 15A(b)(6) of the Securities Exchange Act require stock exchanges and associations of brokers and securities dealers to establish rules to protect the investing public from fraudulent and manipulative practices in the securities market. 15 U.S.C. § 78o-3(b)(6). In response, a number of national exchanges and SROs have adopted "suitability rules" for brokers. The NASD adopted Rule 2310(a), which provides,

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs." This is the so-called "suitability rule," and its purpose is to protect unsophisticated investors of publicly-held corporations from the sometimes devious practices of unscrupulous securities transactions experts.

The NYSE adopted a similar, "know your customer rule," NYSE Rule 405(a), which requires the officers of member organizations to "use diligence to learn essential facts relative to every customer, every order, every cash or margin account accepted or carried by such

---

[38] For example, Article III, NSAD Rules of Fair Practice, NASD Manual (CCH) ¶ 2151 provides, "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."

organization." Generally regulatory rules of conduct do not provide a private right of action for individual investors, but are for actions brought by the SEC or state regulatory investors.  As a result, aggrieved individual investors must frame their securities complaints as claims under § 10(b) of the Exchange Act and Rule 10b-5.  Steven D. Irwin, Scott A. Lane, and Carolyn W. Mendelson, *Wasn't My Brother Always Looking Out For My Best Interests?  The Road to Become a Fiduciary*, 12 Duquesne Bus. L. J. 41,44-45 (Winter 2009)("In itself, the regulatory violation does not state an independent claim for economic relief in a civil proceeding for the investor who suffered a loss at the hands of a broker who has made an unsuitable trade recommendation.  Instead, the aggrieved investor must state a valid claim under Rule 10b-5.  The plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.").

Hazen comments regarding violations of NYSE, FINRA or NASD rules that "it is generally held that violation of a rule or a self regulatory organization will not, by itself, support a private right of action.  However, a violation of an exchange or FINRA rule can form the basis of a 10b-5 action, provided of course, that all of the elements of a 10b-5 claim can be established."  "Market Regulation:  Broker-Dealer Regulation; Credit Rating agencies," 5

Law Sec. Reg. § 14:175 (updated March 2016).  The courts are split in a variety of ways over whether a private right of action exists for violations of such rules and regulations.

The Fifth Circuit has deliberately chosen not to decide whether rules for brokers established by national exchanges and SROs, such as the NASD suitability rule or the NYSE "know your customer rule," provide a private cause of action for individual investors, but has found that they may be used as evidence of industry standards and practices. *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 333 (5th Cir. 1981)(*en banc*)(in a churning case "NYSE and NASD rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," the other five factors being the nature and objectives of the account, the turnover rate, in-and-out trading, the holding period of the respective securities, and the broker's profit), *abrogated on other grounds*, 470 U.S. 213 (1985).

The Securities Exchange Act has no express civil remedy for a violation of an exchange or association rule.  In a seminal opinion in *Colonial Realty v. Bache and Co.*, 358 F.2d 178, 181 (2d Cir. 1965), *cert. denied,* 385 U.S. 817 (1966), in which a client sued his broker-dealer for failure to conduct its dealings in accordance with just and equitable principles of trade in violation of NYSE and NASD rules, Judge Henry J. Friendly opined that since a private remedy is not expressly stated in the 1934 Act, the

finding of an implied private cause of action should be based on the court's duty to effect Congress's purpose in the statute and the federal policy it has adopted.  A court may find an implied right of action under the Securities Exchange Act where there is explicit condemnation of certain conduct in the statute and when the statute provides a general grant of jurisdiction to enforce liability.  *Id.* Judge Friendly concluded that there could be no general rule as to when a private claim can be maintained for a violation of NYSE and NASD rules because "the effect and significance of particular rules may vary with the manner of their adoption and their relationship to provisions and purpose of the statute and SEC regulations thereunder."  An implied action may arise from the protection intended by the legislature and the ineffectiveness of existing administrative and judicial remedies to accomplish.  The court must examine the nature of the specific rule and its role in the regulatory scheme, with the party seeking to impose liability bearing a heavier burden of persuasion than the violation of the statute or of an SEC regulation would require.  *Id.* at 182.  Judge Friendly concluded, "The case for implication of liability would be strongest when the rule imposes an explicit duty unknown to the common law."  *Id.* Judge Friendly found that a private cause of action may exist under section 6 of the 1934 Act, which requires a securities association like the NASD to adopt disciplinary rules. *Id.* 181-83.  He found an implied cause of action where the rule that

was violated either constituted a substitute for an SEC regulation and where the rule that was violated established an explicit duty unknown to the common law.  *Id.* at 182.

As indicated in *Miley*, the Fifth Circuit has been hesitant to recognize a private cause of action based only on a violation of a NYSE or NASD rule.  *See also Porter v. Shearson Lehman Bros., Inc.*, 802 F. Supp. 41, 61 (S.D. Tex. 1992), in which the Honorable Ewing Werlein, noting Judge Friendly's opinion, emphasized that the 1934 Act "did not specifically authorize actions for violation of private associations rules," including the "suitability" rule of NASD, which "requires generally that a broker recommend a purchase or sale only after determining that the recommendation is suitable to the customer, and that he use due diligence to learn essential facts regarding the customer. . . . Congress could not have meant that NASD should be given the authority to define new crimes." Observing that district courts within the Fifth Circuit were split about whether an implied cause of action may be based on the NASD or stock exchange rules, Judge Werlein observed that in *Miley* and in *Jolley v. Welch*, 904 F.2d 988, 993 (5th Cir. 1990), *cert. denied*, 498 U.S. 1050 (1981), the Fifth Circuit permitted the NYSE and NASD rules to be considered as one of six factors in determining an element of an excessive trading violation (churning), but not as a private cause of action.  *Porter*, 802 F. Supp. at 62-63.  *See also Lange v. H. Hentz & Co.*, 418 F. Supp. 1376 (N.D. Tex. 1976)(NASD

rules are evidence of the standard of care NASD members should provide and are admissible in determining the question what fiduciary duties are owed by a broker to his investor).

In 1988 Congress passed Section 15(f) of the Exchange Act, 15 U.S.C. § 78o(f),[39] and Section 204A of the Investment Advisers Act, 15 U.S.C. § 8ob-4a,[40] which require broker-dealers and

---

[39] Section 78o(f) provides,

> Every registered broker or dealer shall make appropriate rules or regulations about these policies and procedures. *See* 17 C.F.R. §§ 230.37, 230.138, 230.139. Thus an investment bank is required to erect a Chinese wall between its securities analysts' research department and its divisions providing commercial banking, underwriting, or other services to issuers of securities to prevent information from the latter influencing the former.

[40] Section 204A of the Investment Advisers Act, 15 U.S.C. § 8ob-4a ("Prevention of misuse of nonpublic information") provides,

> Every investment adviser subject to section 80b-4 of this title shall establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse in violation of this chapter of the Securities Exchange Act of 1934 [15 U.S.C.A. § 78a et seq.], or the rules and regulations thereunder, of material nonpublic information by such investment adviser. The Commission, as it deems necessary or appropriate in the public interest or for the protection of investors, shall adopt rules or regulations to require specific policies or procedures reasonably designed to prevent misuse in violation of

investment advisers to establish, maintain, and enforce written policies and procedures reasonably designed to preclude unlawful use of material nonpublic information.

Federal common law has also imposed fiduciary duties in federal securities cases. For example, because a brokerage relationship is a principal/agent relationship, some courts have found fiduciary duties that generally accompany such a relationship, including that "the broker must act in the customer's best interests and must refrain from self-dealing unless the customer consents after full disclosure." Hazen, "Are Existing Stock Broker Standards Sufficient?," 2010 Colum. Bus. L. Rev. at 736-37 & n.127. When a broker recommends securities or transactions, heightened duties have been found to apply that parallel those under the Investment Advisers Act that arose from judicial interpretation. *Id*. at 738.

Under the "shingle theory" of the common law, "by hanging up a shingle, a broker implicitly represents that he or she will conduct business in an equitable and professional manner." *Id*. at 749, 738-39. As an extension of the common law doctrine of "holding out," it has been long and well established that "a securities broker occupies a special position of trust and confidence with regard to his or her customer when making a recommendation, and that

---

this chapter or the Securities Exchange Act of 1934 [15 U.S.C.A. § 78a et seq.] (or the rules or regulations thereunder) of material nonpublic information.

any recommendation of a security carries with it an implicit representation that the broker has an adequate basis for the recommendation." *Id.* at 750-51, *citing Hanly v. SEC*, 415 F.2d 589, 506 (2d Cir. 1969).

As another basis for enforcing suitability, the "shingle theory" holds that the SEC and self-regulatory rules require broker-dealers to adhere to standards of fair and equitable principles of trade and that breach of the implied representation that a broker will deal fairly with the public [even at arm's length] will be actionable in a private action under the securities laws only if a plaintiff customer can show a causal relationship between the alleged breach and injury to the plaintiff; a breach of fiduciary duty, alone, does not violate federal securities laws. *Id.* at 750, *citing Charles Hughes & Co. v. SEC*, 139 F.2d 434 (2d Cir. 1943), *cert. denied*, 321 U.S. 786 (1944). Nevertheless, the Court has been unable to find a single Texas case, no less a case in the Fifth Circuit, that applies the shingle theory, so presumably it has not been adopted in Texas.

"[A]ccountability for the implied representations that may arise out of a fiduciary duty will not violate the securities laws' antifraud provisions in the absence of showing that the defendant acted with the requisite scienter." Thomas Lee Hazen, "Fiduciary Obligations of Securities Brokers," 5 Law Sec. Reg. § 14:133 (updated March 2016), *citing In the Matter of Michael Flanagan,*

*Ronald Kindschi, and Spectrum Administration, Inc.*, Release No. 160, Release No. ID-160, 71 SEC Docket 1415, 2000 WL 98210, *24 (S.E.C. Release No. 2000).   The SEC also directs attention to the "basic principle" that by holding itself out as a broker-dealer, "a firm is representing that it will act in the customer's best interests." *Id.* & n.57 (and cases cited therein).

        In addition, "[e]ven in the context of federal claims against a broker-dealer, the federal courts may look to state law to determine whether a fiduciary duty existed."   Hazen, "Are Existing Stock Broker Standards Sufficient?," 2010 Colum. Bus. L. Rev. at 740, *citing Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999)(finding no fiduciary duty under New York common law for 10b-5 claims relating to mark-ups); *SEC v. Pasternak*, 561 F. Supp. 2d 459, 499 (D.N.J. 2008)("To determine the existence of a fiduciary relationship in federal securities fraud actions, district courts generally look to state law.").   Hazen concludes that the "apparent majority of cases applying state common law" found that although "there is no blanket fiduciary relationship between a broker-dealer and a client as a matter of law," certain circumstances "can suffice to create a fiduciary duty," especially when the broker holds itself out as having investment expertise and the customer places faith, confidence, and trust in the broker.   *Id.*

at 741-46.  Even where there is no discretionary account, the degree to which the broker cultivates a degree of trust and confidence in the customer affects the obligations that the broker has to the customer.  *Id.* at 748.  Among the duties that may be owed by a broker to a customer in a non-discretionary account[41] are "the duty to recommend a stock only after studying it, sufficiently to become informed as to its nature, price and financial prognosis," "the duty to inform the customer of the risks involved in purchasing or selling a particular security," "the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security," and "the duty not to misrepresent any fact material to the transaction." *Id.* at 748-49, *citing Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951, 953 (E.D. Mich. 1978)(and cases cited therein).

The Texas Supreme Court has opined that "the term 'fiduciary' is derived from the civil law and contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction.  Further, that term includes those informal

---

[41] A nondiscretionary account is one in which the customer must approve all transactions before they are effected. *Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 492 (Tex. App.-- Houston [14th Dist.] 1994, writ denied).  A discretionary account is one in which the broker makes the investment decisions and manages the account.  *Id*.

relations which exist whenever one party trusts and relies upon another, as well as technical fiduciary relations." *Texas Bank and Trust Co. v. Moore*, 595 S.W. 2d 502, 507 (1980), *citing Kinzbach Tool, Inc. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W. 2d 509 (1942).  The Supreme Court in *Texas Bank* quoted the Illinois Supreme Court in *Higgins v. Chicago Title & Trust Co.*, 312 Ill. 11, 18, 143 N.E. 482, 484 (1924),

> A fiduciary relation is not limited to cases of trustee and cestui que trust, guardian and ward, attorney and client, nor other recognized legal relations, but it exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed, and the origin of the confidence is immaterial, and may be moral, social, or domestic or merely personal.

Moreover, "a fiduciary relationship exists when the parties are 'under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation.'  It exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *Id., quoting Lappas v. Barker*, 375 S.W. 2d 248, 251 (Ky. 1964).  "The problem is one of equity and the circumstances out of which a fiduciary relationship will be said to arise are not subject to hard and fast lines." *Id.* at 508.

In Texas, to state a claim for breach of fiduciary duty, the plaintiff must plead "(1) a fiduciary relationship between the plaintiff and defendants; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Billiteri v. Securities America, Inc.*, No. 09-CV-1568-F, 2010 WL 6785484, *9 (N.D. Tex. July 26, 2010), *citing Jones v. Blume*, 196 S.W. 3d 440, 447 (Tex. App.--Dallas 2006, pet. denied). Texas law recognizes two types of fiduciary duty, a formal relationship arising as a matter of law, and an informal relationship, where there is a close personal relationship of trust and confidence. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007); *Willis v. Donnelly*, 199 S.W. 3d 262, 277 (Tex. 2006). The latter arises from a "moral, social, domestic, or purely personal relationship of trust and confidence." *Meyer v. Cathey*, 167 S.W. 3d 327, 331 (Tex. 2005); *Thigpen v. Locke*, 363 S.W. 2d 247, 253 (Tex. 1962). "The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved." Thigpen, 363 S.W. 2d at 253.

Under Texas law the formal relationship between a broker and its customer is one of principal and agent. *Rauscher Pierce Refsnes, Inc. v. Great Southwest Savings, F.A.*, 923 S.W. 2d 112, 115

(Tex. App.--Houston [14th Dist.] 1996), *citing Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*, 794 F.2d 198, 200 (5th Cir. 1986)("The relationship between a securities broker and its customer is that of principal and agent. . . . . The law imposes upon the broker a duty to disclose to the customer information that is material and relevant to the order."). The relationship between an agent and a principal is a fiduciary relationship under Texas law. *West v. Touchstone*, 620 S.W. 2d 687, 690 (Tex. App.--Dallas 1981), *citing Restatement (Second) of Agency* § 1 (1958). Nevertheless that fiduciary relationship is a narrow one, starting with and restricted to the scope of the agency. *Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 492 (Tex. App.--Houston [14th Dist.] 1994, writ denied). As with federal law, under Texas law "[i]n a non-discretionary account, the agency relationship begins when the customer places the order and ends when the broker executes it, because the broker's duties in this type of account, unlike those of an investment advisor or those of a manager of a discretionary account, are 'only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security or future[s] contracts on the market. As a general proposition, a broker's duty in relation to a nondiscretionary account is complete and his authority ceases, when the sale or purchase is made and the receipts

- 91 -

therefrom accounted for." *Id.* 493-94, *citing Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F. Supp. 107, 111 (N.D. Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972).  In *Rauscher*, 923 S.W. 2d at 115 (citations omitted), the Fourteenth Court of Appeals explains,

> An agent is one who consents to act on behalf of, and subject to, the control of another, the principal, who has manifested consent that the agent shall so act.  Agency is a consensual relationship, and the agency or broker/customer relationship does not come into existence until the order has been placed and the broker has consented to execute it. . . . If a broker, under his contract with his principal, is charged with no responsibility and is not obligated to exercise any discretion, but his duty consists of merely bringing the parties together so that between themselves, they may negotiate a sale, and the sale is made in that manner, the broker is considered a mere "middleman" and is not necessarily the "agent" of either party.

The *Restatement (Third) of Agency* § 1.01 (2006) defines "agency" as follows:  "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  An innate duty of good faith and fair dealing, honest performance, and strict accountability is owed by an agent to his principal, and is required in every transaction

on behalf of the principal. *Vogt v. Wamock*, 107 S.W. 3d 778, 782
(Tex. App.--El Paso 2003, pet. denied), *citing Sassen v. Tanglegrove
Townhouse Condominium Ass'n*, 877 S.W. 2d 489, 492 (Tex. App.--
Texarkana 2001, pet. denied).

Nevertheless, under Texas law, to impose an informal
fiduciary duty in a business transaction, "the special relationship
of trust and confidence must exist *prior to* and *apart from* the
agreement that formed the basis of the suit." *Aubrey v. Barlin*, _
_ F. Supp. 3d ____, No. 1:10-CV-00076-DAE, 2016 WL 393551, at *7
(W.D. Tex. Feb. 1, 2016), *citing Meyer v. Cathey*, 167 S.W. 3d 327,
331 (Tex. 1998). "[T]he fact that a business relationship has been
cordial and of extended duration is not by itself evidence of a
confidential relationship." *Floyd v. CIBC World Market, Inc.*, 426
B.R. 622, 651 (S.D. Tex. 2009), *quoting Lexington Ins. Co. v. North
Am. Interpipe, Inc.*, Civ. A. No. H-08-3589, 2009 WL 1750523, at *3
(S.D. Tex. June 19, 2009). Whether a fiduciary duty exists is a
question of law for the court. *Fuqua v. Taylor*, 683 S.W. 2d 735,
737 (Tex. App.--Dallas 1984, writ ref'd n.r.e.). The facts giving
rise to a fiduciary duty, however, are to be determined by the fact
finder. *Id.* at 737-38. Texas courts do not create a fiduciary
relationship lightly. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.
2d 171, 177 (Tex. 1997); *Meyer*, 167 S.W. 3d at 331.

## V.  Allegations of the Third Amended Complaint (#122)

Each of the eight named Lead Plaintiffs purchased or held Enron equity securities and/or acquired stock options to purchase Enron securities in his [or her] PW account "in reliance on the information provided to him [or her] and absence of information withheld from him" by PW during the Class Period.  #122, ¶¶ 5-12. Plaintiffs contend that UBS owed them a duty of disclosure but failed to disclose material information within its knowledge, gained by its participation with Enron in creating a false public characterization of Enron's financial condition throughout the 1934 Act Class Period, in order to maximize its earnings from Enron at the expense of and in conflict with the interests of its retail clients who were purchasing, acquiring and/or holding Enron securities.[42]

_____

[42]Plaintiffs identify as alleged undisclosed conflicts of interest the following matters (see #122 ¶¶ 209-22).  UBS, like many investment banks, uses research analysts as "bird dogs" to lure in customers and assist the banking department of the bank, just as it used Barone and his "Strong Buy" recommendation, but UBS never disclosed to the investing public or to Plaintiffs Barone's activities or pay.  Described as a "regular" occurrence, Mark Altman, deputy head of the U.S. Equity Research for UBS, conceded that, at the request of the investment bankers in UBS, the Equity Department research analysts helped by initiating coverage of a company as an incentive for that company to then do business with the bank.  Barone took clients to visit Enron, assisted in the Enron-owned Azurix's IPO, and participated in Enron-subsidiary EOTT's secondary and senior note offerings.  Brian Barefoot, head of PW's investment bank until the completion of its integration

Plaintiffs allege that Defendants, with scienter, violated Section 10(b) of the 1934 Act and Rule 10b-5(a) and (c) by engaging in a scheme to defraud or a course of business or conduct that operated as a fraud upon Plaintiffs and the putative class and deceived them into believing that the price at which they either purchased or held their Enron securities during the Class Period[43] was determined by supply and demand in the marketplace.   More specifically, UBS participated in five transactions lacking a legitimate business purpose, but employed to create a false public

---

with UBS, in February 2000 contributed money on behalf of the investment banking department to the "research compensation pool" for Barone's efforts, including those related to Azurix and EOTT. Each year Barone's base salary and bonuses went up substantially. With Barone's help, in 2001 UBS was chosen as a co-lead manager and/or co-manager on Enron investment banking deals.

The Court observes that the customers who were purportedly lured in to do business with UBS are not members of the Plaintiff class defined in the Third Amended Complaint and thus not relevant to this suit.

[43] The Class Period for the § 10(b), 1934 Act claims was from November 5, 2000 to December 2, 2001.

The Class Period for the §§ 11 and 12 1933 Act claims was from October 19, 1998 to November 19, 2001.

There are two proposed subclasses of PW customer Plaintiffs under each of the two Acts.   #122 at p. 6, ¶16. These are (1) a class of purchasers of Enron common or preferred stock on whose behalf the 1934 Act claims are alleged (¶ 16(I); (2) a class of  holders of Enron common or preferred stock with claims under the 1934 Act (¶16(ii)); (3) and (4) classes of former Enron employees with claims regarding Enron employee stock options  under Section 11 and Section 12 of the 1933 Act (¶ 16 (iii) and (iv), respectively).

- 95 -

image of a strong Enron financial position:  two amendments to the
Equity Forward Contracts between UBS and Enron; underwriting notes
issued as part of Enron's Osprey/Whitewing projects; commitment to
extend credit to Enron's E-Next facility; and underwriting credit
linked notes in Enron's Yosemite IV structure.   #122 ¶¶ 51-52.
Plaintiffs contend that UBS breached its duty to disclose to
Plaintiffs, based on the 1934 Act and on the brokerage relationship
between PW and Plaintiffs, the material information and knowledge
that UBS possessed because of its participation, with scienter, in
these transactions, manipulated to create a false public
characterization of Enron's financial position and of the concealed
conflicts underlying Warburg's commercial banking relationship with
Enron and PW's brokerage relationship with retail clients.   #122 ¶
188.  The undisclosed information was material in that a reasonable
investor would have considered it important in deciding whether to
invest in Enron securities.  Once that information became public,
Plaintiffs allege that it negatively impacted the price of Enron
securities and thus damaged Plaintiffs and the putative class.
Furthermore Plaintiffs conclusorily assert that "UBS's actions
certainly show it acted with requisite scienter." #122 ¶ 190.  They
also claim that UBS and Enron's self-serving relationship took
precedence over and conflicted with the interests of these PW retail

investor clients, from whom UBS had first bite at Enron employee wealth (which it dubbed "the goldmine") to generate retail fees and income for UBS and to whom PW would funnel Enron and Enron-related securities to transfer Enron's risk to the marketplace.

Plaintiffs' claims against PW under §§ 11 and 12 of the 1933 Act, 15 U.S.C. §§ 77k and 77l, on behalf of persons who acquired Enron employee stock options and the common stock acquired when they exercised those stock options, arise from PW's alleged role as the exclusive broker and stock option plan administrator for Enron during the 1933 Act Class Period.  #122 ¶¶ 16(iii)-(iv), 26, 230, 271.  The complaint asserts that PW functioned as a "seller"[44] and "underwriter"[45] of Enron securities and is purportedly liable for the materially false financial statements contained in Enron prospectuses and registration statements.  #122 ¶ 26.

According to the governing complaint, it was common knowledge in the banking industry that Enron paid huge investment banking fees to banks that provided it with credit capacity.  The rapid expansion of Enron's business from natural gas pipelines to

---

[44] Under the 1933 Act, "sellers" and "underwriters" of securities are required to make full and complete disclosure to purchasing investors in public offerings.  Section 11, 15 U.S.C. § 77k(a).

[45] Pages 95-96 (¶ 200) of #122 list the public offerings of Enron securities for which PW or UBS served as underwriter.

a global enterprise energy trading in the mid 1990's created a substantial need for cash infusions, so from 1998 onward the UBS Defendants worked hard to expand their credit capacity for Enron in hopes of being allowed to obtain some of the more than $100 million in non-credit related investment banking fees that Enron paid out yearly. It also sought to obtain and retain high credit ratings to allow it to accumulate senior unsecured long-term debt, essential to its success.  Moreover beginning in 1992 with the SEC's okay and expanding as the years went by, Enron used mark to market accounting ("MTM accounting"), including for its merchant investments, which allowed Enron to recognize earnings long before its activities generated any cash, resulting in an ever increasing gap between income and actual funds flowing from operations (a "quality of earnings" issue) by 1999.  By December 31, 2000, approximately $22.8 billion of Enron's assets were accounted for using MTM accounting, representing 35% of its $65.5 billion total assets.

More specifically the complaint recites that Rocky Val Emery ("Emery"), originally a financial adviser with PW, in 1993 learned from a client, Bill Roamy, an executive with Enron-owned EOG Resources, that Enron was creating an "all employee" stock option program and putting it out for bids from investment firms for a contract to administer the Stock Option Program.  #122 ¶ 65.

Seeking to make a lot of money, Emery put together a plan that impressed Enron, and PW was chosen in 1994 to be the exclusive Administrator of the Enron Employee Stock Option Plan, *id.* at ¶ 66, with Emery given the primary responsibility for overseeing services to Enron and the Enron employees who opened accounts.  Emery's group in PW was known as the Emery Group, which continued to expand and provide services to PW for four years.  In 1998 PW and Enron entered into a written, three-year contract which provided that when an Enron employee chose to exercise his stock options, he had to do so exclusively through PW.  # 122, ¶¶ 66-68.  Once he exercised the stock options, he could either stay with PW or move his business to another firm.  #122 ¶ 67.  To retain that retail business, PW did not charge Enron any fee to administer the Employee Stock Option program, and PW charged the employees merely six cents per share to exercise their options, and thereby insured that PW would receive a stream of wealth from the arrangement.  #122 ¶ 67.

With its goal being to retain wealth generated by Enron employees as they exercised their stock options, with its business model PW was gradually capturing and retaining about 60% of that wealth.[46]  #122 ¶ 70.  The way the arrangement worked, each time an

---

[46] The complaint at ¶ 69 states that by 1999 about 45,000-50,000 Enron employees participated in the Employee Stock Option Plans.  Of these, 25% signed up immediately by filling out the

Enron employee received a grant of stock options, PW would send that employee a packet of information regarding that stock grant, the exercise price, vesting dates, tax treatments, and other data about how to exercise those options and a form for the employee to apply for a new PW account; in addition it would inform the employee as a lure that PW charged a negligible six cents per share for the employee to exercise his stock options.   #122 ¶¶ 67-68.   PW emphasized to the employee that it provided free services to employees who opened PW accounts, including not only the Resource Management Account itself ($85 per year value), but also free stock option analysis and free financial plans worth hundreds of dollars. *Id.* When an employee wanted to exercise his stock options, he could call PW.   If the employee was an insider or had options worth $500,000 or more, he was transferred to Emery; otherwise he was forwarded to one of the brokers in the Emery group on a rotating basis.   When a PW broker answered the call, the broker would immediately offer the employee a free "financial plan," which would then automatically assign the employee account to that broker, and the employee became an advisory client of UBS under the Investment Advisers Act of 1940.   #122 ¶ 71.   One broker described this

---

forms provided in the introductory packed; 25% opened accounts when they exercised their stock options; and another 25% would slowly flow in over a few months.

lucrative flow of money to PW "like shooting fish in a barrel." #122 ¶ 72.

Furthermore to keep this money flowing, PW made a secret "gentlemen's agreement" with Enron, unknown to PW's clients, that PW financial advisors would not recommend that their retail customers should sell Enron stock, would advise them to exercise their Enron options, and would say nothing about Enron that might be perceived as negative. While PW advisors were permitted to advise their clients to diversify, those advisors had to speak with clients in code language, in which they intended "diversify" to mean "sell," in violation of the rules of the National Association of Securities Dealers, Inc. ("NASD"). #122 ¶ 74. PW did not reveal that communications between it and its clients were limited nor that there would be no full disclosure. These communications were intentionally misleading. Furthermore, whenever a PW client asked his financial advisor about Enron, the financial advisor was required to give the client the "Strong Buy" rating on Enron's stock by the managing director of the energy group at UBS Equity Research Ron Barone,[47] despite the fact that Barone did not intend that

---

[47] It should be noted that ironically Plaintiffs' complaint, if anything, bolsters Barone's credentials to evaluate energy companies (#122 ¶ 206):

Barone is the managing director in the energy

rating to be a "buy" recommendation.[48] #122 ¶ 76.[49]

> group at UBS Equity Research and has been an
> analyst since 1971. At UBS, he specializes in
> natural gas transmission, distribution,
> independent power production and energy
> marketing companies. He has been ranked on
> *Institutional Investors'* "All Star Team" for
> 27 consecutive years. In 2001, Barone was
> ranked No. 2 in the natural gas category by
> *Institutional Investors'* All-American Team.
> Prior to joining UBS, Barone was the natural
> gas analyst at Paine Webber, Inc.

The Court notes that the complaint alleges no facts that would demonstrate that Barone acted with scienter in misleading those he advised. As Defendants observe, #126 at p. 43, it was not "an extreme departure from the standards of ordinary care" for Warburg to permit Barone to publish his research even though others had different views. *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006)(defining severe recklessness for scienter as "highly unreasonable omissions or misrepresentations demonstrating an extreme departure from standards of ordinary care"), *citing Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

[48] Barone allegedly sent a Note with each rating to the PW brokers to indicate that it was a rating, not a recommendation, and that he expected they would read and understand it and discuss with their client whether a stock was appropriate for the account holder, but this information was never revealed to PW clients. #122 ¶ 76.

[49] The complaint asserts (#122 at ¶¶ 205 and 207-08),

> 205. UBS purports to have "Research
> Principles." During the class period, it
> represented to clients that the purpose of its
> equity research was to benefit the investing
> clients by (1) analyzing companies, industries
> and countries to forecast their financial
> performance; and (2) providing opinions on the
> value and future behavior of securities. UBS

represented that its equity research was objective, had a reasonable basis and was balanced and objective. Perhaps most importantly, UBS represented that its Equity Research would not be used by UBS ". . . **to advance its own interests over those of its client, or to advance analysts' own interests."** [emphasis in original #122] . . . .

207. UBS's fraudulent course of business is evidenced, in part, by its (1) willingness to allow Barone to continue coverage on Enron when he espoused positions that UBS **knew** were **wrong**; and (2) requiring, in the face of its knowledge, that Barone's "Strong Buy" Research Notes be given to each and every client who asked questions regarding Enron. Within the UBS investment bank it was openly discussed that Barone's analysis and "Strong Buy" rating was [*sic*] inconsistent with the investment bank's knowledge of Enron's finances. Moreover, the investment bank's senior credit officers admitted shortly before Enron's bankruptcy that Barone's continuous "Strong Buy" rating when highlighted by the press was "very embarrassing."

208. UBS allowed Barone to accept, apparently blindly, Enron's upper management's nonsensical explanations and ignore known hard data. More importantly, UBS did not manage Barone, took advantage of Barone's contrary rating to mitigate UBS's exposure to Enron, and used Barone to serve Enron, UBS's "true client," by enhancing its investment banking and retail revenues at the complete expense of the Plaintiffs to whom UBS owed concrete regulatory duties of disclosure.

Defendants point out that courts have dismissed claims based on an investment bank's failure to "monitor or correct" allegedly incorrect research reports. #126 at p. 42, *citing Podany*

Because many of the high level executives at Enron had accounts at PW, when a "sudden firestorm of selling Enron stocks began within the ranks of upper level executives at Enron" in mid summer 2000, supported in the complaint by charts showing precise sales by specific, identified executives on pp. 31-36 in #122,[50] PW

_____

*v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154, 156 (S.D.N.Y. 2004)(and cases cited therein)("A securities fraud action may not rest on allegations that amount to second-guesses of defendants' opinions about the future value of issuers' stock-- second guesses made all too easy with the benefit of hindsight"; among "strong policy reasons why courts do not engage in . . . second-guessing of forward-looking opinions" are that "relying on an inference that an opinion that turned out to have been very misguided must have been subjectively insincere would encourage lawsuits every time a drop in share prices proves that an earlier-uttered forward-looking opinion turned out to have been too optimistic. . . . The securities laws are not intended as investor insurance every time an investment strategy turns out to have been mistaken.     Thus,    the    ultimate    inaccuracy    of    defendants' recommendations cannot be the sole basis for liability in a § 10(b) action for misstatement of opinion. . . . [S]uch evidence is not sufficient to allege scienter, and assertions that the opinions must have been false because in hindsight it would have been more prudent to make different recommendations do not constitute the required particularized allegations of 'provable facts' supporting an inference that the opinions were not truly held.").

[50] Defendants argue that these pages of trades do not demonstrate knowledge by PW of Enron's deteriorating financial condition.   Plaintiffs fail to indicate how many shares of Enron stock each insider retained and whether he sold most of his holdings or retained substantial exposure to Enron.   Moreover allegations of sales of the company's stock by insiders, without more, are insufficient to plead knowledge of the corporation's declining financial state even by those insiders.   *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999)("The Third

knew from these red flags that there was trouble at Enron.  Within thirteen months twenty-one insiders sold more than half a billion dollars in Enron stock and generated hundreds of thousands of dollars in fees for PW, which did not warn its retail clients, but instead focused on keeping them invested in Enron securities.

As noted, Enron would not permit any adverse comments about its stock.  Heritage Branch Manager Patrick Mendenhall, Heritage Branch Sales Manager Willie Finnigan, and Rocky Emery warned brokers in the branch on various occasions that if they communicated "any adverse information about Enron to Enron employees, they would be reprimanded, sanctioned, yanked from the

---

Circuit has held that it "will not infer fraudulent intent from the mere fact that some officers sold stock."); *In re Enron*, 258 F. Supp. 2d at 593-94 ("The mere pleading of insider training without regard to either context or the strength of the inferences to be drawn is not enough"; "[w]hether there is an unusual or suspicious pattern of insider trading may be gauged by such factors as timing of the sales (how close to the class period's high price), the amount and percentage of the seller's holdings sold, the amount of profit the insider received, the number of other insiders selling, or a substantial change in the volume of insider sales.").  That a third party like PW simply knows about the trades by executing or reading about them does not constitute knowledge of Enron's "true" financial condition.

The Court notes that in *Advanta Corp.*, *id.*, the Third Circuit went on to say "But if the stock sales were unusual in scope or timing, they may support an inference of scienter." *Citing Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) ("[A]llegations of 'insider trading in suspicious amounts or at suspicious times' may permit an inference that the trader--and by further inference, the company--possessed material nonpublic information at the time.").

Enron account, or even terminated." #122 ¶ 80. Whenever someone crossed that line, the brokers were told about the incident and the person was exposed. The brokers were given a blunt notice: "If you 'piss off' Enron, 'you're done.'" *Id.* During the summer of 2000, David Loftus, an employee in management, raised questions about Enron's business decisions to another passenger on a plane and was subsequently criticized for doing so and admonished not to say anything negative about Enron. *Id.* ¶78. In 2001 Craig Ellis, a consultant to help PW's sales force with various investments, at a sales meeting characterized the company as "'cook the books' Enron"; Ken Logsdon, one of Rocky Emery's right-hand men and an elite member of the Emery Group, told Patrick Mendenhall, who then "silenced Ellis." *Id.* ¶ 81.

As an extreme example of Enron's repression of broker communications to clients, the complaint also goes into great detail about a PW broker, Chung Wu ("Wu"), who worked with the Emery Group at PW and whose client base was largely comprised of Enron employees and former employees who had opened their accounts when exercising their Enron stock options and whose wealth, he realized, was overly and dangerously concentrated in Enron stock and unexercised Enron stock options. #122 ¶¶ 78-79, 82-110. After intense due diligence, Wu was concerned that expectations for Enron stock were far too

optimistic. By March 1990, in spite of PW/UBS's "Strong Buy" recommendation for Enron stock, Wu warned his clients of Enron's "worsening condition." Meanwhile between December 2000 and March 2001 PW sold more than $65,000,000 worth of Enron common stock for four top Enron executives: Ken Lay ($20,604,300), Jeff Skilling ($12,382,100), Ken Rice ($20,604,300), and Cliff Baxter ($13,694,751). Wu continued to warn his clients, including Plaintiff Janice Schuette's husband, about Enron's deteriorating P/E ratio, problems with its India plant, and silence about its increasing losses. In April and May 2001, PW continued its extensive stock sell-off for Enron executives: Lay ($4,144,380), Skilling ($5,216,400), Rice ($1,096,465) and Lou Pai ($45,833,700). In June and July 2001, as Wu sent more warnings to his clients, UBS continued to facilitate the executives' liquidation of Enron stock: Lay ($6,808,155), Skilling ($1,034,200), Rice ($18,993,991), and Pai ($2,215,605). In sum, while publishing "Strong Buy" recommendations and touting Enron stock to Enron's rank-and-file employees, including putative Class Members, PW liquidated over $150,000,000 in Enron stock for five Enron executives. #122 ¶¶ 87-91.

Wu continued to follow Enron's deteriorating financial position and in a August 21, 2001 final report to his clients he urged them to divest themselves of Enron stocks and vested options.

Several of Wu's clients who were also Enron officers[51] in anger reported the correspondence to higher officers, and Wu was immediately terminated from PW.  #122 ¶¶ 93-104.  With Enron's approval, PW sent out by email a retraction letter from Patrick Mendenhall to all of Wu's clients stating that Wu's email was not approved by PW and its contents were in violation of PW's policies and contrary to Barone's "Strong Buy" recommendation.  #122 ¶¶ 105-06, 108-10.

PW also purportedly immediately implemented a written policy requiring compliance with the secret "gentlemen's agreement" to prevent another such incident.  PW management forbade its financial advisors from giving any advice to their retail clients regarding stock option issuers like Enron after August 21, 2001, and instead ordered them to refer the clients to UBS's current research report and rating on the stock.  #122 ¶ 111.  Not only did Barone's deceptive "Strong Buy" rating remain unchanged until November 28, 2001, when it was merely downgraded to "Hold,"[52] but even "the Chief

---

[51] Specifically, Jeff Donahue, Enron's Senior Vice President of Corporate Development; Joan Amero, who worked for Enron-owned PGE in Portland Oregon; and Mary Joyce, Senior Vice President of Executive Compensation.

[52] The complaint points out that beginning in June 2001, UBS eliminated virtually all of its trading and credit exposure to Enron by the time Enron filed for bankruptcy on December 2, 2001. At the same time it continued to sell Enron securities and debt to

Executive Office of UBS's retail brokerage business, the man who was responsible for the corporate gag policy on UBS brokers," like the clients, misinterpreted it to mean he should buy Enron stock.  #122 ¶ 112, 115.

         In addition to "highlight[ing] UBS's subordination of its retail clients' interests to its own and those of Enron," Plaintiffs claim that Wu's termination illustrates "UBS's coordination of its entire structure to accomplish a common goal," as well as "the control Enron was able to exert over UBS, even during a period of time when UBS had its hands full moving heaven and earth to rid itself of liability and exposure to Enron."  #122 ¶ 115.

         UBS allegedly used its extensive information about Enron's financial status, gained in part through its active participation in Enron transactions and financial manipulations[53] in which UBS played significant parts (1) to maximize its Enron-derived income at the expense of and in conflict with the interests of PW's retail customers and (2) to limit UBS's own exposure to Enron.    The

---

uninformed investors, including its retail clients.  #122 ¶ 174-75. By the first week of September UBS had begun its review to downgrade Enron's internal rating and determined by October that such a downgrade would take place.  #122 ¶ 174.

         [53] Including 1999 and 2000 amendments of existing Equity Forward Contracts, the Osprey and Yosemite IV financial structures, and the Enron E-Next Generation loan.

complaint describes in substantial detail certain transactions[54] and UBS's unwinding in which UBS's active participation gave it material, nonpublic information about Enron's deteriorating financial condition and manipulations that provide the basis for Plaintiffs' securities fraud claims and which Plaintiffs contend UBS had a duty, which it breached, to disclose to its investor clients,[55] who purchased, acquired, and/or held Enron securities through UBS. UBS's involvement with Enron in these transactions, was designed to create a false appearance of Enron's financial position by concealing significant losses, as well as to generate income and conceal secret loans to Enron, hidden by off-balance sheet and mark-to-market accounting, in other words, actions in which UBS aided and abetted Enron in its fraud on the investing

---

[54] UBS Defendants identify and describe in detail (1) the 1999 and 2000 amendments to existing Equity Forward Contracts to effect two undocumented and undisclosed loans to Enron (#122 ¶ 119-146, 176-80), (2) the Osprey transaction (*id.* ¶¶ 147-155), (3) the Yosemite IV structures (*id.* ¶¶ 156-160), and (4) the Enron E-Next Generation loan (*id.* ¶¶ 161-66). The complaint also lists other transactions on which UBS worked through which it purportedly gained additional nonpublic information about Enron's deceptive acts: "Project Wiamea" or "Project Kahuna"; "Project Summer" or "Enigma"; and "Enigma II." #122 ¶¶ 167-73.

[55] The nondisclosure of material information in violation of a duty to disclose is a "deceptive" act prohibited by Section 10(b) and Rule 10b-5. *In re Enron Corp. Sec., Derivative & "ERISA Litig.*, 235 F. Supp. 2d 549, 569 n.9 (S.D. Tex. 2001), *citing Santa Fe*, 430 U.S. 462, 470 (1977). At issue here is whether UBS owed a duty to disclose to these investors.

public generally, claims now invalidated as primary violations of the 1934 Exchange Act and of Rule 10b-5 by *Central Bank* and *Stoneridge*. Because UBS's participation in these allegedly illegal acts does not constitute a primary violation of the 1934 Act as to Enron, the Court does not summarize them, but refers the parties to the complaint's descriptions. Instead the Court focuses on allegations that, having gained substantial knowledge of Enron's deceptive acts by its involvement in these deceptive transactions, PW breached its duty as broker to disclose to its own retail investor clients, in violation of § 10(b) and Rule 10b-5, material information that it gained about Enron's fraudulent activities and deteriorating financial condition. #122 ¶¶ 116-73.

Starting in June 2001, Enron's financial image began to disintegrate rapidly, with Enron filing for bankruptcy on December 2, 2001. As part of its plan to transfer its Enron credit exposure, in June and July UBS issued and sold $163 million worth of notes to a Japanese investor with the payment obligation structured so that if Enron filed bankruptcy or otherwise defaulted on an obligation to UBS, UBS would not have to repay the notes. In July 2001 UBS commenced selling Enron debt securities held by UBS to a wider group of similarly unknowing investors, including its retail clients. UBS had also purchased from initial purchasers Enron Zero Coupon

Convertible Senior Notes Due 2021, which Enron had issued and sold in a private placement in February 2001 and which UBS began selling while using its "Strong Buy" rating on Enron equity securities even though UBS had a "Sell" and "Hold" rating on Enron debt securities. It was in August 2001 that Wu sent his warning email to his clients about Enron, leading to his swift termination.

Furthermore, UBS had approximately $390 million of notational trading exposure with Enron on the Equity Forward Contracts. The Equity Forward Contracts were derivative financial instruments whose value fluctuated with the market price of Enron stock: on a specific future date, known as the "Settlement Date," Enron was contractually obligated to purchase from UBS, and UBS was contractually obligated to deliver to Enron, a specified number of Enron shares at a specific price, known as the "Forward Price." If at a given time the market price of Enron stock was higher than the Forward Price, the contracts were "in the money" for Enron, i.e., UBS owed Enron value in excess of the value Enron owed UBS. If the market price of Enron stock was below the Forward Price, the contracts were "out of the money" for Enron, i.e., Enron owed UBS value in excess of the value UBS owed Enron. The contracts would be settled in two ways: (1) they could be "physically settled," meaning that UBS would deliver shares to Enron and Enron would

deliver cash to UBS or vice versa; or (2) they could be "net share settled." Under the latter method, if the contract net share settled when the contract was "in the money" for Enron, UBS would deliver to Enron the number of shares required at the current market price to equal the net value of the Contract to Enron; if the contract was "out of the money for Enron, Enron would deliver to UBS the number of shares at market price required to equal the net liability of Enron under the contract. The new value Enron promised to pay or to give up was subject to an interest component as expressed in the amendments. Furthermore Enron had the contractual right to terminate the Forward Contracts at any time. In 1999 and 2000 UBS allegedly used these Equity Forward Contracts to effect what in essence were two undocumented and undisclosed loans to Enron that were not reported as debt and to support manufactured hedge transactions between Enron and two related party entities to allow Enron improperly to manipulate its income in violation of tax and accounting principles. The two loan transactions kept more than $260,000,000 in debt off Enron's balance sheet and net losses associated with merchant investments off its income statement. #122 ¶¶ 119-23. Moreover Enron used the value to fund LJM, a special purpose vehicle that Enron could use to hedge stocks that it could not sell ("Illiquid Positions") and to avoid prohibitions under GAAP

and § 1032(a)[56] of the Internal Revenue Code against a company (here Enron) from recognizing as gain or loss what it received in exchange for the issuance of its own stock.   #122 ¶¶ 127-29.   UBS subsequently devised a transaction to allow LJM to "purchase" Enron stock directly from UBS to avoid GAAP and accounting restrictions.

Amendments in 1999 and 2000 to the Equity Forward Contracts permitted Enron and UBS to devise a largely similar structures that allowed Enron maximum accounting benefit of the value in the Equity Forward Contracts by circumventing Section 1032 of the Internal Revenue Code and GAAP and by avoiding "early settlement" of the original Equity Forward Contracts (making the transaction an undocumented, undisclosed loan) and making the Amendments the effective Forward Contracts as of the amendment date. The amendment to the first Forward Contract divided each contract into two, and the same number of shares of Enron stock were transferred but with new value, in return for Enron's new promise to pay or forgo more in the future.   UBS was to sell, transfer and

---

[56] Section 1032(a) states, "Nonrecognition of Gain or Loss--No gain or loss shall be recognized to a corporation on receipt of money or other property in exchange for stock (including treasury stock) of such corporation.   No gain or loss shall be recognized by a corporation with respect to any lapse or acquisition of an option, with respect to a securities futures contract (as defined in section 1234B), to buy or sell its stock (including treasury stock)."

assign directly to LJM all of its rights, title and interest in the assigned shares, leaving Enron out of the loop, as required to achieve a hedge against the Illiquid Positions.  In addition to providing Enron with a hedge for assets that could not otherwise be hedged, the two restructurings of the Forward  Contracts provided Enron with hundreds of millions of dollars in capital for LJM and a newly formed entity, Harrier, which Enron later used for numerous illicit accounting and corporate purposes.

In June 2001 when Enron's stock price was sinking to near $50.00, UBS agreed to lower the trigger price on the Equity Forward Contracts to $40.00.  A provision in these Forward Contracts gave UBS the right to force Enron to settle the Contracts before their Settlement Date if the price of Enron stock closed at or below a set trigger price for two consecutive days.  On August 14, 2001 Enron announced the resignation of its CEO, Jeff Skilling.  The next day Enron's stock price closed at $40.25, causing an uproar in UBS's corporate finance, equity risk management, credit, trading and legal departments.  After requiring Enron to provide nonpublic information on the number, amounts, and trigger prices of equity forward contracts with other parties, as well as information about Enron's recent trading in its own shares, UBS finally agreed to lower the trigger price on stringent conditions, including a commitment that

Enron settle the large equity forward contract at its October maturity, that Enron increase the number of shares with which it could net share settle the contracts, and that Enron provide UBS with "Most Favored Nation" status, meaning that Enron would not allow its other equity forward trades to have a higher trigger price or more favorable unwind conditions than were permitted to UBS contracts. Matters only got worse. In response to Enron's request for a lower trigger price, UBS required Enron to settle the smaller contract at maturity and continued to address the larger. As the risk increased, the stock continued to drop in value, and in late October UBS finally exercised its early termination rights, received a cash payment to settle an equity swap and the remainder of the forward contract, and immediately sold 2.2 million shares of Enron stock that it held as a hedge to obligations under these contracts. Because UBS understood the default risk Enron posed throughout the period, UBS managed to unwind its positions timely, leaving it little exposure to Enron before Enron declared bankruptcy.

In contrast to Barone, Stewart Morel (Morel") , debt/credit analyst for Warburg, reported on Enron bonds and the company's ability to pay its debts. Anyone at UBS could have a copy of Morel's opinions. In his analysis of Enron's public filings, Morel observed an increase in debt consistently over the period from the

third quarter of 2000 until Enron went out of business.  Morel knew that Enron's deteriorating credit and possible loss of investment grade status would cause acceleration of its debt obligations, which in turn would require Enron to have more short-term money to meet its debts.  Until November 2000, Morel listed Enron debt as a "Buy"; after November 2000, as Enron's debt increased, he lowered it to "Hold"; and in early 2001, he changed it to "Sell."[57]  On June 20, 2001, he produced a report downgrading Enron bonds to "Reduce," i.e., reduce one's holdings, sell.[58]  But unlike Barone's "Strong Buy" rating on stock, Morel's "Sell" opinion on bonds was not circulated to retail investors, even those encouraged by UBS to buy Enron bonds after Morel downgraded Enron's debt.

Plaintiffs allege that the ways UBS actively used Barone's

---

[57] In their response to the motion to dismiss, #148 at p. 32, Plaintiffs explain that "'Buy' meant that a bond was expected to outperform other investments, a 'Hold' meant the bond was expected to track the market and a 'Sell' meant the bond was expected to under perform."

[58] Defendants challenge Plaintiffs' allegations as false and maintain that Morel's opinion was not at odds with Barone's, as evidenced by the same reports that Plaintiffs cite.  They contend that Morel's June 2001 research report actually recommended reducing exposure to Enron and buying ENE structured offerings. #126 at pp. 44-45.  Defendants argue that the falsity of Plaintiffs' allegations about Morel's research and recommendations is evidenced by the reports that Plaintiffs rely on.  #130, Lomuscio Decl., Ex. 19 (Morel June 21, 2001 research report, UBS/LAM 069845-96) at 10.

research and hid Morel's was part of the scheme and artifice to deceive its retail clients.  While UBS's policy required financial advisors to provide Barone's research to retail clients and touted its equity research as objective, fair, sound, and founded on a reasonable basis, UBS did not reveal the material information that its analysts received substantial amounts of money for, at the request of, the Bank, covering companies and cozying up to corporate management to obtain investment banking business.  #122 ¶ 224.  The industry standard, according to Brian Barefoot, requires that a bank that discovers corporate malfeasance should stop analyst coverage on the stock, suspend the stock and the research activity, and investigate.  #122 ¶ 226.  According to the complaint, UBS took none of these steps, but instead relentlessly hawked Barone's "strong Buy" opinion to deceive the investing public for UBS's own gain. Even though the UBS analyst research note containing the recommendation specifically stated that the rating was intended to be distributed only to major institutional investors, PW required its brokers to send it to their retail clients across the board, regardless of the suitability of the Enron securities for a particular retail client.  #122 ¶¶ 263-64.  Any broker that refused to promote Enron securities aggressively and rapidly, like Wu, was quickly terminated.  *Id.* ¶ 264-65.  No negative comments about Enron

were tolerated and any advice to sell had to be characterized as for diversification purposes. *Id.* at 265.

Lampkin, Ferrell, and Swiber's claims under the 1933 Act's Section 12(a)(2) against PW arise out of the alleged misrepresentations and omissions identified on the restatement of the Enron financials before November 8, 2001 in Enron's formal notice, filed Form 8-K,[59] and subsequently Enron's restatement of

---

[59] The complaint, #122 ¶ 236 asserts that this Form 8-K stated that Enron would be providing material information to investors about the following matters:

    * A required restatement of prior period financial statements to reflect: (1) recording the previously announced $1.2 billion reduction to shareholders' equity reported by Enron in the third quarter of 2002; and (2) various income statement and balance sheet adjustments required as the result of a determination by Enron and its auditors (which resulted from the information made available from further review of certain related-party transactions) that three unconsolidated entities should have been consolidated in the financial statements pursuant to generally accepted accounting principles.

    * Enron intended to restate its financial statements for the years ended December 31, 1997 through 2000 and the quarters ended March 31 and June 30, 2001. As a result, the previously-issued financial statements for these periods and the audit reports covering the year-end financial statements for 1997 to 2000 should not be relied upon.

financials in Enron's November 19, 2001 Form 10Q for Quarter Ended September, 30, 2001.  Identifying the date, file numbers, number of shares, relevant benefit plan and total value, Plaintiffs list the Registration Statements (#122 ¶ 230) accompanying the Prospectuses pursuant to which they acquired options to purchase Enron equity securities and the exercise of those options to receive Enron common stock.  That the Prospectuses[60] and Registration Statements undisputedly contained inaccurate financial statements and other information and omitted material information is evidenced by the fact that they had to be restated.  #122 ¶ 235.  The Form 8-K

---

* The accounting basis for the $1.2 billion reduction to shareholders' equity.

* The Special Committee appointed by Enron's Board of Directors to review transactions between Enron and related parties.

* Information regarding the LJM1 and LJM2 limited partnerships formed by Enron's then Chief Financial Officer, the former CFO's role in the partnerships, the business relationships and transactions between Enron and the partnerships, and the economic results of those transactions as known thus far to Enron, which are outlined [in the attached Tables to the report].

* Transactions between Enron and other Enron employees.

[60] The complaint asserts that copies were provided of the Stock Option Plans of 1991, 1994, and 1999, along with any restatements or amendments to them.

revealed what years and areas had to be restated, what had to be
disclosed; it further disclosed that Enron's financial restatement
would include a reduction to reported net income of about $96
million in 1997, $113 million in 1998, $250 million in 1999, and
$132 million in 2000, increases of $17 million for the first quarter
of 2001, and $5 million for the second quarter, and a reduction of
$17 million for the third quarter of 2001.  The Form 8-K explained
that these changes to net income were caused by the retroactive
consolidation of JEDI and Chewco, commencing in November 1997, which
increased Enron's debt by approximately $711 million in 1997, $561
million in 1998, $685 million in 1999, and $628 million in 2000.
The Prospectuses were false and misleading in part because they
incorporated by reference all of Enron's 10-Ks from 1997-2001, which
misrepresented Enron's financial results for all those years.  On
November 8, 2001 Enron's restatments reflected a charge to earnings
of approximately $500 million, or about twenty percent of earnings
during that period.  On November 19, 2001 Enron filed a Form 10-Q,
showing for the first time a November 9, 2001 downgrade to BBB,
which triggered a demand for $690 million from Enron, associated
with Whitewing, in which UBS was involved,[61] which sum Enron was

---

[61] Plaintiffs state that the Whitewing structure was
discussed in #122, but the Court is unable to find any mention of
Whitewing other than a single, unexplained reference to

unable to pay it. #122 ¶¶ 238-40.

Regarding Section 12(a)(2), Plaintiffs allege that PW qualifies as a "seller" under the statute because PW successfully promoted or solicited the purchase of securities to serve its own financial interests or the interests of the securities owner. "Brokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors." *Crawford v. Glenns, Inc.*, 876 F.2d 207, 510-12 (5th Cir. 1989)("The Court has recently reformulated the test for 'seller' status in light of the Supreme Court's decision in *Pinter v. Dahl* . . . . [T]he seller [is] either one who owns a security and transfers it for consideration or one who successfully promotes or solicits the purchase 'motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'"), *cited by In re Azurix Corp.*, 198 F. Supp. 2d 862, 892 (S.D. Tex. 2002)("For potential § 12(a)(2) liability to exist, defendants must have passed title to the plaintiffs as a 'direct seller' (such as an underwriter) or solicited the transaction in which title passed to them,"), *aff'd*, 332 F.3d 854 (2003). PW was a "seller" under Section 12(a)(2) "(1)

---

Osprey/Whitewing in ¶ 258 of #122.

because of its direct participation in the timing and exercise of Enron employees' stock options on Enron's behalf and its active solicitation and promotion of Enron securities during these transactions; and (2) because [PW's] direct participation and active solicitation/promotion of Enron securities was motivated by and resulted in unprecedented amounts of collateral enrichment to [PW]." #122 ¶ 267. Its function was greater than as simply a conduit for Enron employees' receipt of Enron securities. *Id.* Using the Agreement between PW and Enron to administer exclusively Enron's stock option plans for more than 27,000 individuals for over five years provided PW with a three-pronged approach to capture great wealth: (1) PW required Enron employees to open an account with PW before they could exercise their stock options, after which they were guided to PW's phone bank of advisors and instructed how to exercise the options[62]; (2) the employees were given printed materials, including a copy of *Guide to Exercising Your Stock Options Online* about PW's services, to convince them of the need for assistance from a PW financial advisor in investing in matters purportedly too complicated for them to navigate alone; and (3) they were given stock option analysis and financial planning services

---

[62] The advisors were frequently reminded that they were not to provide any opinion regarding the exercise of the stock options until the employee had set up an account with PW.

- 123 -

free of charge.   As permitted by the Agreement, PW would then aggressively pursue further investment business with the employees and enrich itself collaterally.   PW did not confine itself to simple administrative services in exercising stock options, but sought to provide voluminous free financial services to these customers, such as the *Guide to Exercising Your Stock Options Online* publication, including UBS's equity research analyst reports and ratings.   It also made millions of dollars from the insider trading of controlling officers and directors at Enron when it sold over $550,000,000 in the insiders' Enron stock in the latter part of 2000 and first half of 2001, and would then strive to control the funds generated from these sales.   Thus PW enriched itself directly and collaterally through the administration of the stock option plans. #122 ¶¶ 255-62.

Finally, regarding the § 12(a)(2) claims against PW, Plaintiffs Lampkin, Ferrell, and Swiber insist they are grounded entirely in negligence and/or strict liability, and not in fraud.

The same Plaintiffs, themselves, and on behalf of the putative class, also sue PW as underwriter for untrue statements of material fact or omissions in the S-8 Registration Statements filed with the SEC, identified in ¶ 230 of #122, under Section 11(a)(5),

15 U.S.C. § 77k(a)(5),[63] of the 1933 Act.   The same untrue statements of material fact or omissions that are the basis of Plaintiffs' § 12(a)(2) claims are also the basis of their § 11(a) claims.   The expansive statutory definition of "underwriter," § 2(a)(11) of the 1933 Act, covers any person who participates directly or indirectly in the distribution of securities.   Citing Louis Loss and Joel Seligman, *Securities Regulations 3d*, § 2-A (2001), Plaintiffs list five basic underwriting techniques, some with variations:  "[1] strict or 'old fashioned' underwriting, [2] firm commitment underwriting, [3] best efforts underwriting, [4] competitive bidding, and [5] shelf registration."  Traditionally, functioning as a gatekeeper between the United States securities markets and issuers, the underwriter provides the issuer with a strong advocate in the secondary market and sponsorship of the

---

[63] Section 77k(a)(5) states in relevant part,

In any case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law of in equity, in any court of competent jurisdiction, sue--every underwriter with respect to such security.

stock, and it ensures that the issuer provides truthful and adequate information upon which the investing public can make an informed investment decision.  After investigation of the issuer, performing due diligence, and approving the issuance, the underwriter often metamorphoses into a "market maker" to distribute the shares among private individuals and institutional purchasers to insure a good price in the offering and adequate trading in the shares.  Essential to the issuer, the underwriter makes a market for the stock by providing research and analysis on the company for investors, organizing communications with investors and potential investors, and helping the company to create or maintain a following in the investment community.  It times purchases and sales of the company's stock in the market to give the company's stock necessary liquidity and thus stabilizes trading prices.  The investing public depends upon underwriters to protect them from the Enrons of the world.  PW served as a market maker for Enron. #122 ¶¶ 276-78.

As noted, under Section 2(11), 15 U.S.C. § 77b(11), a statutory underwriter is defined functionally on the basis of its relationship to a particular offering and reaches "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has direct or indirect participation in any such

undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking . . . ." #122 ¶ 279.   PW has promoted, offered, and sold for Enron and has had a direct or indirect participation in the offer and sale and the distribution of securities at issue into the initial and secondary security markets.   PW meets both the seller aspect of an underwriter (Section X of #122, pp. 87-107) and the participation aspect of the statutory definition of "underwriter" (Section XII).   The SEC construes the words "participates" and "participation" as covering any person "enjoying substantial relationships with the issuer or underwriter, or engaging in the performance of any substantial functions in the organization or management of the distribution." Op. of Gen. Counsel Securities Act Release No. 33-1862 (Dec. 14, 1938).  PW, in consideration for the exclusive right to broker Enron employees' exercise of stock options under the Stock Option Plans, took on the administration of the Stock Option Plans.   In essence Enron "outsourced the organization and management of its [Stock Option Plans] to PW, which, as a licensed and registered broker-dealer, could be a market maker providing sponsorship in the financial markets to support the value of the Enron securities.  PW took on the task of selling the stock to the investor, giving him advice and an explanation of his plan, explaining how the exercising

of his options fit in with overall investment goals, whether and when to exercise and sell or exercise and buy, or not exercise their stock options at all and  timing large blocks of exercises into the market to avoid price fluctuations despite the huge amount of insider stock being sold on the market in late 2000 and early 2001. Exhibiting another traditional underwriter role, PW initially financed Enron employees' exercise of stock options through a broker-financed exercise pursuant to provisions of Regulation T of the Federal Reserve Board (explained in #122 ¶¶ 283-84).

Plaintiffs also allege that because PW contractually arranged to be the exclusive conduit for Enron securities being placed into the hands of Enron employees and Enron affiliates' employees through the Stock Option Plans, meant that PW was the sole gatekeeper to the initial and secondary markets for the 100,000,000 securities issued via the process registered by the Registration Statements.  A contractual arrangement with an issuer whereby a broker-dealer becomes the administrator, organizer, manager, and exclusive conduit for the distribution of hundreds of millions of securities clearly falls within the statutory definition of an underwriter under section 2(a)(11), 17 U.S.C. § 77b(a)(11),[64] insist

---

[64] Section 2(a)(11) states,

The term "underwriter" means any person who

Plaintiffs.   Statutory underwriters include any person who is "engaged in steps necessary to the distribution of security issues." *SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941); *SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005).  The Agreement evidences that PW is a "necessary step" in the registered transactions.  Furthermore, the statutory definition of underwriter includes an exemption from that designation for "a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission."   PW cannot argue that it is so exempt because it received only the usual and customary commission in connection with the distribution of the securities covered by the Registration Statements directly from an underwriter or dealer since PW received its compensation for being the exclusive conduit into the market for

---

has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking; but such term does not include a person whose interests is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.  As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

the subject securities from the investor, not from the underwriter or dealer.

In sum, argue Defendants, under § 2(11) of the 1933 Act PW qualifies an "underwriter" of securities issued pursuant to Registration Statements and is subject to liability under Section 11 for untrue statements of material facts and omissions of material facts in the Registration Statements.   PW offered and sold securities for Enron and it participated directly and indirectly in the sale and distribution of Enron stock to Lampkin, Ferrell and Swiber and other employees of Enron or its affiliate companies by and through their employee stock option plans.   PW asserts its Section 11 claims, too, are grounded in negligence and/or strict liability and disclaims any allegation that may be construed as fraudulent and/or knowing or reckless conduct.

### Defendants' Motion to Dismiss (#125 and 126)[65]

Defendants contend that Plaintiffs' Third Amended Complaint alleges claims of a scheme under § 10(b) of the 1934 Act that is no different from, and even weaker than, the scheme claims

---

[65] Because the Court has not considered the Enron Bankruptcy Examiner's Report, the results of two NASD Arbitrations, regulatory activity against UBS and the fact that other counsel have not sued UBS in connection with Enron litigation, since none of these challenged factors control the determinations of this Court in this case, the Court does not address Plaintiffs' objections to them.

in *Newby* asserted against Deutsche Bank and Barclays, which were dismissed by this Court in the *Newby* litigation.  See *Newby v. Enron Corp. (In re Enron Corporation Securities, Derivative & "ERISA" Litig.)*, H-01-3624, #4735.

First, Warburg allegedly participated in transactions that misrepresented to the public Enron's financial status and damaged Plaintiffs (i.e., PW's retail customers) in five ways, none of which, Defendants contend, stated a viable primary liability claim under § 10(b):  by underwriting a follow-on offering[66] of Osprey notes; underwriting a follow-on offering of Yosemite IV credit-linked notes; extending credit to E-Next Generation LLC; and twice

---

[66]   "Follow-on   offering"   is   defined   at http://www.investopedia.com/terms/f/followonoffering.asp   as follows:

> A follow-on offering is an issue of stock that comes after a company has already issued an initial public offering (IPO).  A follow-on offering can be diluted, meaning that the new shares lower a company's earnings per share (EPS), or undiluted, if the additional shares are preferred.  A company looking to offer additional shares registers the offering with regulators, which includes a prospectus of the investment.
> Unlike an IPO, which includes a price range that the company is looking to sell its shares, the price of a follow-on offering is market-driven. . . . The price of a follow-on offering is usually offered at a small discount from the closing market price on the day of the transaction.

settling existing equity forward contracts by delivering stock to
newly created special purpose entities ("SPEs").   Warburg
purportedly not only participated in transactions that were used by
Enron to distort Enron's financial statements, but its involvement
revealed to "a score of UBS officers . . . significant amounts of
information regarding Enron's questionable business activities" and
allowed UBS to "undert[ake] trading activities to eliminate its own
credit exposure to Enron for its own benefit.   #122 ¶ 52.   UBS did
not give its own retail investor clients this information nor inform
them of the conflicts under which it operated its brokerage
business.   *Id.* at ¶ 25.   Second, Warburg limited its financial
exposure to Enron in late 2001 based on material nonpublic
information.   In addition, Warburg did not attempt to prevent Barone
from rating Enron stock a "Strong Buy" even when Warburg knew that
the actual condition of the company was the opposite.   Moreover PW
did not disclose to its retail investing customers the material,
nonpublic, negative information about Enron and the manipulation of
Enron's public financial appearance, partly accomplished by UBS and
allegedly known by Warburg bankers.   Last, PW chose not to disclose
the conflicts of interest it had, originating from PW's
administration of Enron's employee stock option program.

        Second, Defendants maintain that Plaintiffs' claims,

listed above, constitute aiding and abetting and are thus not cognizable under § 10(b) and Rule 10b-5. As in *Newby*, Plaintiffs in this action allege that Warburg defrauded investors by extending "disguised loans" to Enron and participating in concealed off-balance-sheet financings. When addressing claims in *Newby* against Deutsche Bank and Barclays, this Court has already ruled that such claims constitute aiding and abetting and cannot give rise to a primary violation of the 1934 Act under the Supreme Court's decisions in *Central Bank* and *Stoneridge.*

Third, for the required element of scienter, even though Plaintiffs recognize that Warburg and PW were separate and distinct entities during the putative Class Periods, with no ownership interests in each other, Plaintiffs fail to plead with the required specificity which individual employee at which defendant had what knowledge of wrongdoing or wrongful intent for 1934 Act and the PSLRA claims. *Southland*, 365 F.3d at 365. The few times the complaint does identify an employee who knew something about Enron, the allegations of knowledge that were made were impermissibly general and vague. Plaintiffs do not plead specific misrepresentations or misleading omissions by either Defendant with the required "who, what, when, where, and how" of each misrepresentation or omission. Furthermore, since the two entities

are corporate Defendants, Plaintiffs are required, but have failed, to plead facts giving rise to a strong inference that an identified employee of each Defendant employee acted with scienter as to each misrepresentation and/or omission. *Southland*, 365 F.3d at 366-67. In addition, only PW, not Warburg, had a "retail brokerage relationship" with Plaintiffs that might give rise to a duty to disclose.

Nor have Plaintiffs pleaded loss causation, Defendants charge. While they plead that Enron's "financial collapse" was caused by its inability "to service its debt," Defendants point out that the alleged fraudulent brokerage practices at PW relating to purchases or sales of Enron stock by PW's retail brokerage customers had no relation to Enron's purported fraudulent financial statements and were disclosed only after Enron's stock price had plummeted to zero.

Finally, regarding the 1933 Act claims against PW under Sections 11 and 12 on behalf of persons who acquired Enron stock options and common stock through the exercise of those options (¶ ¶16(iii)-(iv) and 230), there was no "sale" involved in Enron options. The purported false Forms S-8 targeted by the Third Amended Complaint registered only Enron stock, not employee stock options, and therefore could not have constituted "registration

statements" or "prospectuses" offering Enron employee options for
which PW is an alleged underwriter.  Moreover, an employer's grant
of stock options to its employees is not a "sale" of securities, so
PW could not have been an "underwriter" of options triggering
Section 11 liability, nor liable for "offering or selling" options
under Section 12(a)(2).  Last, there are no facts alleged showing
that any named Plaintiff has standing to assert 1933 Act claims
based on shares acquired by exercising an employee stock option.

While Warburg and PW are separate legal entities with no
ownership interests in each other, throughout the complaint
Plaintiffs do not distinguish between the two, often using "UBS" to
not only refer to both, but also to nonparty parent corporation UBS
AG, and the term "Defendants" to include both Warburg and PW.  #122
¶ 15.

Defendants emphasize that in opinions in *Newby*, this Court
detailed the legal duties owed by banks to Enron investors, like
Plaintiffs here.  Defendants charge that because Plaintiffs here
allege no facts distinguishing their claims against Warburg from
those dismissed against banks in *Newby*, Plaintiffs' "banking" claims
against Warburg must be dismissed for the same reasons.  Plaintiffs
fail to plead primary scheme liability against Warburg.  For
example, in *Enron*, H-01-3624, slip. op. (#4735), at 180 (S.D. Tex.

2006), this Court wrote,

> The . . . allegations that Deutsche Bank
> provided standard [banking] services, i.e.,
> underwrote billions of dollars of Enron-related
> securities, lent money to Enron, provided
> commercial banking and investment banking
> services to Enron, and earned a lot of money in
> fees from Enron, or that its employees who
> performed due diligence on Enron projects had
> an obligation to ensure that statements in
> offering memoranda are full, fair and accurate,
> in an effort to plead scheme liability under §
> 10(b), are too general and clearly lack the
> kind of specific facts that would support a
> strong inference of scienter under the PSLRA.
> Moreover, . . . these acts constitute aiding
> and abetting and thus are not actionable under
> § 10(b) in this case pursuant to the holding of
> *Central Bank*.

In sum, each of the five transactions in which the complaint asserts that Warburg participated fail to state a claim for two reasons:  none states a primary violation of Section 10(b) and Rule 10b-5 and Plaintiffs fail to plead particular facts giving rise to a strong inference that Warburg acted with scienter.

In the same Opinion and Order (#4735 at 183 & n.158), this Court dismissed claims that Deutsche Bank violated Section 10(b) and Rule 10b-5 by underwriting debt issued by the Osprey Trust or Enron, that Deutsche Bank structured Osprey to fund Whitewing while knowing that Enron sold assets to Whitewing at inflated values to falsify Enron's earnings, and that Deutsche Bank designed Osprey to transfer billions of dollars of debt off Enron's balance sheet.  Noting that

Lead Plaintiff in *Newby* did "not explain specifically what was inherently deceptive in these structurings created by Deutsche Bank," this Court concluded, "Once again, without specific facts demonstrating that Deutsche Bank established an innately illicit deceptive entity or device, Deutsche Bank was at most merely aiding and abetting any subsequent deceptive use of these entities by Enron, the trustees, and Enron's auditor." *Id.* The Court also rejected allegations that Deutsche Bank's underwriting of various securities violated Section 10(b) and Rule 10b-5. *Id.*

Similarly in the instant action, in its services as one of several co-managers in a follow-on offering of Osprey notes, Warburg did not "structure" Osprey. Not only have Plaintiffs failed to identify any "innately deceptive entities or devices" employed by Warburg in the Osprey offering, but they did not allege that they purchased any notes in the Osprey offering, nor could they, since the Osprey notes were sold in private placements to qualified institutional buyers. *Newby*, H-01-3624, #4735 at 23. Even if a bank structured and led the underwriting syndicate of the Osprey offering, it would at most be aiding and abetting of Enron's fraud. Warburg's lesser role as a mere co-managing underwriter of that offering could not be more.

Not only have Plaintiffs failed to allege a primary

violation by Warburg, but they do not plead scienter with the requisite particularity.  No facts are pleaded showing that Warburg bankers knew a transaction was fraudulent.  Even their claims that Warburg performed such recklessly inadequate due diligence that it did not discover that "Enron used the Osprey structure to generate income by parking overvalued, non-performing assets in the structure" (#122 at ¶ 155) "are too general and clearly lack the kind of specific facts that would support a strong inference of scienter under the PSLRA" (*Newby*, H-01-3624, #4735 at 189).  In *Newby* this Court dismissed the Section 10(b) and Rule 10b-5 claims against Deutsche Bank, including the claim that Deutsche Bank actually knew (not merely that it acted recklessly in failing to know) that "Enron sold assets to Whitewing at inflated values to falsify Enron's earnings."  *Id.* at 183 & n.158.

As for Warburg's alleged trades in Zero Coupon Notes, in the *Newby* action, *id.*, Deutsche Bank was the "selling security holder" of $169 million worth of Zero Coupon Notes, more than 200 times the amount of Zero Notes sold by Warburg, while Deutsche Bank was also one of five initial purchasers in the initial Rule 144 private placement of the Zero Coupon Notes.[67]  No UBS-affiliated

---

[67] #127, Declaration of Richard J.L. Lomuscio, Exhibit 4 (Enron Corp. Form 424B3, filed Aug. 17, 2001) at 1 (Warburg listed as "selling security holder" of $800,000 worth of Zero Coupon

entity participated in that private placement.  In H-01-3624 the *Newby* Lead Plaintiff asserted that a bank "provided its services as underwriter of Zero Coupon Notes (#4735 at 183), and in *Giancarlo*, *et al. v. UBS Financial Services, Inc., et al.*, H-03-4359, #30 at 42, Plaintiffs claimed that a bank "purchased some of [this] unsecured Enron debt": the Court found the allegations "clearly . . . inadequate to sustain a fraud claim." *Id*.  That is all that Lead Plaintiffs in this action assert against Warburg regarding the Zero Coupon Notes (#122 at ¶ 175), so they also fail to state a fraud claim against Warburg.

In addition the complaint fails to plead facts that even hint than any alleged trades in the Zero Coupon Notes were based on nonpublic information or were meant to defraud investors.  There is no allegation of any connection between research reports rating Enron stock a "Strong Buy" and Enron's SEC filing at the same time listing UBS AG and Warburg as selling security-holders of these notes other than their proximity in time.

In *Newby*, H-01-3624, #4735 at 183, Deutsche Bank was dismissed despite allegations that it underwrote credit-linked debt

---

Notes; Nonparty UBS AG, London Branch, listed as a "selling security holder" of $250 million of those notes), and Exhibit 5 (Enron Corp. Form 424B3, filed July 25, 1001) at 7 (listing Deutsche Bank as one of five initial purchasers of Zero Coupon Notes).

securities associated with Citibank's Yosemite transactions.
Barclays was dismissed even though it executed prepay transactions
relating to the Yosemite IV Credit Linked Notes Offering because the
Court found the prepays were "not *per se* illegal." *Id.*, #4874 at 61.
Plaintiffs here do not assert that Warburg participated in a prepay,
but do charge that Warburg defrauded them by underwriting the
credit-linked notes in Yosemite IV (#122 ¶ 52) when it knew that
"Enron used these Yosemite transactions to obtain what in economic
substance were loans, despite their public characterization as funds
flow from operations" (#122 ¶ 156).   The fraud in this case was
effected by Enron, not by the underwriting of the notes, argue
Defendants.   Furthermore Defendants insist such conclusory
allegations that Warburg was aware of the prepay are, as this Court
found in *Newby*, #4735 at 180, "too general and clearly lack the kind
of specific facts that would support a strong inference of scienter
under the PSLRA," and fail to plead a primary violation of § 10(b)
or Rule 10b-5; as this Court again opined regarding Barclays,
"prepays are not *per se* illegal."   In both suits Plaintiffs fail to
explain the mechanics of Yosemite IV, no less identify anything that
made it improper.   Last, #122 at ¶ 160, Plaintiffs allege that UBS
"either knew . . . or was severely reckless in not knowing about the
commodity prepay aspect of the transaction . . . and that the prepay

transaction was nothing more than yet another disguised loan to Enron." Defendants respond that this statement, to, "is conclusory and wholly inadequate to plead scienter." *Id.*, citing *Newby*, #4735 at 180.

Defendants point out that the amendments to the two Equity Forward Contracts between UBS and Enron occurred in mid-1999 and early 2000, long before the Class Period and before PW was affiliated with Warburg or UBS AG. The complaint asserts the contracts were actually undocumented and undisclosed loans to Enron, which were used "to support manufactured hedge transactions between Enron and two related party entities, which Enron used improperly to manage its income" and to keep more than $260,000,000 in debt from its balance sheet. #122 ¶¶ 121-22. The complaint alleges that UBS entered into these loans knowing that they would not be reported as debts and that the manufactured hedge positions would be employed to shore up MTM accounting of income by denying the possibility of losses in connection with those assets. *Id.* ¶ 122. Defendants insist that the allegations that Warburg helped Enron by extending disguised loans of any kind at most constitute allegations of aiding and abetting Enron's fraud.

After explaining the two restructurings in detail, Defendants conclude that the "Complaint's factual allegations were

a form of 'net settlement' that discharged Warburg's pre-existing obligations to Enron and struck new forward contracts." #122 ¶ 120. Contrary to Plaintiffs' claims, the two Equity Forward Contracts were no more loans than any other forward contract. The complaint correctly states that "the value of the contracts, but not their terms, fluctuated with the market price of Enron stock." #122 ¶ 212. While Plaintiffs highlight the "interest component in the two Equity Forward Contracts," Defendants note that such contracts typically incorporate an "interest component" in that the forward price is higher than the market price. *See* David F. Levy, *Towards Equal Tax Treatment of Economically Equivalent Financial Instruments: Proposals for Taxing Prepaid Forwards, Equity Swaps, and Certain Contingent Debt Instruments*, 3 Fla. Tax. Rev. 471, 481 (1997)(to determine a forward contract price, "the parties add to the current spot price of the underlying property . . . the costs that the seller will incur in holding the underlying property (i.e., insurance, storage, and interest.)"). Levy describes forward contracts, *id.* a 478-79, as having "fixed price terms" such that one party can "benefit economically from a downward movement" in the price of the underlying asset and the other "benefit[s] economically from an increase in the price" of the asset. Accordingly, Warburg transferred to the SPE Harrier Enron stock worth $254 million in

April 2000 after the stock increased in value since June 1999; in October 2001 Enron paid Warburg $153 million after Enron's stock price fell after April 2000. #122 ¶¶ 145, 185-86. The restructurings were not disguised loans, but a form of "net settlement" that discharged Warburg's pre-existing obligations to Enron and struck new forward contracts, i.e., "reset Warburg's obligations to Enron to zero, allow an Enron SPE to receive Enron stock, and put in place new equity forward contracts reflecting the then-current market price of Enron stock." #122 ¶ 120; #126 at 22-23 (detailing the two restructurings).

Furthermore, even if the amendments to the Equity Forward Contracts had been undisclosed loans, the complaint still fails to state a claim against Warburg because Plaintiffs' allegations constitute at most aiding and abetting Enron in concealing its debt and falsely representing its financial condition to potential investors. Furthermore there is nothing innately illicit about equity derivative transactions, which are common and legitimate transactions used by the world's largest companies. #129, Lomuscio Decl Ex. 11 (International Swaps and Derivatives Association, Securities Industry Association, and The Bond Market Association, amicus brief in *Enron Corp. v. UBS AG*, Adv. Proc. No. 03-93373

(Bankr. S.D.N.Y.) at 1 and 12.[68]  And while Plaintiffs allege that these restructurings gave Enron seed money to create the LJM Cayman and Harrier SPEs and that Warburg designed them (#122 ¶ 122 and ¶ 127), the claim still fails to state a claim because it was not the creation of such an entity that violated § 10(b), but Enron's alleged use of it to achieve off-balance-sheet treatment of debt that violated the law.

Plaintiffs claim that Warburg knew that the E-Next Generation LLC Credit Facility was intentionally kept off Enron's balance sheet to present a false picture of Enron's financial conditions to conceal a $600 million loan to Enron.  Defendants respond that again Plaintiffs fail to plead a primary violation of Rule 10b-5.  As this Court wrote in *Newby*, H-01-3626, #4735 at 181, "[A] bank making a loan to a borrower, even where it knows the borrower will use the proceeds to commit securities fraud, is aiding and abetting," and "'[f]inancings and investments are not sham transactions if there is no suggestion that the transactions were something other than what they purported to be.'"  *Citing In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 505 (S.D.N.Y. 2005).  The

_____

[68] "Equity derivative transactions may be settled with cash payments, the physical exchange of cash for securities, or by delivering 'a sufficient quantity of a designated security in lieu of cash'-i.e., *net share settlement*.  *Id.* at 2 & n.2."  #126 at 27 n.28, citing *id.*, Ex. 11.

E-Next facility was not a sham:  a number of banks lent money for its legitimate business purposes of purchasing turbines and other equipment during the first of its three phases and finding locations and constructing gas-fired electric generating plants during its second.  Plaintiffs do not claim that Enron used the funds for anything else, not to mention that anyone at Warburg knew about such.  The primary violation was in Enron's auditing and concealing the transactions.  Nor do Plaintiffs allege scienter as to Warburg. Even if Warburg employees knew that E-Next would be illegally kept off Enron's balance sheet by Enron, "the creation of an unqualified SPV [does not] violate  § 10(b), but the use of it to obtain that unwarranted off-balance-sheet treatment [constitutes] a primary violation."  H-01-3624, #4874 at 62.

As noted Warburg and PW are legally separate entities, Warburg is not a broker, and Warburg owes no duty to disclose to PW's retail investor clients.

Defendants also insist that the complaint fails to plead with particularity what material, nonpublic information about Enron who at Warburg possessed and when.

Finally, Defendants insist, Warburg did not unlawfully trade on insider information.  Plaintiffs' allegation that "UBS undertook trading activities to eliminate its credit exposure to

Enron for its own benefit, while in possession of . . . material, non-public information [learned during various transactions with Enron and regarding 'Enron's questionable business practices'], while simultaneously allowing its retail clients to purchase and hold Enron equity securities with the same benefit of UBS's institutional knowledge," also fails.  The complaint does not identify what material, nonpublic information was possessed by which Warburg employee at what time.  Nor does it identify any trades with particularity with the possible exception of its settlement of Warburg's equity forward contracts in late 2001.  Defendants maintain that because Enron voluntarily provided Warburg in September 2001 with the specific information on which Warburg supposedly traded in order to persuade Warburg to extend the equity forwards, Warburg did not violate Rule 10b-5 under either the misappropriation or classical theories of insider trading.  *U.S. v. O'Hagan*, 521 U.S. 642, 651-54 (1997).[69]    There was no

---

[69] Under the classical theory of insider trading, a corporate insider  violates § 10(b) and Rule 10b-5 when he trades in  the  securities  of  his  own  corporation  based  on  material, nonpublic information, i.e., conduct which constitutes a "deceptive device" under the statute because there is a relationship of trust and confidence between the shareholders of a corporation and those insiders who have gained confidential information because of their position within the corporation.  *Id.* at 651-52.  That relationship gives rise to a duty either to disclose or to abstain from trading to prevent the corporate insider from taking advantage of the unknowing stockholders.  Id. at 652.

misappropriation because, as Defendants point out, Warburg sold its hedge shares after Enron and Warburg settled the equity derivative contracts; thus Warburg did not deceive Enron by selling stock held to hedge transactions which Enron knew were concluded.  Nor did the classical theory of insider trading apply.  Outsiders, such underwriters, accountants, lawyers or consultants, "may become temporary fiduciaries to shareholders by entering into a special confidential relationship in the conduct of the business of the enterprise and [receiving] access to information solely for corporate purposes" and thus also have a duty "to forgo actions based on material, nonpublic information." *Dirks v. S.E.C.*, 463 U.S. 646, 655 & n.14 (1983).  "[C]ounterparties to a bilateral derivatives trade--where one party's gain is the other's loss--do not have a 'special confidential relationship.'" #126 at 36, citing #122 ¶ 119.  Even if Warburg did assume a duty to assist Enron in the "conduct of the business of the enterprise" by extending the equity forward contracts, plaintiffs do not plead any reason why

---

Under the misappropriation theory, a person who is a corporate outsider violates the statute and the rule by committing fraud in connection with a securities transaction when he misappropriates confidential information to trade in securities in breach of a duty owed to the source of the information.  In other words, "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *Id.*

that duty would survive the termination of the equity forward contracts, only after which did Warburg sell its hedge shares. #122 ¶ 186.  At most, again Plaintiffs charge Warburg with aiding and abetting Enron's fraud.

Defendants also argue that PW's failure to provide its retail customers with information about Enron's "true" financial condition does not qualify as securities fraud.  PW's only agreement with Enron was to administer Enron's employee stock option plan. Plaintiffs do not allege that this agreement aided Enron in concealing anything or that the administration of the plan gave PW any knowledge of Enron's actual financial condition.  Instead Plaintiffs plead a secret "gentleman's agreement between PW and Enron that barred PW brokers from advising its customers to sell or to say anything negative about Enron.  Plaintiffs provide no details of the agreement or how it defrauded those PW clients who held Enron stock in their PW accounts.

Moreover a party is not a primary violator if it only engaged in routine business transactions or failed to disclose another party's fraud if it had no duty to do so.  *Newby*, # 4735 at 47-49.[70]  Plaintiffs do not claim that PW participated in any

_____

[70] In their response to UBS's argument that there is no basis for a strong inference that UBS acted with scienter, #148 at pp. 20-21, Plaintiffs insist that UBS's undertaking of these

- 148 -

banking or other transactions employed by Enron to hide its actual financial state or that it used the employee stock option plan to defraud investors.   Even it had, such claims would only be for aiding and abetting.

Defendants also maintain that PW had no duty to disclose material omissions to retail clients and participants in the Enron stock option plan because the clients' brokerage accounts were nondiscretionary and the clients retained the ability to make investment decisions. *Martinez Tapia v. Chase Manhattan Bank, N.A.,* 149 F.3d 404, 412 (5th Cir. 1998)("[W]here the investor controls a nondiscretionary account and retains the ability to make investment decisions, the scope of any duties owed by the broker will generally be confined to executing the investor's order."); *Hand v. Dean Witter Reynolds, Inc.*, 889 S.W. 2d 483, 492-93 & n.5 (Tex. App.-- Houston [14th Dist.] 1994, writ denied)(under Texas law "the fiduciary duty owed to the customer [holding a non-discretionary account] is very narrow--primarily not to make unauthorized trades).

In ¶ 223 of the complaint (#122) Plaintiffs allege,

---

transactions, which its own (but very vaguely mentioned) banking standards, protocols, and regulations made to be improper attempts to achieve particular tax, legal, accounting and regulatory treatments where conventional structures could achieve the same alleged commercial purpose, in itself gives rise to a strong inference of knowledge or severe recklessness.

> This is not an "analyst" case.  Plaintiffs do
> not sue UBS because Barone's research was wrong
> or because Morel's research was right.
> However, the manner in which UBS actively **used**
> Barone's Research notes, and hid Morel's, was
> part of the scheme and artifice to deceive its
> retail clients.

Thus Plaintiffs have not asserted, but had no obligation to, that Barone acted with scienter.  As noted, the Fifth Circuit does not permit group pleading of securities fraud.  "'It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another knows to be false.  A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer [accused of fraud] has the requisite level of scienter . . . .'"  *Southland*, 365 F.3d at 366, *quoting In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Ca. 2002).  Plaintiffs fail to identify who knowingly and wrongfully failed to stop Barone from publishing his "Strong Buy" rating.

Plaintiffs assert that UBS failed to disclose to PW customers' conflicts of interest between PW's brokerage business and options-administration contract with Enron and the nonpublic information about Enron's financial status and "questionable business practices" obtained by Warburg bankers.  Defendants highlight the fact that Plaintiffs do not allege that PW's

conflicted internal business practices caused Enron to collapse nor facts showing scienter regarding any omissions involving Enron's financial condition.

Nor does the complaint provide facts giving rise to a strong inference that any PW employer possessed nonpublic information about Enron or "questionable business practices" allegedly known to Warburg bankers. The complaint references a conversation between Warburg banker Jim Hunt and PW branch manager Pat Mendenhall on August 24, 2001 about Wu, three days after Wu was fired. #122 ¶¶ 93-94, 102, 110.[71] There is no allegation that they discussed Enron's financial status. There is a vague allegation that an outside consultant, Craig Ellis, once used the phrase, "cook the books Enron," during a meeting of PW brokers, but the statement does not give rise to a strong inference that any PW employee knew any specific facts about Enron's financial condition. #122 ¶ 81. There is no assertion that this consultant ever told any PW broker

---

[71] For purposes of the motion to dismiss only, Defendants concede that Wu was wrongfully fired by Pat Mendenhall solely to curry favor with Enron's human resources executives, but emphasize that Plaintiffs provide no logical link between Wu's termination and their securities fraud claim that someone at PW knew something about Enron's "true" financial condition but failed to disclose that information to PW customers despite a duty to do so. # 126 at pp. 41-42. Even though he had no duty to disclose to his non-discretionary-account clients, Wu did disclose to them what his own independent research found about Enron's precarious financial condition.

even one fact about Enron's finances; instead the complaint states that Craig Ellis was "silenced." *Id.* Moreover the pages addressing publicly disclosed sales of Enron stock by Enron insiders do not show knowledge by PW, a third party, of Enron's risky financial condition.  They also fail to state how many shares of Enron stock were retained by each these insiders to allow a determination of whether any executive sold most of his holdings or kept a substantial exposure to Enron. *Newby*, H-01-3624, #1269 at 18-22 ("Whether there is an unusual or suspicious pattern of insider trading may be gauged by such factors as timing of the sales (how close to the period's high priced), the amount and percentage of the seller's holding sold, the amount of profit the insider received, the number of other insiders selling, or a substantial change in the volume of insider sales.  There is no *per se* rule for what constitutes illicit insider trading, and each case must be decided on its own facts.  '[M]ere pleading of insider trading without regard to either context or the strength of the inferences to be drawn, is not enough.'  Context is critical to the analysis.  For example, sudden and substantial trading may not be suspicious where the seller was legally prohibited from trading during the period before the alleged insider trading.").  Allegations of sales of a corporation's stock by insiders, without more, are not sufficient

to plead knowledge of that corporations's financial health even by those insiders. *See, e.g., Tellabs*, 551 U.S. at 323 ("[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences.").

Nor have Plaintiffs alleged facts showing that PW employees were severely reckless for not obtaining nonpublic information about Enron. Retail brokers have long been barred from seeking material nonpublic information from another division of a financial institution to assist their clients in investment decisions; indeed they must erect Chinese Walls to prevent the flow of information in a multi-service financial institution and stop their employees from illegally obtaining and trading on nonpublic information.

As for those Plaintiffs who claim to have held their options or Enron securities without trading during the Class Period, under the 1934 Act they must be dismissed. *Krim*, 909 F.2d at 1443 & n.7, *citing Blue Chip Stamps*, 421 U.S. 723. *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 79 (2006)(private remedy under section 10(b) and Rule 10b-5 is limited by the "in connection with the purchase or sale of any security" to purchasers and sellers of securities and does not extend to holders

of securities over the class period for policy reasons, including the danger of vexatious litigation); *in accord Roland v. Green*, 675 F.3d 503, 511-12 (5th Cir. 2012), *aff'd sub nom. Chadbourne & Parke LLP v. Troice*, 134 S.Ct. 1058 (2014)("a fraudulent misrepresentation or omission is not made 'in connection with' a purchase of sale of a covered security unless it is material to a decision to buy or to sell a covered security").

Furthermore Plaintiffs fail to plead that any acts or omissions by Warburg or PW caused Plaintiffs' losses. *Dura Pharmaceuticals*, 544 U.S. at 342 (a plaintiff must prove that the defendant's misrepresentation or other fraudulent conduct proximately caused the plaintiff's economic loss). The complaint's allegations of loss causation do not distinguish between PW and Warburg even though they are required to separately plead each act or omission alleged to violate Rule 10b-5 as to each separate defendant. 15 U.S.C. § 78u-4(b)(4); *Southland*, 365 F.3d at 364-65. Thus they fail to allege loss causation against both entities. Plaintiffs do not make any allegations of public disclosures of business practices or conflicts of interest at any time while Enron's stock was trading nor allegations that PW's brokerage practices affected Enron's stock price in any way prior to its bankruptcy. As noted earlier, in *Public Employees Retirement System*

*of Mississippi, Puerto Rico Teachers Retirement System v. Amedisys, Inc.*, 769 F.3d 313, 320-21 (5th Cir. 2013)(citations omitted), the Fifth Circuit held,

> To establish proximate causation, the plaintiff must allege that when the "relevant truth" about the fraud began to leak out or otherwise make its way into the market, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm. Loss causation in fraud-on-the-market cases can be demonstrated circumstantially by "(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop so that the factfinder can infer that it is *more probable than not* that it was the corrective disclosure--as opposed to other possible depressive factors--that caused at least a 'substantial' amount of the priced drop."

Defendants observe that the complaint fails to identify any public disclosures about PW's business practices or conflicts of interest at any time when Enron's stock was trading and thus Plaintiffs fail to plead loss causation. *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 479-80 (4th Cir. 2006)(claim was properly dismissed where the

complaint established that the defendants alleged misrepresentations were not revealed to the market until after the company filed bankruptcy), *cert. denied*, 549 U.S. 1304 (2007); *D.E.&J. Ltd. Partnership v. Conaway*, 133 Fed. Appx. 994, 1000 (6th Cir. June 10, 2005)(affirming dismissal where complaint failed to allege that K'Mart's bankruptcy announcement disclosed any prior misrepresentations to the market). Since Plaintiffs here do not allege any drop in the price of Enron's stock during the class period that they claim was based on the market's learning of PW's brokerage practices or conflicts of interest, their 1934 Act claims against PW fail.

Last of all, Defendants maintain that Plaintiffs' claims, expressly brought on behalf of all persons who purchased or acquired Enron employee options or acquired Enron common stock through the exercise of such an option (#122 ¶ 16(iii), (iv)) fail to allege that PW violated Section 11 or 12 of the 1933 Act. Defendants agree with Plaintiffs that Enron employees did not "purchase" or "sell" stock options received from Enron; both Sections 11 and 12 "are by their terms expressly limited to purchasers or seller of securities." *Blue Chip*, 421 U.S. at 735-36; 15 U.S.C. § 77k(a)(any person "acquiring" a security may sue under Section 11); 15 U.S.C. § l (any person "purchasing" a security may sue under Section 12).

To qualify as an underwriter of Enron employee options under Section 11, PW would have had to purchase options from Enron, "offered" or "sold" options for Enron in connection with the distribution of employee options by Enron.   15 U.S.C. § 77b(11).   Because a corporation's grant to employees of an involuntary, noncontributory employee benefit plan, such as an employee stock option plan (17 C.F.R. § 230.405), does not constitute a "sale" under the 1933 Act, PW cannot be liable for any losses arising out of Enron's grants of options to its employees.   They also agree that after the issuance of *Daniel*, 439 U.S. 551 (holding that a compulsory, noncontributory pension plan did not constitute an "investment contract" and was therefore not a "security" within the meaning of the 1933 and 1934 Acts), the SEC's "1980 release," 45 F.R.  8962, made clear that for the registration and antifraud provisions of the 1933 Act to apply, there must be an offer or sale of a security.   It observed that although stock bonus plans or "plans under which an employer awards shares of its own stock to covered employees at no direct cost to the employees," did provide employees with a security (corporate stock), "there is no 'sale' in the 1933 Act sense to employees, since such employees do not individually bargain to contribute cash or other tangible or definable consideration to such plans."   *Id.* at 8968.  The "no-sale" doctrine applies to grants of employee stock

options, which are a type of employee benefit plan. *See, e.g.,* SEC Release No. 33-6455, *Interpretive Release on Regulation D*, 48 F.R. 10045 (Mar. 10, 1983) at Question 78 ("In a typical plan, the grant of [employee stock] options will not be deemed a sale of a security for purposes of the Securities Act.").

Defendants point out that the Enron plans expressly indicate that Enron's grants of options to employees were noncontributory: they state that "any employee" was eligible to receive awards of Enron stock options, that "awards shall be granted for no cash consideration or for such minimal cash consideration as may be required under applicable law," that no employee or other person eligible to participate in the plan had any right to be awarded stock options, and that grants of options could be made to discharge Enron's contractractual obligations or "in payment of any benefit or remuneration payable under any compensatory plan or program." Lomuscio Decl. Ex. 20 (Enron Corp. 1994 Stock Plan) at § 4.1 (cited at Complaint ¶¶ 230, 234), § 5.3(i) (*id.* at § 7.1), and § 5.3(vii). *See also* Lomuscio Decl. Ex. 21 (Enron Corp. 1999 Stock Plan) at §§ 4.1, 5.3(i), 5(3)(vii), 7.1, cited at Complaint ¶¶ 230 and 233); and Ex. 22 (Enron 1991 Stock Plan at §§ 4.1, 5.4(I), 8.1, cited at Complaint ¶ 230, 233). In sum, because there was no "purchase or sale" when Enron granted stock options to its

employees, Lampkin, Ferrell, Swiber and Nelson's 1933 Act claims must be dismissed.  Complaint (#122) at ¶¶ 5,7,9,10.

These claims, however, must also be dismissed because Enron's grant of stock options to its employees was not a registered offering.  As noted, the 1980 Release required an offer or sale of a security for the registration and antifraud provisions of the 1933 Act to be applicable.  The Enron Forms S-8 cited by Plaintiffs demonstrate that they registered only Enron common *stock* that could be acquired by optionees upon the *exercise* of their options. Lomuscio Decl., Exs. 23, 24, 25 (Enron Corp. Forms S-8 filed Jan. 26, 2001 in connection with the 1991, 1994, and 1999 Stock Plans), at 1.  Enron's Plan documents also state, "The Company intends to register . . . the shares of Stock acquirable pursuant to Awards under the Plan."  Lomuscio Decl. Exs. 22, 20, and 21. (Enron 1991, 1994, and 1999 Stock Plans) at § 5.3(v).  The General Instructions to Form S-8 demonstrate that the form is available for registration of securities to be offered under any employee benefit plan," e.g., "the exercise of employee benefit plan options and the subsequent resale of the underlying securities."  Lomuscio Decl. Ex. 26 (SEC Form S-8, General Instructions) at § 1(a).  #126 at p. 56.

Finally Defendants insist that no named Plaintiff has standing to assert a 1933 Act claim based on the acquisition of

Enron stock by exercising Enron options because the complaint and the affidavits attached to the complaint fail to state that any named plaintiff ever exercised his stock options and acquired Enron stock, not to mention that he or she lost money on such shares, or to plead facts tracing those shares to any registration statement or prospectus identified in the complaint. Thus the named Plaintiffs cannot represent a class of persons who hypothetically could bring viable 1933 Act claims.

**Plaintiffs' Response (#148; Index of Authority #149-164)**

As in a similar MDL 1446 case with respect to the 1934 Act claims against the same UBS Defendants, *Giancarlo, et al., v. UBS Financial Services, et al.*, H-03-4359, #175, Plaintiffs here distinguish their claims from those in *Newby* by explaining that their claims arise from UBS's relationship to Plaintiffs as their securities broker, as a U.S. broker-dealer, and as a member of self-regulated securities organizations, which owed Enron investors an admitted duty[72] "to comply with the associated regulations establishing the practices and standards of care such broker-dealers are required to follow in connection with their retail customers."

---

[72] *See* Declaration of David L. Augustus ("Augustus"), #109-123, "Attachment 1," UBS Form F-1 Registration Statement at 42-45; *id.* "Attachment 2," UBS Compliance Sales Practice Policy Manual at pp. 215-21.

#148 at pp. 4-5, citing Complaint (#122) at ¶¶ 118 43-44, 117-18, 226-27.  UBS also served as some Plaintiffs' stock options plan's statutory underwriter and sales conduit for securities distributed under the plans for claims under Section 11.  #122 ¶¶ 279-88.  UBS allegedly recklessly elevated Enron's business interests and UBS's own profits above its retail Enron investors' interests, in a conflict of interest in which UBS breached its brokerage duties to Plaintiffs.  #122 ¶¶ 119-73.  UBS also planned and participated with Enron in the five transactions identified in the complaint and other investment banking activities, which provided UBS with the knowledge that Enron's public financials were misstated.  *Id.*  In violation of its duties to its retail investor clients, UBS (1) made undisclosed agreements with Enron not to fulfill UBS's duty to its retail investor customers, who were acquiring, purchasing and/or holding Enron securities during the Class Period (*id.* at ¶¶ 74-81, 111-19, and 223-24; (2) secretly allowed Enron to exercise control over UBS's retail operations (*id.* at ¶¶ 92-110); (3) did not follow UBS's own established protocols and procedures to protect its Enron-owning retail customers from the Enron fraud and accounting violations, of which UBS was aware (*id.* at ¶¶ 223-27; and (4) failed to disclose its substantial conflict of interest when it was rapidly minimizing its own Enron default exposure in the public securities

market while promoting the purchase of Enron securities to its retail customers (*id.* at ¶ 187). UBS's actions "violated [its] communications duties and created additional duties of care, full disclosure, and fair dealing, arising from UBS's own policies and industry regulations implementing the federal securities laws."[73] #148 at p. 6.

As for the structure of UBS, although Defendants attempt to distinguish the three separate entities comprising UBS, Plaintiffs argue that the complaint (#122 at ¶¶ 27, 32, 35-36, 38, 44 and 94) asserts, and the Court must accept as true for purposes of the motion to dismiss, that UBS is an "integrated business enterprise," with Warburg and PW under UBS AG, as evidenced by its business operations during the Class Period. #148 at p. 7. *See also* Augustus Decl., #109, "Attachment 3," p. 18, *The Making of UBS*

_____

[73] *See GMS Group, LLC v. Benderson*, 326 F.3d 75, 81-82 (2d Cir. 2003)(Although there is no right of action for simply violating NASD rules, violation of NASD Rules 2860(19) and 2310, which govern the conduct of NASD members and address the suitability of securities recommendations, are relevant for purposes of § 10(b) unsuitability claims); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.3d 186, 200 (3d Cir. 1990)(violations of NASD rules may be probative in demonstrating a course of conduct amounting to fraud); Declaration of Augustus, #109, "Attachment 2," at pp. 10, 12, 29-33, and 55-57. Plaintiffs ignore Fifth Circuit cases rejecting these as independent bases for primary violations of the securities statutes.

(3d ed. March 2006); Attachments 4-11; Attachment 1 at pp. 11-12.[74]

The *Lampkin* Plaintiffs challenge the same five transactions as the *Giancarlo* Plaintiffs: (1) the two restructurings of the equity forward contracts as disguised loans, not as net share settling of existing contracts and new replacement contracts; (2) the E-Next Generation facility, allegedly structured to keep the facility off Enron's balance sheet and to provide Enron with a $600 million loan in direct violation of UBS's investment banking, tax, legal, and accounting or regulatory protocols; (3) the Yosemite IV prepay transactions, with Plaintiffs arguing that UBS's issuance of the credit linked notes and the prepay commodity forward arrangement were not independent transactions, but interdependent pieces of a single integrated transaction in which UBS participated, contrary to Defendants' claims[75]; and (4) the issuance of Osprey notes and the allegations that all the banks were aware that specific disclosures were removed from the offering memorandum (#122 at ¶

---

[74]The Court notes that these publications are not subject to the pleading requirements of the PSLRA; Plaintiffs' complaints are.

[75] To Defendants' contention that Plaintiffs' pleadings about the mechanics of Yosemite IV are conclusory and vague, Plaintiffs respond that they have alleged facts showing that UBS knew the Yosemite structures used a circular commodity swap to give Enron upfront cash and eliminate price risk exposure between the parties, thus constituting a loan to Enron. #148 at p. 29, citing Complaint, #122 at ¶¶ 156-59.

154), to which UBS has not offered any disagreement.

Regarding the ratings of UBS energy sector debt analyst Stewart Morel, Plaintiffs, citing to Morel's deposition,[76] point out that Morel published his research reports on Enron bonds for the UBS fixed-income group, which provided them to UBS institutional clients for investment decisions, and that Morel as well sent them directly to UBS personnel and clients and to anyone in UBS that wanted them. Morel's reports were not "hidden."

Plaintiffs claim that Rule 10b-5's requirement that a primary violator directly or indirectly engage in a manipulative or deceptive, nonrepresentational act, which is at the center of this case,[77] is satisfied by allegations of UBS's continuous failure to disclose to its retail investing clients, to whom UBS, operating as a single, fully integrated entity comprised of Warburg, PW and their corporate parent UBS AG, owed duties of disclosure. Those duties of disclosure distinguish this case from *Newby*, as does UBS's institutional material knowledge (gained through participation with Enron mainly in the five transactions) that Enron's public financial

---

[76] Augustus Decl., Ex. 30.

[77] As opposed to *Newby*, in which the theory of liability centers around allegations that various financial institutions worked together with Enron to create a false financial appearance. #148 at p. 35.

appearance was unreliable and materially misleading and that UBS failed to act in accordance with its own established guidelines to suspend analyst coverage and restrict sales. Complaint, #122 ¶¶ 25, 42, 52, 116-18, 173, 188-90, 226-27. *See In re Enron*, 235 F. Supp. 2d at 569 n.9 ("In *Santa Fe [Industries, Inc. v. Green*, 430 U.S. 462, 470 (1977)] the Supreme Court defined 'deception' as used in § 10(b) as the making of a material misrepresentation or the nondisclosure of material information in violation of a duty to disclose. . . . Thus the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative or deceptive act."). Plaintiffs agree with Defendants that the regulatory duty of disclosure in a nondiscretionary account is limited to executing an investor's order, but Plaintiffs also emphasize as a matter of law that "anyone in possession of material inside information must either disclose it to the investing public, or, if he is either disabled from disclosing it in order to protect a corporate confidence, or if he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." *SEC v. Texas Gulf Coast Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968)(*en banc*), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976 (1969). This rule applies not only to corporate insiders, but also "to one possessing the

[material inside] information who may not be strictly termed an 'insider.'" *Id*. UBS had both greater access to information concerning Enron's financial manipulations and a special financial advisor/client relationship with Plaintiffs that gave rise to specific duties of disclosure, but failed to disclose material information to its retail clients or the public at large, nor did it abstain from trading or recommending Enron securities.

Plaintiffs also object that they have not engaged in group pleading, but have identified specific officers of UBS who had knowledge that Enron's public financial statements were materially misleading, when these officers had this knowledge, and what they knew. Complaint, #122 ¶¶ 124, 130, 137-44, 150, 152, 157-59, 161, 164, 165, 170, 176, 179, and 187.[78] Plaintiffs claim that the information was not a series of disconnected facts, but an

---

[78] The Court observes that ¶ 124 merely states, "On May 17, 1999 Fastow approached Jim Hunt with a proposition that would allow Enron to extract value from the 'Equity Forward] contracts by using the UBS hedge shares . . . in the amount of the difference between the Forward Price and the increased market value of the shares, which was approximately $30 per share." As the Court explained on pages 11-12, this is the way the contracts were supposed to work and there was nothing deceptive or fraudulent about them. Paragraph 130 simply names officers for UBS and Enron on a conference call discussing the restructuring of the Equity Forward Contracts, again a matter not innately deceptive or illegal. The same appears to be true of the substance of all of the listed paragraphs. At most the allegations once again amount to aiding and abetting Enron in effectuating a fraud on investors and the public.

interrelated universe of facts [that] was communicated through out a substantially unchanged group of top UBS officers during a relatively short period of time and eventually even made its way to the apex of the global organization." #122 ¶ 176. The core group of UBS top executives that managed UBS' relationship with Enron included Jim Hunt, Kimberly Blue, Michael Collins, Karsten Berlage, and Wendy Field. #122 ¶¶ 49-50, 130, 139-42, 150, 157-58, 161, 163-65. In addition the executive credit team composed of Bill Glass, Bob Verna, Roger Bieri, Chris Glockler, and Steve Landowne served as a center for information about Enron and the risk Enron posed. #122 ¶¶ 130, 163-65, 176-77.

Scienter can be shown in part by pleading facts indicating a defendant's regular pattern of related and repeated conduct, involving an appreciation by UBS of the situation and a severely reckless failure to take action consistent with the standard of ordinary care to address such danger. For example, UBS mandated that Enron pay it $375 million in cash in September and October 2001 (#122 ¶¶ 182-86), virtually immunizing itself from Enron's creditors in bankruptcy because in early April 2001 a UBS risk committee, including Bill Glass, had identified Enron as one of only three companies that UBS did "not like" (#122 ¶ 164). Subsequent transactions that closed and created credit exposure to Enron had

to be approved and the exposure had to be sold or hedged (#122 ¶ 164).  UBS also took steps increasingly to eliminate its credit exposure to Enron (#122 ¶ 187).  For example in June-July 2001, UBS issued and sold JPY (Japanese Yen) 20 billion (approximately $163 million) worth of UBS securities to a foreign investor, pursuant to which UBS's repayment obligations were linked to Enron creditworthiness.  #122 ¶ 174.  If Enron filed bankruptcy or defaulted on its payment obligations to UBS, UBS could avoid repayment of its debt to this institutional investor. *Id.*  UBS used this issuance to obtain essentially a $163 million credit default sway from the unknowing investor.  Another example, in July 2001 UBS held a cumulative face value at maturity of $261,800,000 worth of Zero Coupon Convertible Senior Notes Due in 2011, which UBS had Enron register for public sale; UBS then sold the notes into the market and reduced its exposure to Enron.  #122 ¶ 175.  The outstanding equity forward contracts constituted UBS's most significant exposure to Enron in 2001.  UBS negotiated specific concessions from Enron that would allow UBS to unwind its position fully with a stock price as low as $9.93 per share and stop Enron from offering better terms to any other bank before UBS agreed to amend the early termination provisions of the contracts.  #122 ¶¶ 177-78.  It ultimately managed to settle part and terminate part of

the contracts, forcing Enron to pay the remaining balance of $153,453,776.44 and another $22,347,457.54 on a separate entity swap contract maturing on October 24, 2001, then sold 2.2 million shares of Enron common stock into the market, and ended its relationship with Enron.

Lampkin, Ferrell and Swiber's 1933 Act claims against UBS under Sections 11 and 12 are solely against PW, as a statutory underwriter and seller. UBS makes only two arguments to support its motion to dismiss these claims: (1) Plaintiffs did not "purchase" registered securities through the Enron stock plans because a corporation's grant to employees of an interest in an involuntary, noncontributory employee benefit plan, such as an employee stock option plan, does not constitute a "sale" under the 1933 Act, and (2) the Plaintiffs lack standing to assert claims under the 1933 Act. #126 at pp. 53–55 and n.33.

Plaintiffs contend that the "no sale" doctrine does not apply to Enron's employee stock option plans. *See Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America v. Daniel*, 439 U.S. 551, 570 (1979)(holding that "the Securities Acts do not apply to a noncontributory, compulsory pension plan" because an employee's participation in such a plan does not involve an "investment contract" under Section 21(1) of the Securities Act; for

- 169 -

the registration and antifraud provisions of the Securities Act to be triggered there must be an offer of sale of a "security."[79]); SEC Release No. 33-6188, *Employee Benefit Plans: Interpretations of Statute*, 45 F.R. 8960 (Feb. 11, 1980), codified at 17 C.F.R. 231 (the "1980 Release")(seminal document on the "no sale" doctrine)(available at 1980 WL 29482 (Feb. 1, 1980).[80]

_____

[79] Decl. of Augustus, Attachment 36 at p. 467.

[80] In *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 284 F. Supp. 2d 511, 639-40 (S.D. Tex. 2003), since only the purchaser or seller of securities may bring a private action for damages under § 10(b) and Rule 10b-5, this Court explained,

> Whether an employee's interest in an employment retirement (pension) benefit plan constitutes as "security" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 . . . depends on whether the plan is "voluntary or involuntary, and contributory or noncontributory." The S.E.C. defined a "'voluntary' plan [as] 'one in which the employees may elect whether or not to participate,'" while a "contributory" plan is "one in which employees make direct payments, usually in the form of cash or payroll deductions, to the plan." [The 1980 Release, 1980 WL 29482 at *6 and nn. 19, 20]. In other words, a "noncontributory" plan would be one where the employer makes all the contributions. The interests of employees in an employee benefit plan "are securities only when the employees voluntarily participate in the plan and individually contribute thereto." *Id*. at *2, 7. On the other hand, " . . . the Securities Acts do not apply to a

Insisting that the "no sale" doctrine is concerned with whether or not a particular situation involves a "security" under the 1933 Act, Plaintiffs claim that UBS misuses the "no sale" doctrine to argue that there is no "purchase" of a security by

---

noncontributory, compulsory plan." *Id.* at *8, citing [*International Brotherhood*, 439 U.S. at 570]. The SEC has long taken the position that interests in voluntary contribution pension and profit-sharing plans are "securities" because "such interests constitute investment contracts . . . ." . . . . The SEC's Chairman stated before the Senate Committee on Human Resources on the antifraud provisions of the proposed ERISA Improvements Act of 1979 (S.209),

An employee who is given a choice whether to participate in a voluntary pension plan and decides to contribute a portion of his earnings or savings to such plan, has clearly made an investment decision, particularly when his contribution is invested in securities issued by his employer. *Id.* (noting that the reasoning in *Daniel* supports the view that the employee's interest in a voluntary, contributory plan is an investment contract).

This Court observes that Enron's stock option plans were involuntary and noncontributory. As noted earlier, after *Daniel* its progeny expanded *Daniel*'s reasoning to all employee benefit plans. Under that reasoning, Enron's employees' interests in the Enron stock option plans were not interests in an investment contract and thus not securities. Moreover, as discussed previously, the SEC's 1980 Release changed its position to accord with the holding in *Daniel*.

Plaintiffs in connection with their 1933 Act claims.  Plaintiffs maintain that it is undisputed that a stock option is a security. 15 U.S.C. § 77b(1).  The SEC has also proclaimed that "stock options are a separate equity security under the Exchange Act" and that unless an exemption applies, these securities must be registered. Therefore the entire offering and distribution process created by the Enron Stock Plans is subject to these registration requirements, not merely the securities offered and distributed pursuant to them. Plaintiffs argue that the 1980 Release specifically address stock option plans:

> The Commission's belief that the registration provisions of the 1933 Act should be applicable to voluntary contributory plans which involve the purchase by employees of employer stock is supported by the legislative history of the Act. In 1934 Congress considered and rejected a proposed amendment to the Act that would have exempted employee stock investment and stock option plans from the Act's registration provision.  That amendment, which had been passed by the Senate but was eliminated in conference, was not adopted "on the ground that the participants in employees' stock investment plans may be in as great need of the protection afforded by the availability of information concerning the issuer for which they work as are most members of the public.

Decl. of Augustus, Attachment 36 at p. 471.  Thus the 1991, 1994, and 1999 Enron Stock Plans fall inside the boundaries of stock option benefit plans that are subject to the registration

requirements of the Securities Act.  The SEC's interpretation of the securities laws is entitled to deference.  *See generally Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984).

Plaintiffs note that UBS' claims that the "SEC noted that although 'stock bonus plans,' or 'plans under which and employer awards shares of its own stock to covered employees at no direct cost to the employees,' did provide employees with a security (corporate stock), #126 at p. 54, 'there is no 'sale' in the 1933 Act sense to employees since such employees do not individually bargain to contribute cash or other tangible or definable consideration to such plans." Asserting that UBS tries to obfuscate the issue by treating as equals "stock option plans" where the interest received by the employee is itself a "security," and other types of employee benefit plans that involve securities but do not involve an investment decision with regard to them.  Plaintiffs contend that stock option plans force an employee to make an investment decision, i.e., to exercise the option security and sell the underlying stock, to exercise the option security and hold the stock, or to do nothing and allow the option security to expire unexercised.  The SEC has asserted, "Employees making such decisions should continue to be afforded the protections of the anti-fraud provisions of the Federal Securities Law."  Decl. of Augustus,

Attachment 36 at 475.  Moreover, the employee has to pay Enron for
the stock when he exercises his stock option, thereby contributing
cash under the plan's provisions.

Plaintiffs demonstrate that the Enron Stock Plan includes
provisions for when and how the exercise is to be accomplished, the
option agreement, and other issues regarding the grant and exercise
of the Enron stock option.  #148 at p. 67.  It alone governs the
grant of Enron stock options.  UBS, on the other hand, fails to
point to a separate Enron employee benefit plan governing the grant
of stock options to support its argument that options are an
independent "species of employee benefit plan."

Plaintiffs cite *Falkowski v. Imation Corp.*, 309 F.3d 1123,
1129-30 (2002), *amended on other grounds*, 320 F.3d 905 (9th Cir.
2003)(addressing the "in connection with" element of preemption
under the Securities Litigation Uniform Standards Act ("SLUSA") and
holding that because the 1933 and 1934 Acts define the purchase or
sale of a security to include any contract to buy or sell a
security, and because it follows from Congress' definition that if
a person contracts to sell a security, that contract is a "sale"
even if the sale is never consummated, the grant of an employee
stock option on a covered security is a sale of that covered

security [known as the "aborted purchaser-seller doctrine]"),[81] as rejecting the application of the "no sale" doctrine to the distribution of employee stock options.  *Id.* at 1129 ("Both the 1933 and 1934 Acts define the purchase or sale of a security to include any contract to buy or sell a security."[82]), *citing* 15 U.S.C. §§ 77b(a)(3), 78c(a)(13)-(14), and *Blue Chip Stamps*, 421 U.S. at 751.[83]

---

[81] In *Proctor v. Vishay Intertechnology*, 594 F.3d 1208, 1219-20 (9th Cir. 2009), the Ninth Circuit points out that the suggestion in *Falkowski* that SLUSA completely preempted state law was abrogated by *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 636 n.1 (2006):

> SLUSA "does not itself displace state law with federal law but makes some state-law claims nonactionable through the class action device in federal as well as state court."  In other words, SLUSA does not provide a federal rule of decision in  lieu of a state one, but instead provides a federal defense precluding certain state law actions from going forward.  Thus, what we termed complete preemption in pre-*Kircher* cases, by which we are no longer bound on this issue . . . is actually a federal preclusion defense, and would not fall under the complete preemption exception to § 1331's well-pleaded complaint rule.

[82] "The grant of an employee stock option on a covered security is therefor a 'sale' of that covered security.  The option is a contractual duty to sell a security at a later date for a sum of money should the employee choose to buy it.  Whether or not the employee ever exercises the option, it is a 'sale' under Congress's definition."  *Falkowski*, 309 F.3d at 1130.

[83] The Ninth Circuit in *Falkowski*, 309 F.3d at 1130, opined regarding "the SEC's no-sale doctrine, which provides in part that a grant of stock under an Employee Stock Ownership Plan

Thus state law fraud claims relating to employee stock options are preempted by the Securities Litigation Uniform Standards Act ("SLUSA") because the alleged fraud took place "in connection with the purchase or sale of a covered security."[84] *Falkowski*, 309 F.3d at 1126. Plaintiffs claim that since *Falkowski* no other court has returned a contrary decision; in fact courts reviewing the issue have agreed with *Falkowski*.[85] *See also* order in an enforcement

---

or similar stock bonus program is generally not a 'sale' under the 1933 Act,"

> [I]t is inapplicable here. Unlike stock bonus plans, stock option plans involve contracts to sell stock for money at a later date (stock that is indisputably a "security"). Whether or not an option grant is a sale in the lay sense, it is a sale under the securities laws because it is a contract to sell a security when the option is exercised. We reject the contrary holding of *In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 539, 545 (D.N.J. 1999).

[84] Subsequently in *Kircher v. Putnam Funds Trsut*, 547 U.S. 633, 636 n.1 (2006) clarified that SLUSA "does not itself displace state law with federal law, but makes some state-law claims nonactionable through the class action device in federal as awell as state court." *Proctor v. Vishay Intertechnology, Inc.*, 584 F.3d 1208, 1219 (9th Cir. 2009); *in accord Romano v. Kazacos*, 609 F.3d 512, 519 n.2 (2d Cir. 2010)("SLUSA is a preclusion, not a preemption statute" and citing *Kircher*).

[85] Defendants point out, #167 at p. 30 & n.18, that *Falkowski* deals with a sale under the 1934 Act, which, unlike a 1933 Act "sale," does not have to be "for value," the key phrase in the 1933 Act that does not appear in the 1934 Act. 15 U.S.C. §§ 77b(3), 78c(a)(14); 1980 Release, 45 F.R. 8960, 8969 ("The key elements in the [1933 Act definition of sale] from the standpoint

action filed by the SEC, *In the Matter of Google, Inc. and David C. Drummond*, Admin. Proceeding file No. 3-11795, Release No. 8523 (Jan. 13, 2005), in which the SEC stated that it does not apply the "no sale" doctrine to the mass distribution of stock options to employees.[86]   Moreover, absent an exemption from registration, an

---

of employee benefit plans are the words 'value' and 'solicitation of an offer to buy,' for without one or both the 1933 Act is inapplicable."); *Blue Chip Stamps*, 421 U.S. at 733 & n.5 (noting "Congress' separate definition and use of [the term 'sale'] in the 1933 and 1934 Acts").   Moreover, argue Defendants, *Falkowski* erroneously states that the SEC's "no sale" doctrine applies only to stock bonus plans, and not to stock option plans, a contention which is contrary to the SEC's practice for more than twenty-five years.   See further discussion *infra*.   Defendants insist there is no support for Plaintiffs' contention that a 1933 Act "sale" took place when Enron made compulsory, noncontributory grants of options to its employees.

As Matthew Bodie points out in *Aligning Incentives with Equity: Employee Stock Options and Rule 10b-5*, 88 Iowa L. Rev. 539, 556-57 (March 2003), in three decisions in which the courts found ESOPS to be voluntary and contributory and therefore represented securities, there were key distinctions made that distinguished them from *Falkowski*.   In *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564 (10th Cir. 1991), the Tenth Circuit found that the employees contributed to the plan by forfeiting 17% of their wages and they were given a choice of whether to participate or to continue receiving their full wages. *Id.* at 575.   In *Hood v. Smith's Transfer Corp.*, 762 F. Supp. 1274, 1290-91 (W.D. Ky. 1991), the employees were permitted to choose whether to participate in the plan and if they did, a 15% wage reduction would be required, which the court found constituted contribution by the employee.   In *Harris v. Republic Airlines, Inc.*, Civ. A. No. 86-2147, 1988 WL 56256, *4 (D.D.C. May 19, 1988), the employees "agreed to participate" and to contribute a wage cut of 15%.

[86] Defendants note that *Google* relates to Google's failure to comply with SEC Rule 701 and does not mention the "no sale"

offering of stock options must be registered under the Securities Act of 1933.

In addition to Form S-8, which registers both offer and the sale of all securities issued to an employee benefit plan, its Notes to General Instruction F states, "Where a registration statement on this form relates to securities to be offered pursuant to an employee stock purchase, savings, or similar plan, the registration statement is deemed to register an indeterminate amount of interests in such plan that are separate securities and required to be registered under the securities Act."[87]   Rules 416(c) and 405

---

doctrine.

[87] Defendants object that General Instruction F concerns only those securities that "are required to be registered under the Securities Act," and they argue that the grant of stock options under the 1933 Act is not deemed a "sale" and does not have to be registered.  *See* discussion *infra*.  Furthermore the instruction defines the number or securities deemed registered, not what securities must be registered on Form S-8.  *See also* 17 C.F.R. § 230.416(c)(similar language in regulation).  Only underlying stock, not the options themselves, must be registered.  *See, e.g.,* following SEC no-action letters: *Dayton Steel Foundry Co.*, 1971 WL 6518 at *1 (July 8, 1971)("It is the opinion of this office, that the company may issue the options without registration because no sale of a security is involved in the mere option grant," but "the underlying common stock could not be issued unless a registration statement was in effect at the time of exercise."); *Formation, Inc.*, 1977 WL 11544 at *2 (Dec. 5, 1977)("[W]e are of the opinion that Formation may grant options under the Plan without registration under the [1933] Act since the mere issuance of such options does not involve a sale within the meaning of Section 2(3) of the Act.  We are also of the opinion that Formation will be required to register the underlying common shares under the Act

of the Securities Act also require registration of stock option plans.  Although UBS argues that the distribution of stock options is separate from the distribution of Enron common stock, both distributions are part of the same plan of distribution--the Enron Stock Plans--and require investment decisions by participants.  The Form S-8 registers the entire offering, both of the common stock and the stock options issued under the plan, although there is no filing fee associated with the stock options; therefore the employee stock options, although not considered for purposes of the registration fee, are still securities registered by the S-8 registration statements.

        To fully own Enron common stock, an employee must initially decide whether to invest in it and if so, must pay for it.  Their stock option plans were voluntary and contributory.  Nor did Enron hide the fact that it sought to raise money through the sale of Enron common stock to its employees through the plans.

        Arguing that UBS's contention that because Enron failed to register its stock options by S-8 Forms, Plaintiffs lack standing to assert a 1933 Act is incorrect, Plaintiffs insist that they have standing to assert their 1933 Act claims as a subclass of plaintiffs

---

before issuing or selling any of the shares upon exercise of the options unless at such time the issuance of such shares would be exempt from registration.").

who purchased or acquired options to purchase Enron equity securities, and/or purchased or acquired Enron equity securities through the exercise of an option to purchase Enron equity securities, pursuant to the registration statements and/or prospectuses pursuant to the subject Enron stock option plans identified in the complaint at ¶¶ 16, 228, and 269. The complaint asserts that Lampkin, Ferrell, and Swiber received registered securities pursuant to the plans during the defined class periods. # 122 ¶¶ 5,7,9.

Regarding the claims of "holders," Plaintiffs urge the Court to reconsider and reject the holding in *Blue Chips Stamps* and progeny that those who neither purchased nor sold Enron securities during the class period, but merely held onto them, lack standing to sue for securities fraud because there is no federal remedy for holders who are the victims of a fraud by issuers, their brokers, their analysts, their accountants and their banks.

### Defendants' Reply (#167)

Defendants object to Plaintiffs' current argument that PW's status as Plaintiffs' stockbroker and as a corporate affiliate of Warburg somehow changes the allegations of PW's aiding and abetting of Enron's fraud into a primary violation of the securities laws. Plaintiffs now claim that a "core group" of Warburg bankers

learned material nonpublic information about Enron's "true financial condition," that this knowledge is imputable to UBS AG, Warburg and PW as "institutional knowledge," that the three UBS entities owed a duty to disclose this information to PW customers or to bar those customers from trading Enron securities, but that to "optimize" their fees from Enron Warburg and PW did not disclose the information or suspend the trading in Enron securities even though to have done so would have prevented Plaintiffs' resulting losses. Defendants contend that Plaintiffs cannot cite a single case upholding what they claim is a "unique" theory.

Defendants maintain that Plaintiffs fail to allege scienter adequately under § 10(b), i.e., to "distinguish among those they sue and enlighten each defendant as to his or her particular role in the alleged fraud" without indulging in impermissible group pleading. *Southland*, 365 F.3d at 365. Plaintiffs assert that knowledge purportedly held by a few officers at Warburg or UBS AG is attributable to PW by characterizing these three legally distinct corporations as a "single business enterprise" with "institutional knowledge." Plaintiffs fail to allege what information any Warburg banker knew or identify even one occurrence in which any PW employee obtained Enron-related material nonpublic information from Warburg, Enron or anyone else. Thus they fail to plead scienter against

Warburg, PW and UBS AG.

Nor do Plaintiffs plead loss causation. At most, Warburg's transactions with Enron constitute aiding and abetting Enron's financial-statement fraud. Plaintiffs fail to explain how any PW brokerage practices directly affected Enron's stock price or to plead that Enron's stock price declined because of any public disclosure of PW's dealings with Enron.

Defendants further point out that Warburg and PW had established duties not to share information with each other because they were required by federal law to maintain a Chinese Wall between them. Moreover insider trading laws prohibited Warburg and PW from sharing any material nonpublic information with Plaintiffs. For both reasons Plaintiffs' argument that because Warburg had material, nonpublic information about Enron, Warburg and PW had a duty to disclose it to PW's customers is meritless.

While Plaintiffs' omission-based fraud claims require them to plead they were owed a fiduciary duty, Warburg did not have a fiduciary relationship with PW's clients, and Plaintiffs have failed to allege facts showing that PW had one with them.

In addition, Plaintiffs fail to cite even one case upholding a claim under §§ 11 and/or 12 of the 1933 Act based on an employer's award of stock options to its employees, no less against

a third-party administrator like PW.  Such claims are meritless and unprecedented and should be dismissed, insist Defendants.

Plaintiffs' allegations about the five transactions involving Warburg are at most claims of aiding and abetting under the holding of *Central Bank* because Plaintiffs assert that these transactions were used by Enron to falsify its financial statements. Thus they fail to state a securities fraud claim against Warburg or PW as primary violators.  Now Plaintiffs appear to have shifted to a claim that these five transactions demonstrate Warburg's knowledge of Enron's wrongdoing.[88]  As this Court indicated in its Opinion and Order in *Newby*, H-01-3624, #5242 at pp. 16-17,[89]

> [C]onclusory allegations that a defendant designed and structured an SPE or a transaction that was inherently deceptive will not satisfy the pleading standards under the PSLRA and Rule 9(b).  Simply calling something a "sham" or a "pretense" or a "fiction" does not make a

---

[88]Plaintiffs object that they indicated in their response to requests for production on October 17, 2005 regarding the five transactions detailed in the Complaint that UBS gained its knowledge of Enron's manipulation of its public financial appearance, but chose not to reveal it to the market and instead foster its relationship with Enron to achieve Tier 1 banking fees from Enron; in other words, Plaintiffs argue that every aspect of UBS's relationship with Enron is part of UBS' fraud on the market. Decl. of Augustus, Ex. 1 at pp. 5-7.  *See also* Complaint (#122) at par/ 117.

[89] Also available as *In re Enron Corp. Securities, Derivative &* "ERISA" Litig., No. MDL 1446, Civ. A. No. H-01-3624, 2006 WL 6892915, at *5 (S.D. Tex. Dec. 4, 2006).

transaction a primary violation. Lead Plaintiff must allege specific details that show that a structure of the entity or a transaction that was created by [the bank] was inherently deceptive and that the bank used and employed it to deceive investors, not that Enron, its officers and accountants subsequently used the entity improperly to cook its books, or that [the bank] engaged in acts, practices, or course of business that operated as a fraud or deceit on any person in connection with the purchase or sale of an Enron security.

None of the transactions identified in the complaint satisfies this standard. Plaintiffs do not plead anything inherently deceptive about the equity forward contracts, net share settlement, or the early termination of a financial contract. Nor have Plaintiffs explained how Warburg, rather than Enron or its accountants, "used and employed" the restructurings to deceive investors. Nor did Plaintiffs allege that any requisite "purchase or sale" of an Enron security involving them occurred regarding the equity forward contracts or their restructuring.

Nor have Plaintiffs asserted that Warburg created the Osprey structure. Warburg only participated in a follow-on offering of Osprey debt securities. Nothing about the Osprey notes was "inherently deceptive," and Warburg did not "use and employ" Osprey to deceive investors. Any deception came from Enron's sales of assets to Whitewing at allegedly noneconomic prices or the

- 184 -

accounting treatment of those sales.  Nor was there a purchase or sale of an Enron security involving Plaintiffs with respect to the Osprey notes.

Similarly Warburg did not create the Yosemite structure as a whole, nor the Yosemite IV structure particularly, but merely participated in a follow-on offering of credit-linked notes issued by a trust.  There was nothing "inherently deceptive" about the credit-linked notes.  Warburg was not involved in the prepay part of the Yosemite IV transaction, nor did it use and employ the prepay to deceive investors.  Nor were Plaintiffs involved in any purchase or sale of an Enron security regarding this offering of credit-linked notes.

The same is true for the E-Next Generation Credit Facility, the structure of which Warburg also did not create, but along with several other banks simply extended to it a line of credit.  There was nothing inherently deceptive about the line of credit to construct the power plants, regardless of whether it was recorded on the balance sheet by Enron.  Nor did Warburg use and employ it to deceive investors.  Any deception was in Enron's accounting for it.  Similarly, nor did any purchase or sale of an Enron security occur when money was lent to E-Next.

Furthermore Defendants maintain that Plaintiffs fail to

allege scienter. Plaintiffs' claim that the Court is required to accept as true their assertion that Warburg, PW, and UBS AG function as a single business enterprise is a textbook example of impermissible group pleading. Plaintiffs must identify, but have not, a particular employee of each defendant and what he knew about Enron, when, why that information was material or nonpublic, and what fraudulent acts or omissions each such individual allegedly made or failed to make. *Southland*, 365 F.3d at 365-66. Specifically Plaintiffs fail to allege with any particularity what Warburg knew about Enron's fraud. They fail to cite any objective support for their conclusion that the equity forward restructurings should have been accounted for as loans or that anyone at Warburg knew that the Yosemite prepay constituted a "$775 million direct loan" to Enron, or that anyone thought that Enron's accounting treatment for a potential exposure relating to the E-Next facility was wrong or would not be disclosed. Plaintiffs' vague statements about the Osprey Note Offering and Waimea/Kahuma do not indicate Warburg bankers' beliefs about the timing, amount, nature, and accounting propriety of Plaintiffs' allegations regarding Enron's "ineffective accounting hedges," "non-arm's-length transactions," "accounting for certain transactions as true sales at written up values," and improper disclosures of debt.

Nor do they adequately plead what PW knew about Enron's fraud.  The emails they mention do not show a sharing of any Enron-related nonpublic information between Warburg and PW and had nothing to do with Enron's financial conditions or the risks that Enron would be unable to service its debt and therefore suffer financial collapse.  Because they have not alleged that any identified PW employee obtained nonpublic information about Enron's financial condition or about Warburg of UBS AG's credit exposure to Enron, they cannot argue that any PW employee failed to disclose information that Plaintiffs have not shown they possessed.

While Plaintiffs appear to agree that Enron's actions caused the price of Enron stock to drop, Plaintiffs contend that Defendants caused their losses because somehow Defendants were aware of some part of Enron's wide-ranging fraud and that it was "foreseeable" that Plaintiffs' losses would occur if the market discovered Enron's fraud.  Defendants insist that because Plaintiffs cannot show that Warburg committed a primary violation of the securities laws by participating in a transaction that affected Enron's financial statements, they cannot plead loss causation against it simply by asserting that Enron's financial statements were misleading.  Defendants have shown that Plaintiffs failed to allege that any of PW's brokerage practices were disclosed before

- 187 -

Enron's bankruptcy, so they could not have caused Plaintiffs'
losses.  In the same way, Plaintiffs cannot show that the failure
to reveal information that PW and/or Warburg possessed about Enron's
financial condition caused Plaintiffs' losses when that information
was revealed to the marketplace.

While Plaintiffs charge that Defendants failed to act
according to their own guidelines and Sales Practices Compliance
Manual to suspend coverage and restrict sales of Enron stock ("the
restricted list policy), Plaintiffs fail to allege that PW's
purported policy violations were a violation of Rule 10b-5 or caused
Plaintiffs' losses.  Furthermore, even if Plaintiffs placed Enron
stock on a restricted list, such placement would not have affected
Plaintiffs' trading decisions because investors desiring to trade
that stock had numerous other sources for information about Enron.

Moreover, insist Defendants, Plaintiffs mischaracterize
PW's "restricted list" policy.  The policy manual did not require
PW to "suspend analyst coverage and restrict sales" whenever the
global UBS AG organization obtained material nonpublic information
about an issuer.  PW's policy manual actually states that securities
may be placed on the Legal Restricted List "for a number of
reasons," none of which is articulated in the part of the manual
cited by Plaintiffs.  In addition, Plaintiffs fail to attach that

part of the manual immediately following the pages on which
Plaintiffs erroneously rely.  These pages contain a section entitled
"The Information Barrier," "better known as the 'Chinese Wall' or
the 'Information Wall,' between the banking side of the Firm
(Investment banking, merchant banking, capital markets banking,
syndicate, public finance, asset-backed or mortgage-backed banking,
and structuring activities), including banking, administrative, and
support employees, and the marketing side of the Firm (research,
sales, trading and Firm administration)." This section demonstrates
that the company policy did not require automatic suspension of
brokerage activities every time an investment banker obtains
material nonpublic information. *See* #169 at pp. 35-37, Supplemental
Decl. of Lomuscio.  Instead PW marketing employees were barred from
breaching the wall or "mak[ing] any effort to obtain inside
information from any banking employee." *Id.* at 36.

        Even if Plaintiffs had adequately pleaded that Warburg
employees or PW employees possessed material nonpublic information
concerning Enron and that the failure to disclose this information
caused Plaintiffs' losses, these claims would still fail because
Warburger and PW not only had no obligation to share that
information with Plaintiffs, but had affirmative duties not to share
it.  Multi-service financial institutions have a duty to prohibit

- 189 -

bankers from giving nonpublic information to other bank employees;
in fact barring such allows brokerage and research operations to
continue unimpeded by bankers' "institutional" knowledge.  *See*
*Koppers Co., Inc. v. Am. Express Co., Shearson Lehman Brothers*
*Holdings, Inc., Shearson Lehman Hutton, Inc., SL Merger, Inc., BNS*
*Partners, BNS Inc., Bright Aggregates, Inc., Beazer PLC, and Nat'l*
*Westminster Bank PLC*, 689 F. Supp. 1413, 1415-16 (W.D. Pa.
1988)("The Commission has rejected the view that the conflicts of
interest . . . require the prohibition of multiple roles by
securities firms.  The Commission has stated that, if multiple roles
were prohibited, 'the capital-raising capability of the industry and
its ability to serve the public would be significantly weakened.'
As stated in the 1963 Report of the Special Study of the Securities
Markets, the total elimination of potential conflicts in the
securities industry 'is obviously quite out of the question.'").
If Warburg or its employees gave PW, and through PW its client
investors, material nonpublic information to allow the clients to
avoid investment losses, Warburg or its employees could themselves
have violated Rule 10b-5.  *See* #126 at p. 32 and 47, citing *United*
*States v. O'Hagan*, 521 U.S. 642, 652 (1997)(Rule 10b-5 bars certain
"efforts to capitalize on public information through the purchase
or sale of securities.").  It is well established law that

stockbrokers who advise their clients to trade on inside information violate Rule 10b-5.[90]   *See, e.g., United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991)(*en banc* 5-4 decision), *cert. denied*, 503 U.S. 1004 (1992).   To preclude insider trading, broker-dealers must establish "Chinese Wall" policies "to prevent the misuse . . . of material, nonpublic information."   15 U.S.C. § 78o(f).   Chinese Walls are "designed to prevent improper or unintended dissemination of market sensitive information from one division of a multi-service firm to another . . . ," in particular to "isolate a firm's investment banking department from other departments."   NASD Notice to Members 91-45, *NASD/NYSE Joint Memo on Chinese Walls and Procedures* (June 21, 1991).   Therefore it cannot be, as Plaintiffs assert, an "extreme departure from the standards of ordinary care"

---

[90] As opined by the court in *SEC v. Alexander*, 160 F. Supp. 2d 642, 650 (S.D.N.Y. 2001),

> [A] person who is in possession of insider information and discloses that information to others can be held liable for violating section 10(b) and Rule 10b-5 as a "tipper" even if he or she did not trade on the inside information.   *See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith*, 495 F.2d 228, 237 (2d Cir. 1974).   "Trades by tippees are attributed to the tipper."   *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 165 (2d Cir. 1980).

The plaintiff must also plead that the defendant tipper acted with adequate scienter, i.e., facts giving rise to a strong inference of fraudulent intent.   *Id.*

for Warburg employees to have "observed" Chinese Wall policies in failing to provide any nonpublic material information to PW's customers.

Defendants argue that the complaint fails to plead with particularity the information possessed by Warburg employees, no less that it was material or nonpublic.  "The price of impermissible generality is that the averments will be disregarded." *Lone Star Ladies Inv. Club*, 238 F.3d at 368.  Furthermore, many of the allegedly nonpublic facts that Plaintiffs now assert that Warburg failed to disclose were widely known and previously characterized by Plaintiffs, themselves, as "critical red flags that should have put Barone on notice that Enron was in serious trouble" and which provided "objective evidence that confirmed Enron's worsening financial condition."  Second Amended Class Action Complaint, #20 at ¶¶ 135 and 166.  The previous complaint highlighted Barone's "ignor[ing] the worsening debt and credit conditions that Enron was reporting in its public findings" (*id.* at ¶¶ 56, 167), "Enron's practice of booking its income at present value" (*id.* at¶ 57), and the $20 billion in debt "associated with [Enron's unconsolidated partners," disclosed in Enron's 2000 Form 10-K (*id.* at ¶ 57).  Since the complaint does not plead facts suggesting that any Warburg employee knew nonpublic information about Enron, Plaintiffs cannot

plead where or how Warburg or "UBS" traded on any nonpublic information.

Plaintiffs claim that Warburg "undertook [unspecified] trading activities to eliminate its credit exposure to Enron for its own benefit, while in possession of . . . [unspecified] material, non-public information [garnered from participating in various unsavory transactions with Enron]." #122 ¶¶ 52, 115-16, 174, 187, 208, 337. They allege that Warburg traded on material nonpublic information (i.e., the "number, amounts, and trigger prices" of Enron's equity forward contracts with two other banks) by amending and settling its equity forward contracts with Enron in late 2001, and by Warburg's later "unwinding" of its hedge position in October 2001. #122 ¶¶ 176-88. Defendants argue that "full disclosure forecloses liability under the misappropriation theory," and because Enron voluntarily gave Warburg in September 2001 the same information on which Plaintiffs claim Warburg traded to cause Warburg to extend the equity forwards, Warburg did not violate Rule 10b-5 under either the misappropriation theory (misappropriating confidential information for securities trading in breach of a duty owed to the source of the information) or the classical theory (breach of a duty of trust and confidence owed by corporate insiders

to corporate shareholders) of insider trading.[91]  *O'Hagan*, 521 U.S. 650-54.    Thus Warburg did not unlawfully trade on inside information.  At most, to the extent that Plaintiffs allege anything with particularity, Warburg merely aided and abetted Enron's fraud and did not violate the 1934 Act.

Defendants also argue that PW's alleged failure to provide its customers with information about Enron's "true" financial condition is not a securities fraud claim.  Plaintiffs do not assert that the single transaction that PW participated in with Enron, i.e., an agreement to administer Enron's stock option plan, aided Enron in concealing anything or that the administration of that plan provided PW with any knowledge of Enron's true financial condition. Instead they rely on the vaguely characterized "gentleman's

---

[91] Although "outsiders" like Warburg may become temporary fiduciaries to shareholders by "enter[ing] into a special confidential relationship in the conduct of the enterprise and [receiving] access to information solely for corporate purposes," "[f]or such a duty to be imposed . . . the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship must imply such a duty." *Dirks v. SEC*, 463 U.S. 646, 655 & n.14 (1983).  Defendants assert that counterparties to a bilateral derivatives trade, where one party's gain is the other's loss (#122 at ¶ 119), do not have a "special confidential relationship.  Even if Warburg did have a duty to assist Enron to conduct the business of the enterprise by extending the equity forward contracts, there is no reason to conclude that such duty extended beyond the termination of the equity forward contracts—-i.e., after the time Warburg sold its hedge shares. #122 ¶ 186.

- 194 -

agreement" between PW and Enron that purportedly prohibited PW from advising its clients to sell or from saying anything negative about Enron.   #122 at ¶ 74.   Plaintiffs provide no details about the secret agreement or how it operated to defraud clients who held Enron stock in their PW accounts.   Thus they fail to allege a securities fraud claim against PW.

PW is not a primary violator of the securities laws if it only engaged in routine business transactions or failed to disclose another party's fraud absent a duty to do so.   There are no allegations that PW engaged in any banking or other transactions used by Enron to conceal its actual financial state, or that Enron used the employee stock option plan to defraud investors.   Even if there were, such allegations are not sufficient to make PW a primary violator of the law.  Since Plaintiffs fail to state a claim against PW as a primary violator used by Enron to conceal its financial state, PW had no duty to disclose its business relationship with Enron or transactions in Enron securities, no less against Warburg as the source of UBS's alleged knowledge about Enron, to its retail clients and participants in the Enron stock option plan because their accounts were nondiscretionary. *Martinez Tapia*, 149 F.3d at 412 ("[W]here the investor controls a nondiscretionary account and retains the ability to make investment decisions, the scope of any

duties owed by the broker will generally be confined to executing the investor's order.").

The complaint conclusorily charges that UBS failed to disclose (1) "conflicts of interests" regarding PW's brokerage business and its contract to administer Enron's options plan and (2) nonpublic information about Enron's financial condition and "questionable business practices" purportedly obtained by Warburg bankers from transactions with Enron.   #122 at ¶¶ 25, 51, 52. Defendants emphasize that Plaintiffs do not plead that PW's internal business practices caused Enron to collapse and that they fail to allege scienter regarding any omissions involving Enron's financial condition.   There are no facts alleged that give rise to a strong inference that any PW employee possessed nonpublic information about Enron or its alleged "questionable business practices" purportedly known to Warburg bankers.   Furthermore, PW was not severely reckless for failing to obtain nonpublic information about Enron because retail brokers are not permitted to seek such in another division of a financial institution to advise their clients on investments, and broker-dealers are required by law to establish Chinese walls to preclude the flow of information within a multi-service financial institution from improperly trading on material nonpublic information.

Defendants point out that the complaint's allegations of loss causation fail to distinguish between PW and Warburg despite the fact that loss causation must be pleaded as to each act or omission in violation of Rule 10b-5 as to each separate defendant. 15 U.S.C. § 78u-4(b)(4); *Southland*, 365 F.3d at 364-65. Moreover the complaint does not identify any public disclosure of purportedly questionable business practices or conflicts of interest or PW's brokerage practices affecting Enron's stock price that proximately caused Plaintiffs' economic losses at any time before its bankruptcy while Enron's stock was still trading. Plaintiffs' 1934 Act claims accordingly must a fail for this reason, too.

Defendants contend that Plaintiffs' claims under §§ 11 and 12 of the 1933 Act fail also because Enron employees did not "purchase or sell" stock options received from Enron,[92] because

---

[92] In #167 at p. 29, Defendants note that the 1933 Act defines the term "sale" as encompassing "every contract of sale or disposition of a security or interest in a security *for value*." 15 U.S.C. § 77b(3)(emphasis added). A grant of stock options to employees under the 1933 Act is a "sale" only if the grant is "for value." Enron employees received their stock options "for no consideration," so the grant of them was not "for value" and did not constitute a 1933 Act "sale." In *Bauman v. Bish*, 571 F. Supp. 1054, 1064 (N.D.W. Va. 1983), the court opined,

> Participation in the ESOP [employee stock ownership plan] for employees of the proposed company is not voluntary, and is, in a sense, compulsory. Each participant who meets certain minimum hours of service requirements

will have stock allocated to his or her
account.     Thus, there is no affirmative
investment decision.  More importantly, there
is no furnishing of "value" by participating
employees.  *See* 15 U.S.C. § 77b(3).  Instead
of giving up some tangible and definable
consideration, participants earn stock through
labor for the employer.  The notion that the
exchange of labor will suffice to constitute
the type of investment which the Securities
Acts were intended to regulate was rejected
in *Daniel*, [439 U.S. at 559-561 ("An employee
who participates in a noncontributory,
compulsory pension plan by definition makes no
payment into the pension fund.  He only
accepts employment, one of the conditions of
which is eligibility for a possible benefit on
retirement. . . . . [T]he purported investment
is a relatively insignificant part of an
employee's total and indivisible compensation
package.     No portion of an employee's
compensation other than the potential pension
benefits has any of the characteristics of a
security, yet these noninvestment interests
cannot be segregated from the possible pension
benefits.  Only in the most abstract sense may
it be said that an employee "exchanges" some
portion of his labor in return for these
possible benefits.  He surrenders his labor as
a whole, and in return receives a compensation
package that is substantially devoid of
aspects resembling a security.  His decision
to accept and retain covered employment may
have only an attenuate relationship, if any,
to perceived investment possibilities of a
future pension.  Looking at the economic
realities, it seems clear that an employee is
selling his labor primarily to obtain a
livelihood, not making an investment.") . . .
. [T]he Court finds that the proposed ESOP is
a method of deferring income, not reducing
wages or paying for stock.  *See* Am. Jur. 2d

- 198 -

Enron's Forms S-8 neither registered nor offered Enron stock options, and because no named Plaintiff has standing to assert the 1933 Act claims based on the acquisition of Enron stock by exercising Enron options. *See* earlier discussion on pp. 130-33 of this Opinion and Order.  Defendants assert that no third-party administrator has ever been held strictly liable under §§ 11 and 12 for errors in the issue's financial statements because no 1933 Act "sale" occurs when a corporation grants stock options to its employees on a compulsory, noncontributory basis.

Furthermore Defendants present a list of six no-action letters from the SEC demonstrating that for over thirty years the SEC has advised companies that because no 1933 Act "sale" occurs in

---

*Pension Reform Act* § 187 (1975).

*In accord Register v. Cameron & Barkley Co.*, 467 F. Supp. 519, 533 (D.S. Ca. 2006); *In re Cendant Corp. Sec. Litig.*, 81 F. Supp. 2d 550, 556-58 (D.N.J. 2000); *Fraser v. Fiduciary Trust Co., Intern.*, No. o4 CIV 6958(RMB)(GWG), 2005 WL 6328596, at *5 (S.D.N.Y. June 23, 2005)"; *In re Enron Sec. Derivative & "ERISA" Litig.*, 284 F. Supp. 2d 511, 641-42 (S.D. Tex. 2003); *Employee Benefits Plans*, Securities Act Release No. 33-6188, 19 S.E.C. Docket 465, 1980 WL 29482, at *15 (SEC Feb. 1, 1980)("SEC Release No. 6188")("there is no 'sale' in the 1933 Act sense to employees, since such persons do not individually bargain to contribute cash or other tangible or definable consideration to such plans"). *But see Foltz v. U.S. News & World Report, Inc.*, 627 F. Supp. 1143, 1159-61 (D.D.C. Jan. 15, 1996)(ESOP at issue was not designed as a method of deferring income and concluding "that a plaintiff who asserts that he would have deferred retirement pending a hoped-for increase in the value of his stock holding states a claim under Section 10(b)").

the grant of stock options to employees of a corporation, the options do not have to be registered under the 1933 Act.  #167 at pp. 31-32.  Defendants assert that the no-action letters cited by Plaintiffs, dated after the Class Period, do not discuss the application of the "no sale" doctrine to grants of employee stock options, but instead relate to irrelevant questions of whether three classes of membership units "can be considered one class of securities" for the purposes of Rule 701 or whether stock options are exempt from the registration requirements of Section 12(g) of the 1934 Act."

Defendants represent that to be characterized as an "underwriter" of Enron employee options for purposes of Section 11 liability, PW must have "purchased" options from Enron, or "offered" or "sold" options for Enron, in connection with the "distribution" of employee options by Enron.  15 U.S.C. § 77b(1).  Defendants maintain that a corporation's grant to employees of an interest in an involuntary, noncontributory employee benefit plan, for example an employee stock option plan, does not constitute a "sale" under the 1933 Act.  Therefore PW cannot be liable for any losses stemming from Enron's grants of options to its employees.  *See* 17 C.F.R. § 230.405 ("The term 'employee benefit plan' means any written purchase, savings, option, bonus, appreciation, profit sharing,

thrift, incentive, pension, or other similar plan or written compensation contract solely for employees . . . .").

Sections 11 and 12 of the 1933 Act are restricted by their express terms to "purchasers or sellers of securities." *Blue Chip*, 421 U.S. at 735-36; 17 U.S.C. § 77k(a)(any person "acquiring" a security may sue under Section 11); 15 U.S.C. § 77l (any person "purchasing" a security may sue under Section 12). Thus to be able to sue, PW must qualify as an "underwriter" of Enron employee options for purposes of Section 11 liability, must have "purchased" options from Enron, or "offered" or "sold" options for Enron, in connection with the distribution of employee options by Enron. 15 U.S.C. § 77b(11). Defendants claim that because a corporation's grant to its employees of an interest in an involuntary, noncontributory employee benefit plan, such as an employee stock option plan, does not constitute a "sale" under the 1933 Act, as a matter of law PW cannot be liable for any losses stemming from Enron's grants of options to its employees. 17 C.F.R. § 230.405.

Defendants sum up the law this Court discussed under "Applicable law." In *Daniel*, 439 U.S. 551,[93] the Supreme Court held

---

[93] In *Daniel,* 439 U.S. at 558, the Court applied an "economic realities" test (substance over form) from *SEC v. W.J. Howey Co.,* 328 U.S. 293,301 (1946), to determine "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." The *Daniel*

that the 1933 and 1934 Acts do not apply to a noncontributory pension plan because such a plan is not an investment contract[94] since the purported investment by the employee is a relatively trivial part of the employee's total and indivisible compensation package and because given the substantial portion of the pension

---

court explained, 439 U.S. at 559-60, concluding that an employee's participation in a noncontributory, compulsory pension plan does not constitute a "security" or an "investment contract":

> An employee who participates in a noncontributory, compulsory pension plan by definition makes no payment into the pension fund. He only accepts employment, one of the conditions of which is eligibility for a possible benefit on retirement. . . . . In every decision of this Court recognizing the presence of a "security" under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separate financial interest with the characteristics of a security. . . . Even in those cases where the interest acquired had intermingled security and nonsecurity aspects, the interest obtained had "to a very substantial degree the element of investment contracts . . . ." In every case the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security.

[94] The SEC defines an "investment contract" as "any contract, transaction or scheme whereby a person invests money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." Denise L. Evans, J.D., and O. William Evans, J.D., *The Complete Real Estate Encyclopedia* (The McGraw Hill Companies, Inc. 2007).

- 202 -

funds which come from contributions, the possibility of
participating in asset earnings is too minimal to include the
transaction within the concept of "investment contract."

Subsequently in SEC Release No. 33-6188, *Employee Benefit
Plans; Interpretations of Statute*, 45 F.R. 8960 (Feb. 11, 1980),
*codified at* 17 C.F.R. 21 (the "1980 Release"), the SEC explained
that "for the registration and antifraud provisions of the 1933 Act
to be applicable, there must be an offer or sale of a security."
1980 Release, 45 F.R. at 8962.[95]  Although "stock bonus plans" or
"plans under which an employer awards shares of its own stock to
covered employees at no direct cost to the employees" do provide
employees with a security, i.e., corporate stock, "there is no
'sale' in the 1933 Act sense to employees since such employees did
not individually bargain to contribute cash or other tangible or
definable consideration to such plans."  *Id.* at 8968.  The term
"sale" has the same meaning for both the antifraud and registration
provisions of the 1933 Act.  *See* 1980 Release, 45 F.R. at 8969.  *See
also Compass Group PLC,* SEC No-Action Letter, 1999 WL 311797 (May
13, 1999)("[W]hen an employee does not give anything of value for
stock other than continuation of employment nor independently

---

[95] Under *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837
(1984), the SEC's interpretation of securities laws is entitled to
deference.

bargains for such stock, registration is not required" under the "no sale doctrine.").

Defendants observe that the "no sale" doctrine applies to grants of employee stock options which are a type of employee benefit plan. SEC Release No. 33-6455, *Interpretive Release on Regulation D*, 48 F.R. 10045 (March 10, 1983), at Question 78 ("In a typical plan, the grant of [employee stock] options will not be deemed a sale of a security for purposes of the Securities Act."); *Sarnoff Corp.*, SEC No-Action Letter, 2001 SL 811033 (July 16, 2001)(no 1933 Act registration required for grant of interests or option to acquire interests in limited-liability company); *Millennium Pharm., Inc.*, SEC No-Action Letter, 1998 WL 264102 (May 21, 1998)(No 1933 Act registration required for grant of stock options by publicly traded company based on opinion from counsel that "the grant of such options does not constitute a 'sale' or 'offer to sell' a security").

The terms of Enron's Stock Option Plans evidence that Enron's grants of options to its employees were noncontributory, stating that "any employee" was eligible to receive awards of Enron stock options, that "awards shall be granted for no cash consideration or for such minimal cash consideration as may be required under applicable law," that no employee or other person

- 204 -

eligible to participate in the plan had any right to be awarded stock options, and that grants of options could be made to discharge Enron's contractual obligations or "in payment of any benefit or remuneration payable under any compensatory plan or program.". These documents, referenced in #122 ¶ 233, are relied on by Plaintiffs as "prospectuses" giving rise to 1933 liability; #130, Lomuscio Decl. Ex. 20 (Enron Corp. 1994 Stock Plan) at §§ 4.1, 5.3(I), 7.1, 5.3(vii), cited at #122 ¶¶ 230 and 233. *See also* #130, Lomuscio Dec. Ex. 21 (Enron Corp. 1999 Stock Plan) at §§ 4.1, 5.3(I), 5.3(vii), 7.1, cited at #122 ¶¶ 230, 233; and Ex. 22 (Enron Corp. 1991 Stock Plan) at §§ 4.1, 5.4(I), 8.1, cited at #122 ¶¶ 230, 233.

In sum, because no "purchase or sale" occurred when Enron granted stock options to its employees, all 1933 Act claims of Plaintiffs Lampkin, Ferrell, Swiber, and Nelson must be dismissed. #122 ¶¶ 5,7,9,10.

In addition, Defendants repeat that these claims must be dismissed also because Enron's Forms S-8 neither registered nor offered Enron Stock Options, so Enron's grant of stock options to its employees was not a registered offering. The Forms S-8 cited by the complaint state they registered only the Enron common *stock* that could be acquired by optionees when they *exercised* those

options.   #130, Lomuscio Decl. Exs. 23, 24, 23 at 1 ("This
registration statement is being filed . . . to register additional
shares of Enron Common stock for sale") and #128 Ex. 5 (statement
by Enron General Counsel James Derrick regarding Forms S-8 "relating
to a proposed offering and sale of up to an aggregate of 10,000,000
shares . . . of Common Stock . . . of the Company which may be
issued pursuant to the Company's [1991, 1994, or 1999] Stock
Plan."). Enron's Plan documents also state, "The Company intends
to register . . . the shares of Stock acquirable pursuant to the
Awards under the Plan." #130, Lomuscio Dec. Exs. 22, 20, 21 (Enron
1991, 1994, and 1999 Stock plans) at § 5.3(v). The instructions to
Form S-8 indicate that the form is available for registration of
"securities of the registrant to be offered under any employee
benefit plan," such as "the exercise of employee benefit plan
options and the subsequent resale of the underlying securities."
#130, Lomuscio Ex. 26 (SEC Form S-8, General Instructions) at §
1(a).

Next Defendants emphasize that none of the named
Plaintiffs has standing to bring the 1933 Acts based on the
acquisition of Enron stock by exercising their options. The
complaint and Plaintiffs' attached affidavits do not allege that any
named plaintiff ever obtained Enron stock by exercising his or her

stock options, not to mention that he or she lost money on such shares or asserted facts sufficient to trace those shares to any registration statement or prospectus identified in the complaint. Therefore Plaintiffs lack standing.  15 U.S.C. § 77k(a) ("Section 11 suit may be brought by "any person acquiring such security" to "recover . . . damages") and § 77l(a)(defendants are liable under Section 12 to "the person purchasing such security . . . to recover the consideration paid for such security . . . or for damages").

Last, Defendants charge that Plaintiffs have not alleged 1933 Act damages, which under Sections 11 and 12 are calculated based on the "purchase price" paid by each plaintiff for the security.  *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873 (5th Cir. 2002)(Section 11 damages are restricted to "the price at which the security was offered to the public"); *Randall v. Loftsgaarden*, 478 U.S. 647, 655-56 (1986)(Section 12(2), 15 U.S.C. § 77l, "prescribes the remedy of rescission except where the plaintiff no longer owns the security," in which case "the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by an 'income received' on the security," and thus "the buyer can 'sue for recovery of his purchase price, or for damages not exceeding such price.'").  Because Enron stock options were usually granted at no cost to ordinary Enron employees and

because plaintiffs have not asserted that they received options under an employment contract, there is no "purchase price" on which to base damages. Lomuscio Decl. Exs. 20-22 (Enron Corp. Stock Plans for 1991, 1994, and 1999) at § 4.1 (cited in Complaint at ¶ 230 and 233)(option "awards shall be made for no cash consideration or for such minimal consideration  as may be required under applicable law"). Plaintiffs have not claimed that they individually bargained for their stock options.  Since 1933 Act damages cannot be calculated for the grants of options to Plaintiffs, their Section 11 and 12 claims must be dismissed for lack of legally cognizable damages. *See. e.g., Pierce v. Morris*, Civ. A. Nos. 4:03-CV-026 *et al.*, 2006 WL 2370343, at *4 (N.D. Tex. Aug. 16, 2006).

### Plaintiffs' Response to Defendants' Reply (#178)

Claiming that Defendants' reply has raised two completely new arguments ((1) the grant of an option is not a sale "for value" and (2) having a Chinese Wall policy on paper "forecloses" liability for fraud), Plaintiffs argue that they should have an opportunity to respond and then do so in this document, although they failed to move for leave of court to do so.  In its discretion, the Court will review the unauthorized document.

Plaintiffs assert that while their claims are unique when compared with the *Newby* cases' claims, and that there are other

security class actions based on various wide-ranging schemes and material omissions with similar facts (broker-dealer securities frauds involving the inflation of stock price, creation of misleading, favorable research reports, company-wide policies to cause brokers to increase or maintain demand for a stock among its customers, and failures to disclose known adverse information or risks inherent in a speculative security) to the ones asserted here that have not been dismissed. Ignoring the mandates of the PSLRA and the fact that they have already had several "bites at the apple," Plaintiffs argue that at this point the Court should be construing the Third Amended Complaint's allegations in a light most favorable to them, and not focusing on the sufficiency of the elements of Plaintiffs' § 10(b) fraud claims. *See, e.g., Varljen v. H.J. Myers, Inc.*, No. 97 Civ 6742, 1998 WL 395266, *2 (S.D.N.Y. July 14, 1998). The Court disagrees.

Plaintiffs point out that although UBS argued in its motion to dismiss that the SEC staff's "no sale" doctrine applied to the grant of options under Enron's stock option plans, inconsistently in its Response (pp. 61-79) UBS asserts that this earlier argument is wrong. Now UBS abandons its "no sale doctrine" claim for a new claim that the grant of options to Enron employees was not a "sale for value."

The Court finds this argument meritless.  Defendants have not abandoned application of the "no sale" doctrine, but rely on both points, both relevant under the law, and neither of which cancels out the other.

Regarding UBS's defense that it should be protected from liability because it has a Chinese Wall policy for preventing conflicts of interest, Plaintiffs respond that Chinese Walls are only one of a number of required mechanisms to isolate the trading side of the firm from the banking side in order to raise such a defense and that a firm must not only have such a policy, but must *implement* it.  Plaintiffs cites as a "glaring example" of UBS's failure to observe its Chinese Wall procedures the equity forward securities contracts.  Because these paragraphs without explanation vaguely refer to "UBS" without recognizing any distinction between the bank entity from broker PW, they do not address the Chinese Wall.  Thus Plaintiffs' point is overruled.  Complaint, #122 at ¶¶ 163-65, 176-77.

### Court's Decision

This Court finds that Defendants correctly state the law and apply it to the numerous and detailed allegations in the Third Amended Complaint and in response to Plaintiffs' briefs.  The Court discusses below a few key reasons why Defendants' motion to dismiss

should be granted in all respects, but refers the parties to Defendants' submissions for additional reasons why Plaintiffs fail to state a claim under the Securities statutes against PW and Warburg.

## I.  UBS As A Single Entity

"Delaware public policy does not lightly disregard the separate legal existence of corporations." *BASF Corp. v. POSM II Properties Partnership, L.P.*, C.S. No. 3608-VCS, 2009 WL 522721 *8 n.50 (Del. Ch. March 3, 2009).  "A Delaware Court will not lightly disregard a corporation's jural identity.  Absent sufficient cause the separate legal existence of a corporation will not be disturbed." *Gasden v. Home Pres. Co.*, No. Civ. A. 18888, 2004 WL 485468, at *4 (Del. Ch. Feb. 20, 2004), *citing Harco Nat. Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, *4 (Del. Ch. Sept. 1989)("[P]ersuading a Delaware Court to disregard the corporate entity is a difficult task.  The legal entity of a corporation will not be disturbed until sufficient reason appears.").  To demonstrate "alter ego" or "instrumentality" liability in order to attribute the actions of one corporation to another, requires "a showing of total domination or control of a showing that the corporations are so closely intertwined that they do not merit treatment as separate entities." *See, e.g., Vichi v. Koninklijke Phillips Electronics,*

*N.V.*, 63 A.3d 26, 48-49 (Del. Ch. 2012)(rejecting claim that corporate formalities attendant to the "far-flung Philips family of companies" should be disregarded, not withstanding Vichi's argument that "Philips acted and operated through a network of subsidiaries and employed a corporate philosophy or slogan of 'One Philips . . . with the aim of creating a 'company of acting parts acting as one.'"). Observing that "'Delaware courts take the corporate form and corporate formalities very seriously . . . [and] will disregard the corporate form only in the 'exceptional case,'" the *Vichi* court found that "[w]hile the 'One Phillips' concept may reflect a marketing program or corporate philosophy that Philips touted at part of an effort to create a unified company, Vichi has not presented evidence sufficient to support a reasonable inference that it was meant to eradicate the corporate structure of Phillips N.V. and its subsidiaries." 62 A.3d at 49. *In accord, eCommerce Industries, Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, *27-28 (Del. Ch. Sept. 30, 2013), order entered, 2013 WL 5785961 (Del. Ch. Oct. 25, 2013).

Although the Delaware courts usually resolve these issues of disregarding corporate structure in the Court of Chancery based on facts presented, since this case is for securities fraud under the 1933 and 1934 Acts and the PSLRA and Rule 9(b), this Court finds

that at least the pleading of some facts sufficient to make a plausible claim that the UBS entities operated as a single entity in defrauding them is necessary but not satisfied here. It finds that Plaintiffs have failed to plead facts sufficient to support their single, fully integrated entity theory of the three UBS entities or of just the two named UBS Defendants to satisfy requirements under Delaware law demonstrating that the UBS entities' corporate structures should be disregarded. Plaintiffs "must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such." *Pearson v. Component Technology Corp.*, 247 F.3d 471, (3d Cir. 2001)(*citing Akzona, Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 237 (D. Del. 1984)(a subsidiary is an alter ego or instrumentality of the parent when "the separate corporate identities . . . are a fiction and . . . the subsidiary is, in fact, being operated as a department of the parent.")), *cert. denied*, 534 U.S. 950 (2001). *See also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989)("A subsidiary corporation may be deemed the alter ego of its corporate parent where there is a lack of attention to corporate formalities, such as where the assets of two entities are commingled, and their operations intertwined" or "where a corporate parent exercises

complete domination and control over its subsidiary.").

Plaintiffs have not pleaded facts supporting any of the seven factors in the "single entity test" of the Third Circuit, which includes Delaware, to justify piercing the corporate veil: (1) gross undercapitalization of a defendant corporation for the purposes of the corporate undertaking; (2) a failure to observe corporate formalities; (3) the non-payment of dividends; (4) the insolvency of the debtor corporation at the time; (5) the siphoning of the corporation's funds by the dominant stockholder; (6) the nonfunctioning of other officers or directors; (7) the absence of corporate records; and (8) the fact that the corporation is merely a facade for the operations of the dominant stockholder(s). *Blair*, 720 F. Supp. 2d at 470-71, *citing Pisani*, 646 F.2d at 88. "While no single factor justifies a decision to disregard the corporate entity," some combination of these factors is required and "an overall element of injustice or unfairness must always be present as well." Delaware law allows a court to "pierce the corporate veil" of a company where plaintiffs show "(1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness is present." *Fletcher v. Atex, Inc*., 68 F.3d 1451, 1457 (2d Cir. 1995)(applying Delaware law). Plaintiffs have failed to plead facts to support the first

element of "exclusive domination and control . . . to the point that [the subsidiary] no longer has legal or independent significance of its own," such as that the corporation was not adequately capitalized, that corporation was insolvent, that dividends were not paid nor corporate records kept, that officers and directors did not function properly, and the absence of other corporate formalities, that the dominant shareholder siphoned corporate funds, and generally that the corporation simply functioned as a facade for the dominant shareholder. *Id.*; *Foxmeyer Corp.*, 290 B.R. at 235-36. Nor have they pleaded facts that would demonstrate the second element, fraud or injustice in the Defendants' use of the corporate form, outside of the underlying cause of action. *Id., citing In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003); *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990). "'To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping.'" *Foxmeyer Corp.*, 290 B.R. at 235. To pierce the corporate veil, the corporate structure must cause the fraud, the fraud or injustice must be found in the defendants' use of the corporate form; the corporation must be a fraud or a sham existing only for the purpose of serving as a vehicle for fraud. *Foxmeyer*, 290 B.R. at 236(cases not cited).

Furthermore it appears that the purpose behind Plaintiffs' single-entity theory is to evade a federal policy and expand liability under the 1934 Act from just Warburg to PW even though the alleged activities of the two entities are not overlapping or redundant (one an investment bank providing credit or loans to Enron, the other a broker for participants in Enron's stock option plans).

In sum, Plaintiffs have failed to plead sufficient facts to plead a plausible claim that Warburg and PW functioned as a single entity to allow the Court to pierce their corporate veils. Moreover, they have failed to plead facts distinguishing the actions of the two corporations, as required under *Southland* to state claims of securities fraud, a failure which infects a substantial portion of the Third Amended Complaint. *Southland*, 365 F.3d at 366 (Where the defendant is a corporation, the plaintiff must plead specific facts giving rise to a strong inference that a particular defendant's employee acted with scienter as to each alleged omission; "[a] defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows the statement is false, or at least deliberately reckless as to its falsity, at the time he or she makes the statement."). "'The

knowledge necessary to form the requisite fraudulent intent must be possessed by at least one agent [of the corporation] and cannot be inferred and imputed to a corporation based on disconnected facts known by different agents.'"  *Id.* at 367, *quoting Gutter*, 124 F. Supp. 2d at 1311.  Plaintiffs fail to allege facts showing that any employee at Warburger disclosed any information about Enron that it gained from working on the five financial transactions at issue to any employee of PW.  Nor do Plaintiffs allege facts demonstrating that the Chinese Wall between the Warburger the banker and PW the broker was breached.

## II.  Both The 1933 and 1934 Acts

## A.  Purchasers or Sellers, But Not Holders

Plaintiffs sue both Defendants under Section 10b and Rule 10b-5, which require that an impermissible misstatement or omission of material fact be made with scienter, on which Plaintiffs relied, and which proximately caused them injury "in connection with the purchase or sale of securities."  They sue PW under section 11, 15 U.S.C. § 77k(a), as purchasers of securities whose registrations contain false or misleading statements of material fact and under section 12(2), 15 U.S.C. 77l(a)(2), of the 1933 Act for offering and selling securities on the basis of misleading information in part in order to serve its own financial interests or those of Enron.

By their terms, both statutes are restricted to "purchasers" or "sellers" of securities. *Blue Chip Stamps*, 421 U.S. at 735-36.

"In a 'holder' claim, the plaintiff alleges not that the defendant wrongfully induced the plaintiff to purchase or sell stock, but that the defendant wrongfully induced the plaintiff to continue holding his stock. As a result, the plaintiff seeks damages for the diminished value of the stock, or the value of a forfeited opportunity, allegedly caused by the defendants misrepresentations [or omissions]." *Grant Thornton, LLP v. Prospect High Income Fund, ML CBO IV (Cayman), Ltd.*, 314 S.W. 3d 913, 926 (Tex. 2010), *citing Newby v. Enron Corp.*, 490 F. Supp. 2d 784, 787 n.4 (S.D. Tex. 2007). In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734-35 (1975), the Supreme Court rejected recognition of holder claims under the federal securities laws because they are speculative and difficult to prove. *Id.*, *citing Blue Chip*, 421 U.S. at 73-35 (Unlike "purchasers or sellers pursuing a § 10(b) cause of action," who "at least seek recovery on a demonstrable number of shares traded[,] [i]n contrast, a putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury such as loss of a noncontractual opportunity to buy or sell, is more likely to be seeking a largely conjectural and speculative recovery in which the number of shares involved will

depend on the plaintiff's subjective hypothesis."). The high court further opined on the dangers of conjecture and speculation in such a claim:

> "The manner in which the defendant's violation caused the plaintiff to fail to act could be a result of the reading of a prospectus, . . . but it could just as easily come as a result of a claimed reading of information contained in the financial page of a local newspaper. Plaintiff's proof would not be that he purchased or sold stock, a fact which would be capable of documentary verification in most situations, but instead that he decided *not* to purchase or sell stock. Plaintiff's entire testimony could be dependent upon uncorroborated oral evidence of many of the crucial elements of his claim, and still be sufficient to go to the jury. The jury would not even have the benefit of weighing the plaintiff's version against the defendant's version, since the elements to which the plaintiff would testify would be in many cases totally unknown and unknowable to the defendant. The very real risk in permitting those in respondent's position to sue under Rule 10b-5 is that the door will be open to recovery of substantial damages on the part of one who offers only his own testimony to prove that he ever consulted a prospectus of the issuer, that he paid any attention to it, or that the representations contained in it damaged him.

*Grant Thornton*, 314 S.W. 3d at 926-27, *quoting Blue Chip*, 421 U.S. at 746. *See also Krim*, 989 F.2d at 1443 & n.7 ("It is well established that mere retention of securities . . . does not form the basis for a § 10(b) or Rule 10b-5 claim."). In holding that

holder claims were not cognizable in federal Rule 10b-5 actions, the Supreme Court stated that while its decision might be seen as "'an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages which have in fact been caused by violations of Rule 10b-5," that drawback "was 'attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law.'" *Grant Thornton,* at 927, *quoting Blue Chip*, at 738, 739 n.9.   Here, however, Plaintiffs have not pleaded their holder claims under state law, but only under federal statutes. Furthermore the Court is completely unpersuaded by Plaintiffs' argument that it should overrule the Supreme Court's ruling in *Blue Chip* for public policy reasons.   Accordingly the Court dismisses the federal holder claims under Rule 12(b)(6).

**B.   "Purchase or Sale" Requirement**

For the 1933 and 1934 Acts to apply to the Enron stock option plans there must be a sale.   As has been discussed, under *Howey*, 328 U.S. at 558, because there is no investment of money in a common enterprise with profits to come solely from the efforts of others, for which the plan participants expect a profit, and under *Daniel*, 439 U.S. at 559-60, and its progeny and SEC Releases Nos. 33-6188, No. 33-6455, and 33-6281, because Enron's stock option plans are noncontributory and compulsory for its employees, as a

matter of law there is no sale.

Moreover PW does not qualify as a statutory "underwriter" under § 12 because PW did not "purchase" the Enron stock from Enron that its investor clients received upon exercising their stock options, nor did those clients "purchase" the stock from PW, Plaintiffs have no claim under § 12(a)(2) of the 1933 Act.  As noted by Defendants, none of the Plaintiffs in the Third Amended Complaint alleges that he or she exercised stock options to obtain Enron stock.

For purposes of section 11(a) of the Securities Act of 1933, because neither PW nor its clients "purchased" the Enron stock obtained by the investor clients, Plaintiffs have no claim under 15 U.S.C. § 77k(a)(5)(Any person who purchases a security, which was subject to a registration statement containing a false statement, may sue "every under writer with respect to such security.").

Therefore neither § 11 or 12 of the 1933 Act applies, and Plaintiffs fail to state a claim under them.

## C. Controlling Person Liability

Because Plaintiffs have failed to state a claim of a primary violation of either the 1933 or 1934 Act, any derivative claims they have asserted for controlling person liability also fail.  *In re BP p.l.c. Litig.*, 843 F. Supp. at 750, *citing ABC*

*Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 348 n.57 (5th Cir. 2002),

**III.  Securities Exchange Act of 1934**

**A.  Scheme Liability:  Primary Violations vs. Aiding and Abetting**

Even if there had been a sale, as noted, the United States Supreme Court has rejected the scheme liability theory under § 10(b).  There is no private right of action under § 10(b) of the Exchange Act for aiding and abetting. *Stoneridge*, 552 U.S. at 155, *citing Central Bank of Denver*, 511 U.S. at 191 (§ 10(b) does not extend to aider and abettors).  A defendant must satisfy the requirements for a primary violation to be liable under § 10(b), i.e., must engage in deceptive conduct involving either a misstatement or a failure to disclose by one with a duty to disclose. *Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 388 (5th Cir. 2007), *cert. denied sub nom. Regents of University of California v. Merrill Lynch, Pierce, Fenner & Smith*, 552 U.S. 1170 (2008).  A device, such as a scheme, is not deceptive within the statute's meaning "unless it involves breach of some duty of candid disclosure owed to investors; otherwise the defendant merely aided and abetted the fraud by Enron. *Id.* at 383.  As discussed, neither Warburg nor PW made a public statement, nor did either have a duty to disclose

material information to Plaintiffs.   Thus their various acts and transactions with Enron constituted mere aiding and abetting of fraud by Enron, which used the transactions to misrepresent its financial condition by fraudulent or off-balance sheet accounting in a primary violation of the 1934 Act.   Although conduct can be deceptive and give rise liability when it has "the requisite relation to the investors' harm," because reliance by a plaintiff on a defendant's deceptive acts is a central element of a § 10(b) private cause of action, Warburg and PW's actions with Enron were not disclosed to the investing public and were too remote to satisfy the element of reliance.   *Stoneridge*, 552 U.S. at 159.

While the Third Amended Complaint alleges that UBS participated with scienter in five transactions with Enron, it was Enron (and its accountants and lawyers), not Warburg or PW, as the only primary violator, that was responsible for using these transactions to "cook its books," creating its allegedly fraudulent financial statements, stock registrations and other documents filed with the SEC, i.e., making misrepresentations of material fact, and thereby manipulating its public financial image to defraud the investing public.

**B.   PW's Broker Dealer Relationship to Plaintiffs and A Duty to Disclose Under the 1934 Act**

Even if Plaintiffs had established a sale, no named Plaintiff alleges that he had a discretionary account with PW and therefore PW's duty its client investors was restricted to executing the investor's order. *Romano*, 834 F.2d at 530; *Martinez Tapia*, 149 F.3d at 412. Plaintiffs have not alleged that PW failed to execute their orders as directed. Thus there is no basis for their § 10(b) and Rule 10b-5 claims against PW.

Moreover, as pointed out by Defendants, there are no factual allegations showing a direct relationship of Plaintiffs to Warburg or UBS AG, which were not parties to the contract between Enron and PW to administer Enron's stock option plans and which did not serve as brokers for PW's retail investor clients, nor in any fiduciary capacity of trust and confidence which would require Warburg and/or UBS AG to disclose any nonpublic information it may have discovered regarding any fraud by Enron.

Furthermore, as delineated in great detail by Defendants, PW and Warburg were barred by federally required Chinese Walls from sharing any information acquired by Warburg in its capacity as an investment bank from its dealings with Enron on the five fraudulent transactions at issue. Plaintiffs have failed to allege with the required specificity any exchange of material information between the entities in violation of the Chinese Wall policy.

## C.  Heightened Pleading Standards

Plaintiffs fail to satisfy the PSLRA's heightened pleading standards by specifying exactly what nonpublic, material information the UBS entities knew about Enron, who discovered it, when, how, and under what circumstances and why it was fraudulent.

## D.  Scienter

Even if there had been a "sale," Plaintiffs fail to allege facts establishing that Defendant corporations had acted with scienter.  As discussed previously, the PSLRA mandates that "untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'"  *Southland*, 365 F.3d at 364.  The PSLRA's use of "the defendant" is reasonably construed to mean "'each defendant' in multiple defendant cases.'" *Id.* at 365.  Where the defendant is a corporation (as Warburg and PW are), the plaintiff must plead specific facts giving rise to a strong inference that a particular defendant's employee acted with scienter as to each alleged omission; "[a] defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows the statement is false, or at least

deliberately reckless as to its falsity, at the time he or she makes the statement." *Southland*, 365 F.3d at 366.   "'The knowledge necessary to form the requisite fraudulent intent must be possessed by at least one agent [of the corporation] and cannot be inferred and imputed to a corporation based on disconnected facts known by different agents.'"  *Id.* at 367, *quoting Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1311 (S.D. Fla. 2000); also citing *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988)("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual."), *aff'd*, 869 F.2d 175 (2d Cir. 1989). Plaintiffs have failed to plead scienter adequately for each Defendant.

**E.  Loss Causation**

As stated by Defendants, Plaintiffs fail to allege loss causation against either Defendant. *Dura Pharmaceuticals*, 544 U.S. at 342.  Their allegations of fraudulent brokerage practices at PW are not related to Enron's fraudulent financial statements and accounting.   Furthermore, those brokerage practices were not disclosed until after Enron's stock became worthless.   Nor do Plaintiffs allege that there was a public disclosure of the conflicts of interest between PW's role as administrator of Enron's stock option program and its own brokerage business before enron

filed for bankruptcy.

Leaving aside Plaintiffs' failure to specify the material, nonpublic information that any particular Warburg employee gleaned from Enron during the various transactions, Plaintiffs have not alleged any specific material misrepresentation or omission by Warburg that caused Enron's stock to plummet.  Nor have Plaintiffs alleged facts plausibly showing that Warburg's five transactions and allegedly disguised loans were inherently fraudulent and caused Enron to file for bankruptcy.  As noted, these transactions were merely acts adding and abetting Enron in its subsequent fraudulent accounting of its finances.

### Court's Order

For the reasons stated above, the Court

ORDERS that

(1) Plaintiffs' opposed motion for amended scheduling order and for additional briefing is DENIED, and its motion for a ruling is MOOT (#223);

(2) Plaintiffs' "holder" claims under federal law are DISMISSED under Rule 12(b)(6) for failure to state a claim for which relief may be granted;

(3) Defendants' motion to dismiss (#125) is GRANTED;

(4) Since Plaintiffs have already submitted three amended complaints

and thus had multiple "bites of the apple," and given the age of this litigation, Plaintiffs' motion for leave to amend (#165) is DENIED;  and

(5) Plaintiffs' motion to certify class (#166) is DENIED as MOOT.

A final judgment shall issue by separate instrument.

SIGNED at Houston, Texas, this __28th__ day of __February__, 2017.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE